John L. Smaha, Esq., Bar No. 95855
Gustavo E. Bravo, Esq. Bar No. 218752
**SMAHA LAW GROUP**
7860 Mission Center Court, Suite 100
San Diego, California 92108
Telephone:   (619) 688-1557
Facsimile:   (619) 688-1558

Attorneys for Debtor, Sargent Ranch, LLC

# UNITED STATES BANKRUPTCY COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>SARGENT RANCH, LLC,<br><br>                          Debtor. | CASE NO. 10-00046-PB11<br><br>Chapter 11<br><br>MOTION OF DEBTOR-IN-POSSESSION TO OBTAIN DEBTOR-IN-POSSESSION FINANCING UNDER 11 U.S.C. § 364<br><br>Date:    November 22, 2010<br>Time:    10:30 a.m.<br>Dept.:    4<br>Judge:    Hon. Peter W. Bowie |

Sargent Ranch, LLC, the above-named Chapter 11 debtor and debtor-in-possession ("Debtor") hereby files its Memorandum of Law in support of the motion for entry of an order authorizing the Debtors to borrow $7,500,000 on a senior secured lien prior to confirmation, junior secured lien, and superpriority administrative claim basis from Equity Investment Properties, Inc. ("EIPI") to enable the Debtors to commence operations of their business during the pendency of this bankruptcy case. The Debtor-In-Possession financing from EIPI will increase to a maximum of $20,000,000 upon confirmation of an acceptable plan.

///

///

///

## STATEMENT OF RELEVANT FACTS

**A.    Background Information**

Sargent Ranch, LLC was created in, or about, May of 2000. The purpose for Debtor's creation was to take title to various real properties located in the County of Santa Clara, State of California and further described as Assessor Parcel Numbers: 841-36-010, 810-38-002, 810-38-009, 810-38-014, 810-38-015, 810-38-016, 810-38-017, 810-37-006, 810-37-007, 810-37-008, along with any and all lot line adjustments thereof (the "Debtor's Properties"). The Debtor's Properties were obtained through the efforts of Wayne F. Pierce, who had obtained an option to purchase the Debtor's Properties from certain third parties including Fivestar Commerce, Inc. and WFP Financial, Inc. (See Declaration of Wayne F. Pierce, ¶ 2).

Debtor obtained financing from First Blackhawk Financial Corporation ("Blackhawk") a full service mortgage company that gathered a number of "investors" in order to fund the loans made to Sargent. By recording of three separate notes and deeds of trust, Blackhawk loaned a total of $43,000,000 to Sargent. The loans were funded in four separate installments in the following general order:

|   | | |
|---|---|---|
| 1. | First Deed of Trust (June, 2000) | $15,000,000.00 |
| 2. | Second Deed of Trust (Nov. 2000) | $15,000,000.00[1] |
| 3. | First Deed of Trust Modification (Nov., 2000) | $10,000,000.00 |
| 4. | Third Deed of Trust (Oct. 2003) | $ 3,000,000.00 |

In fact, in addition to the $43,000,000 in original loans, Blackhawk arranged additional protective advances which raised the total loans to as much as $47,846,532.00 based on copies of bank statements previously held, controlled and managed by Blackhawk. These protective advances were used for project expenses and costs as per the direction of Blackhawk, without the direction of the Debtor or authority of the Debtor. (See Declaration of Wayne F. Pierce, ¶ 3).

---

[1] In fact, this distribution to Sargent occurred over time, with Blackhawk first issuing the note and then selling portions of the note to its "investors" over a brief period of time.

1      The Debtor's Properties were initially obtained by Sargent with the goal of developing

2  residential homes and ranches for sale with a golf course and several other commercial

3  opportunities. However, as the market for residential construction and certain limitations to

4  construction in Santa Clara became evident to Sargent, Sargent sought to expand the scope

5  of potential projects on the Debtor's Properties and began efforts to expand the use of the

6  Debtor's Properties for other purposes. Among these opportunities, was Sargent's efforts

7  to have a tribe of native Americans obtain federal recognition of its tribe and to have a

8  portion of, if not all, of the Debtor's Properties identified as federal property. Other

9  opportunities were later identified, such as the potential to develop a sand quarry on a portion

10  of the Debtor's Properties and the idea of developing a riparian credit bank for the sale of

11  environmental credits to private and government entities. Sargent spent significant amounts

12  of money to develop these opportunities and established potential projects that have

13  exponentially multiplied the potential value, if not the actual value, of the Debtor's Properties

14  from a purchase price of approximately $16,000,000 to as much as $700,000,000. (See

15  Declaration of Wayne F. Pierce, ¶ 4).

16      Although misleading allegations have been made by certain creditors, Sargent never

17  controlled the funds loaned to it by Blackhawk and its "investors". It was Blackhawk's

18  investors that insisted upon having Blackhawk control all loan funds, required that all funds

19  be maintained by Blackhawk in their bank accounts and all releases to Debtor were made

20  subject to the approval of Blackhawk. Debtor did not control the funds and could not direct

21  those funds at its own discretion. Further, all funds paid to any and all parties, including

22  Wayne F. Pierce were approved by Blackhawk. Any indication that Sargent misappropriated

23  funds without Blackhawk's approval is completely unfounded.[2]    Further, certain of

24  Blackhawk's investors have gone so far as to make the ridiculous claim that the Debtor

25  squandered the $47,846,532.00 that Blackhawk "lent" to Sargent. Sargent has reviewed bank

26

27      [2] It is important to note that Sargent had a contractual relationship with Blackhawk

28  and had no relationship with Blackhawk's individual "investors" other than those contracts
with Blackhawk.

1  records for Blackhawk's various "Sargent Ranch" bank accounts. This review has revealed
2  that Blackhawk paid both pre-paid and other interest payments to these same "investors" in
3  the amount of $14,678,076.14. Blackhawk itself received fees on these loans in the amount
4  of $2,375,709.00. These amounts alone indicate that Sargent never even received almost
5  seventeen million of the original forty-three million dollar loan. Further, the acquisition of
6  the Debtor's Properties cost a total of $17,756,132.28, further payments for unpaid property
7  taxes in the amount of $1,682,519.26 all went directly into the Debtor's Properties. After
8  that, Blackhawk also "loaned" as much as $500,000.00 to its insiders, Griffin and Appleton.
9  Finally, Blackhawk made protective advances, at its own direction, not at Debtor's request,
10 to other entities known as Mare Island and Roddy Ranch in order to protect Blackhawk's
11 interests in those projects in the total amount of $837,440.26. In all, Sargent never saw
12 $37,829,876.94 of the initial loans. With the remaining $10,016,655.06, Debtor worked
13 continuously towards the identification and development of the various raw material assets
14 and potential projects that have left the Debtor's Properties with a potential value of over
15 seven hundred million dollars. (See Declaration of Wayne F. Pierce, ¶ 5).

16 **B.    Events Leading to Bankruptcy**

17        Since the filing of the bankruptcy, Debtor has faced much the same staunch opposition
18 to any of its efforts to reorganize, refinance or in any way make progress towards an effective
19 bankruptcy. Debtor has sought and found avenues by which to develop the sand quarry site,
20 having entered into a tentative agreement for Debtor to obtain the necessary permits to begin
21 extraction of the valuable sand deposits on a portion of Debtor's Properties. This motion was
22 met with objections from Admiral Benson and other investors. Debtor also sought to sell a
23 portion of the Subject Properties to an entity looking to develop a solar facility. This motion
24 was also met with objections from Admiral Benson and other investors. Debtor then filed
25 a motion to determine release prices on various portions of the Debtor's Properties in order
26 to make the systematic and organized liquidation of the Debtor's Properties a possibility
27 moving forward. Not surprisingly, that motion was also met with objections from Admiral
28 Benson and other investors. Finally, Debtor filed a motion to employ the brokerage firm of

1  Cassidy Turley, simply to find potential buyers for a portion, or the entirety, of the Subject

2  Property.   The employment of Cassidy Turley would not have resulted in any payment to

3  Cassidy Turley until such time as a separate motion to approve any sale was filed, however,

4  in line with Admiral Benson's strategy, that motion was also met with objections from

5  Admiral Benson and other investors. (See Declaration of Wayne F. Pierce, ¶ 6).

6      It is clear to the Debtor that the select "investors" opposing every motion will not be

7  satisfied unless they are the direct owners of the Debtor's Properties.  Debtor will need to put

8  its best foot forward to try and get a viable and feasible plan on file.  As such, Debtor sought

9  and obtained an order allowing the Debtor to employ the Watley Group, LLC ("Watley").

10 Among other things, the agreement with Watley calls for Watley to assist the Debtor in the

11 things that are most crucial to a reorganization at this point, obtaining Debtor-In-Possession

12 Financing ("DIP Financing"), developing a strategy for Debtor's reorganization based on

13 such DIP Financing and to assist the Debtor in drafting a feasible Plan.  Debtor could have

14 sought a statement of position from the United States Trustee and attempted to get a court

15 order by ex parte application as allowed by the Local Rules, but Debtor somehow anticipated

16 that Admiral Benson and perhaps other "investors" would seek to stop this motion as well.

17 Not surprisingly, Admiral Benson, through ERG has filed another opposition.  Debtor also

18 received an objection from the United States Trustee raising a number of concerns over the

19 Watley Group's employment. Despite these anticipated objections, the Court was convinced

20 that the Watley Agreement was a valid and necessary step towards reorganization and, with

21 a number of changes to the Agreement, approved the Agreement by an order entered after

22 hearing.  (See Declaration of Wayne F. Pierce, ¶ 7).

23 C.    **Valuation of Assets In the Event of A Forced Liquidation**

24     As of the filing of the bankruptcy, the Debtor had successfully identified and

25 developed a number of potential projects to be accomplished and needed additional funding

26 from one source or another to convert these viable and promising opportunities into a reality

27 for the benefit of itself and its creditors.   The Debtor strongly believes that the in ground

28 assets in the Debtor's Properties has a substantial value and that said value can be realized

1  with a limited investment, one that has finally been obtained and is pending approval through

2  this motion.   At the inception of this case, the Debtor would argue that the Debtor's

3  Properties were worth much more than the substantial claims of the secured creditors. (See

4  Declaration of Wayne F. Pierce, ¶ 8).

5        A number of the secured creditors, however, have argued that the Debtor's business

6  opportunities are simply too conjectural in nature to generate an actual fair market value at

7  this time.   These select secured creditors, chief among them being Energy Research &

8  Generation, Inc. ("ERG") and Admiral (Ret.) Benson, claim that the Debtor's Properties,

9  without the benefit of developed businesses upon them, are worth less than $20,000,000.00.

10  Debtor contacted John Barsochini, a real estate agent with Cassidy Turley BT Commercial.

11  Mr. Barsochini is in agreement that, if the Debtor did not have an opportunity to market

12  and/or develop the various business opportunities on the Debtor's Properties, the bare land

13  which currently makes up the Debtor's Properties would likely sell for only $25,000,000 in

14  a forced liquidation in a stressed condition and a relatively down market. (See Declaration

15  of Wayne F. Pierce, ¶ 9).

16        For purposes of this motion, and assuming that a forced liquidation would involve the

17  marketing and sale of the undeveloped, bare lands that the Debtor's Properties are at this time

18  without a mention of the vast natural resources and business opportunities involved with the

19  Debtor's Properties, the Debtor is willing to adopt the generalized $25,000,000.00 value for

20  the Debtor's Properties, based upon a valuation of $5,000.00 per eligible acre.

21  **D.**   **Milestones Reached Since Petition Date**

22        The Debtor filed this matter on January 4, 2010.   During the first several months of

23  this case, the Debtor used of all of its available assets and very limited liquid assets to move

24  the case forward. As expressed above, the Debtor ran into constant objections to his various

25  efforts to develop the Debtor's Properties.   Whether it was an attempt to employ Freeman

26  Associates to obtain the necessary permits to develop the sand quarry, a motion to sell a

27  portion of land for the development of a solar facility or an attempt to employ Cassidy Turley

28  to list various assets of the Debtor for sale, the Debtor was opposed at every turn and

1  Debtor's lack fo liquidity prevented it from moving forward with any of these potential
2  avenues. It was not until recently that the Debtor took the significant and course altering step
3  of obtaining permission from the court to employ the Watley Group as a method of obtaining
4  Debtor-In-Possession financing and obtaining the necessary assistance and knowledge to get
5  a plan of reorganization on file. (See Declaration of Wayne F. Pierce, ¶ 10).

6        Shortly after its retention the Watley Group began to develop a four-phase Business
7  Plan with key elements and objectives as shown below.

8      Phase 1:        Stabilization and Planning (Starting in July 2010 and continuing for a 4- 6
9                          week period.)

10      1.        Secure services of key Management personnel and other critical Company
11              resources.

12      2.        Engage (or re-engage) top engineering, land use/entitlement and environmental firms
13              to further assess and validate approaches to maximizing individual business
14              opportunities.

15      3.        Develop and specify action plans and time tables to achieve objectives, such as
16              determining which Mitigation Credits to "finish" (and at what time frame) and which
17              to sell immediately. Plan the implementation of the liquid asphalt extraction business.
18              (See Declaration of Gary Post, ¶ 2).

19  Phase 1 Milestones Achieved

20      1.        Skip Spiering (Project Director) was retained by Debtor.  Mr. Spiering is critical to the
21              project since he has the most knowledge on the team of various details of the project and
22              its advanced entitlement processes. Further, he has been and now continues to be the
23              main contact person to several critical outside consultants including those involved in
24              permitting and starting the sand quarry operations and  selling mitigation rights.

25  ///
26  ///
27  ///
28

2.     Mike Baldridge (CPA) was retained by Debtor. Mr. Baldridge is critical to the project and its emergence from bankruptcy since he has the most knowledge of the financing history of the project and actions of certain parties throughout this process.

3.     The Debtor has been successful in receiving updated assessments and proposals from key consultants, particularly related to the sand quarry and sale of mitigation rights. These consultants will be formerly retained pending court approval of the DIP financing and these consulting agreements. (See Declarations of Verne Freeman of Freeman Associates and Rick Hopkins of Live Oak Associates.)

4.     The Debtor has worked with a third party specialty energy company and received an assessment from this third party that the asphalt materials on the Property are suitable as a base for the manufacture of a variety of asphalt related products. (See Declaration of Stan Ellis of Ellis Energy Investments). The Company is in continuing discussions with Ellis Energy regarding the further evaluation of this business opportunity, its size, and its profit economics.

5.     The Debtor received a written updated assessment of its value in a liquidation scenario and in a longer term development perspective. (See Declaration of John Barsocchini of Cassidy Turley).   (See Declaration of Gary Post, ¶ 3, and exhibit A, B and C thereto, true and correct copies of the declarations of Verne Freeman, Rick Hopkins and John Barsochini).

Phase 2:     Implementation of the Engineering and Permitting Phase of the Sand Quarry and Research and Development of the Mitigation Credits opportunity (Phase 2 starts immediately after funding of the DIP financing).

1.     Commence permitting process for sand extraction and set plans to open quarry facility in approximately 24 to 30 months from the DIP facility funding.

2.     Commence process to finish certain Mitigation Credits.

3.     Research the Mitigation Credits and conclude negotiate transaction structure. Research the Debtor's internal mitigation needs to gain approval of the Sand Quarry.

4.      Further evaluate and potentially commence extraction of asphalt. (However, since the size and scope of this operation is unknown at present, we have conservatively not included any revenue from this business Resource in the projections)

5.      Additional activities will be added as they emerge from the Phase 1 process over time. (See Declaration of Gary Post, ¶ 4).

Phase 2 Milestones Achieved

The Company has agreed to engage Live Oak Associates to help structure and design a mitigation bank. (See Declaration of Gary Post, ¶ 5).

Phase 3:      Forensic and Litigation (Commenced immediately upon Watley's retention.)

1.      Investigate the actions of certain individuals and entities have caused significant damage to the company pre-petition and aggressively pursue litigation against these individuals and entities to recover assets. (See Declaration of Gary Post, ¶ 6).

Phase 3 Milestones Achieved

The Debtor completed a comprehensive investigation of the details surrounding the various financings completed in the past by the Debtor, particularly as related to certain actions detrimental to the Debtor by First Blackhawk Financial, certain of its principals and certain investors introduced by First Blackhawk.

The Debtor has now assembled a large body of evidence proving substantial wrong doing and certain illegal acts by First Blackhawk, its principals and certain As a result of these investigations, the Company filed a lawsuit against First Blackhawk, its principals and most of the investors in the financings. (See Declaration of Gary Post, ¶ 7).

Phase 4:      Plan of Reorganization: (Commenced immediately after retention and continuing through the entire bankruptcy process.) (See Declaration of Gary Post, ¶ 8).

///
///
///
///

Phase 4 Milestones

The Debtor has completed a detailed and well supported Plan of Reorganization and has filed this Plan with the Court. The Debtor has also obtained financing for this Plan pending approval of the Court by this motion. (See Declaration of Gary Post, ¶ 9).

In summary, the Company has reached essentially all of the milestones required to implement its Business Plan designed to bring substantially more value to creditors than a liquidation process. It is prepared to execute its value creation activities immediately upon Court approval of the financing and other necessary items to proceed. (See Declaration of Gary Post, ¶ 10).

E.    **Use of Proposed DIP Funding**

The Debtor intends to use the $7,500,000.00 to fund its operations until a Plan of Reorganization can be confirmed. These funds will be used to fund the business plan which includes the following: payments to the Liquidation Trust under the Plan of Reorganization, permitting and preparation of the sand quarry, preparation and sale of habitat credits, studies and assessments of the Debtor's other business opportunities (i.e. water rights, liquid asphalt, solar power generation, wind power generation, and real estate development), accrued bankruptcy costs, SG&A expenses, and financing costs. (See Declaration of Chris Olin, ¶ 2). The main categories of expenses are listed below:

1.    **Management of the Estate**

Debtor shall use $180,000 per month for the aggregate of Bankruptcy Counsel, Special Litigation Counsel, forensic analysis of historical contracts and agreements, Investment Banking services, CEO services, and Financial Advisory services, plus $2,500/month for miscellaneous bankruptcy expenses. The Debtor has engaged a number of experts and consultants, including Smaha Law Group, The Watley Group, and Affeld & Grivakis (special litigation counsel) to maximize the value of the estate in bankruptcy. Finally, numerous expenses, such as court fees and regulatory filings with the California Secretary of State, are expected to be incurred during bankruptcy. Additionally, an estimated $20,200 is required to pay US Trustee fees. Debtor's objective is to move as quickly as possible to minimize the costs of the Chapter 11 and confirm a

1   plan of reorganization as soon as possible.  The funds described above would be earmarked for

2   these payments but would in no way be distributed until the Debtor seeks approval of the above

3   described fees and administrative expenses from the court and until an order from the Court

4   approves such fees and expenses. (See Declaration of Chris Olin, ¶ 3).

5         **2.**      **Corporate Management**

6       Debtor shall use $50,800/month for the management of the Debtor, including Wayne

7   Pierce, Mike Baldridge, and Skip Spiering. Debtor's management team has expended many hours

8   in diligent efforts during the bankruptcy process to maximize the value of the Estate and fulfill their

9   fiduciary obligations to all of the Debtor's stakeholders. Their services are essential for shepherding

10   the Debtor through bankruptcy and overseeing the various business operations that the Debtor is

11   evaluating and plans to pursue, and replacement of any of these individuals could only be possible

12   at a very high cost to the estate. (See Declaration of Chris Olin, ¶ 4)

13       The $58,000 a month will include approximately $2,000 a month for an office and office

14   supplies in Gilroy, CA.  It also includes $2,500 a month for corporate travel, and $3,000 a month

15   for administrative personnel. The Debtor will soon require a small office near the Debtor's

16   Properties for certain of its employees to operate out of and funds for any necessary travel.

17   Additionally, an administrative assistant is required to staff the Debtor's office, answer phones, and

18   perform other routine office tasks.  Also included within the $58,000 are $5,000 a month for public

19   relations. The Debtor is in the business of developing various Resources at the Property. This type

20   of business requires good relationships with the surrounding communities and other constituencies.

21   Thus, a well-planned and active public relations program managed by a well qualified outside firm

22   is essential   Again, to the extent that the Debtor employs professionals on an ongoing basis, these

23   professionals will be subject to the approval of the court and any payments to them must be made

24   only after a court order authorizing these payments has been entered.  Finally, Debtor will use

25   $3,000 a month to cover payroll taxes and $5,000 a month for health insurance for the Debtor's

26   employees. (See Declaration of Chris Olin, ¶ 5)

27   ///

28   ///

1        **3.    Quarry Use Permit and Infrastructure**

2        The Debtor shall use $3,900,000 to $4,100,000 over a 24 to 30 month period starting

3    immediately to secure a use permit and construct the necessary infrastructure to extract

4    construction-grade sand from the Debtor's Properties. Key expenses for this activity include: A total

5    of $300,000 to conduct soil engineering, biological, traffic, and civil engineering studies in support

6    of the Use Permit. Developing an environmental impact report and a reclamation plan is estimated

7    to cost $850,000. Fees payable to the county are estimated to be $100,000. The Debtor will also

8    engage Freeman Associates, an engineering/project manager specialized in this industry, and a

9    public relations firm to facilitate and manage the permitting and start-up processes at an average

10   cost of $36,700 per month. An estimated $500,000 to $750,000 will also be required to construct

11   roads and supply water and power to the quarry and an estimated $437,500 will need to be posted

12   for a reclamation bond. Finally, a reserve of $14,600 per month has also been budgeted to account

13   for any unforeseen expenses for this specific endeavor.  (See Declaration of Chris Olin, ¶ 6)

14       **4.    Habitat Mitigation Credit Development**

15       Debtor would also use $11,250 a month to engage Live Oak Associates to develop and/or

16   facilitate the sale of the Debtor's habitat mitigation credits. Live Oak's expertise is required to

17   maintain and develop the Property's habitat mitigation credits. Additionally, the market for

18   mitigation credits is inefficient and opaque, making Live Oak's contacts and experience necessary

19   to sell the Debtor's credits for the highest prices possible and in a timely manner. (See Declaration

20   of Chris Olin, ¶ 7)

21       **5.    Resource Studies**

22       Debtor will also use $16,700/month for other Resource studies. The Debtor must engage

23   various consultants to conduct studies, perform appraisals, and gather information on the Debtor's

24   Properties many resources. These resources include water rights, liquid asphalt, acreage suitable for

25   solar or wind power generation, acreage suitable for commercial or industrial development, and

26   potentially various mineral deposits. Debtor anticipates using $100,000 to engage a firm to appraise

27   the value of the Debtor's water rights, $270,000 to engage Ellis Energy to conduct investigations

28

---

1  into the feasibility of exploiting the Debtor's liquid asphalt, solar, and wind resources, and permit

2  such an operation. (See Declaration of Chris Olin, ¶ 8)

3       **6.**    **Property Taxes**

4       The Debtor shall use $750,000 for Santa Clara and Santa Cruz County Property Taxes on

5  or before the confirmation of a Plan of Reorganization. The Debtor is overdue on its property tax

6  payments. These payments must be made to avoid costly penalties and to prevent the counties from

7  possibly auctioning off the Debtor's Properties.  (See Declaration of Chris Olin, ¶ 9).

8       **7.**    **Financing Costs – DIP Financing**

9       Up to $1,500,000 for Financing Costs. The Debtor estimates that it will require less than

10  $1,500,000 through the term of the DIP loan for financing costs, including fees and interest related

11  to the borrowing required to fund the above expenditures. (See Declaration of Chris Olin, ¶ 10)

12       **8.**    **Contingency**

13       The Debtor would also set aside a 5% contingency added to the budget for possible

14  underestimates of costs and unforeseen expenses. (See Declaration of Chris Olin, ¶ 11)

15  **F.**    **DIP Financing's Benefit to the Debtor's Estate**

16       The Debtor and the Debtor's estate will benefit greatly through obtaining and utilizing the

17  financing proceeds. The value of the estate will increase from the forced liquidation value of

18  $25,000,000 today to between $80,000,000 and $116,000,000. This is an increase in value of

19  between $25,000,000 to $91,000,000. This value derives from summing of the value created

20  by the quarry with the forced liquidation value.  Once permitted and operational, the Debtor's

21  Sand Quarry will be worth between $55,000,000 and $91,000,000. While we believe there is

22  significant value in the habitat mitigation credits, we cannot value these credits at this time

23  because the debtor may need these credits to mitigate its sand quarry and other developments.

24  Surveys completed from March 1 through November 21, 2009 by Live Oak concluded that

25  there are a minimum of 800 Riparian Habitat Credits on the property with significant value. In

26  addition to the Riparian credits, the Property can also generate Habitat Mitigation Credits for

27  various threatened species, including the California Tiger Salamander, Red-legged Frog, and

28  certain plant species. Live Oak estimates that the Property could support at least 1,000

Salamander and Frog Habitat credits combined. Again, these credits could be very valuable mitigation for the sand quarry and other developments. The Debtor's other business opportunities have not yet been explored sufficiently to determine their value. However, resource studies and investigations funded by the financing proceeds will likely lead to business opportunities that will significantly enhance the value of the Estate. (See Declaration of Chris Olin, ¶ 12)

A Net Present Value analysis was performed to calculate the value of the Sand Quarry. The analysis is based on studies conducted by Freeman in 2009 that produced a set of 10-year financial projections, which were extended in this analysis. This analysis rests on the following key operational assumptions:

1.  A 33 year production period with a total of 60,000,000 tons extracted: equivalent to a conservative average annual production of 1.82 million tons

2.  In the thirteenth year of production, $2,400,000 is budgeted to acquire an "add-on" use permit for the remaining 35,000,000 tons of sand.

3.  Pricing of construction grade sand increases at an inflationary rate of 3% per year

4.  Operational costs increase at 3% - 5% per year

5.  A tax rate of 39% is applied to the income from the Quarry

6.  The value for this Resource under this scenario is calculated using the average of the projected cash flows discounted by a rate of 20% and a rate of 15%

7.  No value was given to potential associated resources, such as gold, silica, gravel, etc., that might add substantially to the overall value of this Resource

Using this set of assumptions and the Freeman projections, the Net Present Value of the permitted and operational Sand Quarry is $73,359,938. (See Declaration of Chris Olin, ¶ 13, attached as Exhibit A to the declaration of Mr. Olin is a true and correct copy of the Net Present Value Analysis).

///

///

---

MOTION OF DEBTOR-IN-POSSESSION TO OBTAIN DEBTOR-IN-POSSESSION FINANCING UNDER 11 U.S.C. § 364

G.    **Efforts to Obtain DIP Financing**

Since being retained by the Debtors, Watley has gone out to the marketplace to obtain post-petition DIP and permanent financing for the Debtor. Mr. Bryan, other Watley employees, and placement agents engaged by Watley have contacted and/or spoken with representatives of more than 45 possible investment groups, including institutional lenders, hedge funds, and individuals with financial wherewithal and interest in investments such as Sargent Ranch. (See Declaration of Steven Durbin, ¶ 2). The Debtors were unable to obtain financing on an unsecured basis for many reasons, such as:

1.    The economic climate remains very uncertain and many investment funds stated that they were putting all investments on hold for the immediate future;

2.    Several investors required amortization from cash flow but Sargent Ranch has no current operations or revenue stream (more simply put, these investors were unwilling to be secured solely by real estate value);

3.    The deal has been shopped extensively and several investors shared a perception that the situation was complex and contained unknown risks;

4.    The asset value of the property would be significantly impaired if the business was unable to obtain the necessary permits;

5.    A general aversion to real estate investing given the turmoil in the residential and commercial markets;

6.    Many real estate funds are regionally focused and would not explore opportunities in Northern California;

7.    The business has historically had poor public relations;

8.    A few investors expressed concern with the previous management team and the potential for them to continue to be involved in future decisions related to the business. (See Declaration of Steven Durbin, ¶ 3)

///

///

---

1    To date, the only commitment received by the Debtor was from EIPI as set forth

2  below.  The Debtor did receive indications of interest from a handful of other investors,

3  but the terms of such proposals were not competitive with the commitment from EIPI.

4  Negotiations with EIPI were extensive, with numerous drafts of the proposed loan documents

5  exchanged and modified. At the conclusion of such negotiations, the parties agreed to the

6  terms of the DIP Financing.  (See Declaration of Steven Durbin, ¶ 4).

7  **H.**      **Terms of the Proposed DIP Financing**

8    Equity Investment Properties, Inc. ("EIPI") has offered a $7.5 million DIP facility (the

9  "DIP Facility") as set forth in the term sheet and loan documents.  Furthermore, EIPI has

10  advised the Debtor and will confirm to the Court that it has agreed to extend the facility

11  up to $20.0 million upon confirmation of an acceptable plan of reorganization. The terms

12  of this plan of reorganization financing ("POR Financing") are contained in the loan

13  documents.   True and correct copies of the proposed promissory note and security

14  agreement (collectively, the "DIP Loan Documents") are attached to the declaration of

15  Steven Durbin as Exhibits "A" and "B", respectively.   The DIP Loan Documents are

16  substantially complete, but may be revised further by the parties before finalization and

17  signature.  The Debtor shall inform the Court and interested parties of any material changes

18  prior to the hearing of this matter (See Declaration of Steven Durbin, ¶ 5).

19    The material terms of the proposed DIP Financing include:

20    1.     Pursuant to the DIP Loan Documents, EIPI has committed to fund a

21          minimum of $7.5 million. The financing, less fees and costs, will be used to

22          pay operating and other expenses as presented in the business plan.

23    2.     Interest on the outstanding amount will accrue at the rate of 11.75% per

24          annum.

25    3.     EIPI will be entitled to reimbursement of internal and external expenses up to

26          $50,000 related to negotiation and documentation of the DIP Loan Documents.

27

28

4.    75% of any net asset sale prior to the maturity date shall be used to repay the outstanding amount of the DIP Loan. If the debtor is in Default, 100% of such asset sales will be used to repay the DIP Loan.

5.    The loan will be due and payable 24 months after funding

6.    The DIP Financing will be secured by a first priority priming lien on all assets of the Debtors.

7.    EIPI will be entitled to a penalty of $250,000 in the event the bankruptcy court approves the DIP Financing and the Borrower elects to accept other financing in place of EIPI. (See Exhibit B to the Declaration of Mr. Durbin).

EIPI has also committed to funding a plan of reorganization, subject to terms acceptable to EIPI, with the following material terms:

1.    All outstanding loan amounts due to EIPI by the Borrower (the DIP Financing) shall be converted to become part of the POR Financing.

2.    Interest on the outstanding amount the POR Financing will accrue at the rate of 11.75% per annum (unchanged from the DIP Financing)

3.    The term of the POR Financing shall be five years from the confirmation date of the plan of reorganization.

4.    The POR Financing will be secured by a first priority lien on all assets of the Debtor.

5.    The POR Financing will amortize $1.5 million per year beginning in year 2.

6.    EIPI will receive 40% equity ownership in Sargent Ranch. (See Exhibit B to the Declaration of Mr. Durbin)

7.    75% of any net asset sale prior to the maturity date shall be used to repay the outstanding amount of the POR Financing. If the debtor is in Default, 100% of such asset sales will be used to repay the POR Financing.

1

## COMPLIANCE WITH RULE 4001

2

3

| Material Provision | Brief Summary | Document/ Provision |
|---|---|---|
| Borrower | The Debtor | Note and Security Agreement |
| DIP Lender | Equity Investment Properties, Inc. ("EIPI") | Note and Security Agreement |
| Regular Interest Rate | 11.75% per annum | Note |
| Default Interest Rate | An additional two hundred and fifty basis points, with an acceleration option to EIPI | Note |
| Fees and Expenses | Upon issuance by EIPI of the Loans, the Company shall jointly and severally pay to The Watley Group, from financing proceeds, a closing fee in cash, in an amount equal to five and one quarter percent (5.25%) of the loan amount or such other amount allowed by the Bankruptcy Court if less. | Security Agreement Sections 5(b)(i) and 14 |
| Maturity | 24 months for initial loan without plan confirmation and 60 months for full amount after plan confirmation | Note and Security Agreement |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| Liens, Collateral and Priority<br><br>Bankruptcy Rule 4001(c)(i), (vii) and (xi) | (a) The priority of the Liens granted to EIPI on the Collateral of the Company shall be senior and prior to the entire Company's Prepetition Indebtedness and Post Petition Indebtedness.<br>(b) All Obligations shall constitute allowed super priority administrative expense claims of the Company in the Chapter 11 Cases pursuant to Section 364(c)(1) of the Bankruptcy Code (as to the Collateral) having priority over any and all administrative expenses of the kind specified in or incurred pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) or 726 of the Bankruptcy Code ("Super Priority Claims") and shall at all times be senior to the rights of the Company, its estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code, in any case subject only to Permitted Exceptions.<br>(c) EIPI hereby consents to the application by the Company for entry of an administrative procedures order that will allow all professionals to be paid their customary percentage of their reasonable professional fees on a monthly basis, so long as aggregate payments do not exceed the availability for such professionals under the Carve Out, and EIPI reserves all of its rights to object to the reasonableness of such professional fees pursuant to, inter alia, Section 330 of the Bankruptcy Code and does not waive any rights, requirements or procedures with respect to approval of such fees.<br><br>See Section 7 for specific provisions relating to perfection of EIPI's liens. | Security Agreement Sections 6, 7 and 14 |
| Events of Default | See Section 23 of Security Agreement for extensive list of Events of Default | Security Agreement, Section 23 |
| Automatic Stay | Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Loans, EIPI shall be entitled to immediate payment of such Loans and to enforce the remedies provided for hereunder, subject to the Final Order (with respect to the period from and after the date of entry of the Final Order). | Security Agreement, Section 14 |

| Professional and Statutory Carve-Out<br><br>Bankruptcy Rule 4001(c)(x) | EIPI hereby consents to the application by the Company for entry of an administrative procedures order that will allow all professionals to be paid their customary percentage of their reasonable professional fees on a monthly basis, so long as aggregate payments do not exceed the availability for such professionals under the Carve Out, and EIPI reserves all of its rights to object to the reasonableness of such professional fees pursuant to, inter alia, Section 330 of the Bankruptcy Code and does not waive any rights, requirements or procedures with respect to approval of such fees.<br><br>The Debtor waives all rights to seek to surcharge EIPI pursuant to Section 506(c) of the Bankruptcy Code. | Security Agreement, Section 6 |
| Indemnification<br><br>Bankruptcy Rule 4001(c)(ix) | The Company acknowledges and understands that in order to assure repayment of the Obligations hereunder, EIPI may be required to exercise any and all of EIPIs' rights and remedies hereunder and agrees that, except as limited by applicable law, neither EIPI nor any of EIPIs' agents shall be liable for acts taken or omissions made in connection herewith or therewith except for actual bad faith. | Security Agreement, Section 33 |

## ARGUMENT

**A.   The Debtor Should Be Authorized to Obtain D-I-P Financing from EIPI to Preserve, Maintain and Operate Their Business**

Pursuant to Bankruptcy Code § 364(c) and (d), the Debtors request authority to incur $7,500,000 of post-petition financing, committed by EIPI, allowable as an administrative expense, having priority over all other administrative expenses and secured by a senior lien on all assets of the Debtor's estate. The Debtor needs this funding to meet their obligations necessary to operate their businesses, administer their Chapter 11 estates and increase the going concern value of the Debtors' businesses.

Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. See, e.g., *In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990)

1  ("Ames") (with respect to post-petition credit, courts "permit debtors-in-possession to

2  exercise their basic business judgment consistent with their fiduciary duties"). Section

3  364(c) provides, in pertinent part, that:

> "(c) If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title: secured by a lien on property of the estate that is not otherwise subject to a lien; or secured by a junior lien on property of the estate that is subject to a lien." 11 U.S.C. § 364(c); *In re Utah 7000, LLC*; 2008 WL 2654919 (Bkrtcy. D.Utah 2008).

9          Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured

10  debt or "priming" loans. Pursuant to Section 364(d)(1), the Court may, after notice and a

11  hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or

12  equal lien only if – the trustee is unable to obtain such credit otherwise; and there is adequate

13  protection of the interest of the holder of the lien on the property of the estate on which such senior

14  or equal lien is proposed to be granted. 11 U.S.C. § 364 (d)(1).          Section 364 of the Bankruptcy

15  Code is structured with an escalating series of inducements which a debtor in possession may offer

16  to attract credit during the post-petition period. *In re Photo Promotion Associates, Inc.*, 87 B.R. 835,

17  839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d. Cir. 1989). Where a trustee or debtor

18  in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained

19  under certain carefully proscribed conditions. *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131

20  B.R. 984, 989 (Bankr.N.D.Ill.1991). For example, if creditors are unwilling to extend unsecured

21  credit to a debtor in possession, further inducements are offered, with court approval after notice and

22  a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered

23  property in accordance with 11 U.S.C. § 364(d). *In re Photo Promotion Associates, Inc.*, 87 B.R.

24  at 839.

25  ///

26  ///

27  ///

28

---

1      Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court may

2 grant to post-petition lenders. The Section 364(c) list, however, is not exhaustive. Courts

3 frequently have authorized the use of inducements not specified in the statute. (See, e.g., *In re*

4 *Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which

5 prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*,

6 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), *aff'd*

7 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized

8 postpetition financial arrangements containing lender incentives beyond the explicit priorities

9 and liens specified in section 364").

10      Subject to the approval of the Court, Debtor has agreed to grant to EIPI liens against all of

11 Debtor's assets senior to any and all existing liens and has agreed that any administrative claim in

12 favor of EIPI will have priority over all other administrative claims. For all of the reasons

13 explained herein, Debtor believes that granting these protections to EIPI are warranted,

14 appropriate and necessary given the circumstances of this case where EIPI has agreed to provide

15 the Debtor with critically necessary emergency and future financing.

16      Two factors courts consider in determining whether to authorize post-petition financing

17 which contemplates the granting of a security interest in favor of the lender are (1) whether the

18 debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an

19 administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction

20 are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the

21 proposed lender. In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); see also In

22 re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

23      In addition to the foregoing, a debtor in possession seeking subordination of liens to new

24 financing must establish adequate protection of the liens to be subordinated to the new financing.

25 In re C.B.G. Ltd., 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992). Debtors submit that all of these

26 standards have been satisfied in these cases.

27 ///

28 ///

1    **1.      Debtor Was Unable To Obtain Unsecured Credit.**

2          In satisfying the standards of Section 364, a debtor need not seek credit from every available
3    source, but should make a reasonable effort to seek other sources of credit available under § 364(a)
4    and (b). See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated
5    by good faith effort that credit was not available without senior lien by unsuccessfully contacting
6    other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit
7    from every possible lender before concluding that such credit is unavailable"); Ames, supra,
8    115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing
9    where debtors approached four lending institutions).

10          The accompanying Declaration of Wayne F. Pierce, which is filed concurrently herewith,
11    discusses Debtor's extensive efforts prior to and during the bankruptcy to obtain financing, which
12    efforts were not successful. The accompanying Declaration of A. John A. Bryan, Jr. discusses his
13    extensive efforts after the Petition Date in seeking financing. To date, the best commitment was
14    provided by EIPI. Based on the testimony provided in the foregoing declarations, Debtors
15    submit that this element has been satisfied.

16    **2.      The Terms of the Proposed Financing are Fair, Reasonable and
17    Adequate**

18          Debtor submits that terms of the proposed post-petition financing from EIPI are fair,
19    reasonable and adequate. EIPI is not an insider of Debtor and has been asked to commit to providing
20    Debtor with $7,500,000 of post-petition financing. EIPI is taking on a substantial economic risk
21    by loaning cash to a company that currently has limited operations, which Debtor believes
22    justifies the protections and security requested by EIPI. The EIPI loan offers Debtor its best
23    opportunity to jump start Debtor's business from its current suspension, and increase the going
24    concern value of the business and the Debtor's Real Properties. The terms of the EIPI post-
25    petition financing were extensively negotiated by and between Debtor and EIPI in an arms
26    length transaction. The financing terms offered by EIPI are the best financing terms which have
27    been offered to Debtor.

28    ///

### 3.    The Liens Being Subordinated Are Adequately Protected

The proposed priming liens are authorized by the Bankruptcy Code, even absent consent of other existing lien holders. Bankruptcy Code § 364(d)(1)(B) requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral. Neither this nor any other Bankruptcy Code provision specifically defined the term "adequate protection". However, Bankruptcy Code §361 provides that adequate protection is furnished to the extent Debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3) (emphasis added). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. (See *In re Planned System, Inc.*, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987)). This standard applies equally with respect to a proposed "priming" financing under section 364(d)(1)(B). (See, *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the value of its interests."); *In re Aqua Assoc.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Beker Ind. Corp.*, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986)).

The Court has broad discretion to determine whether adequate protection is furnished. See, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court in *Aqua Assoc.*, 123 B.R. 192, noted:

> "Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized." *Id.* at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).

///
///
///
///

1    The preservation of the value of a secured creditor's lien is sufficient to provide adequate
2 protection to a secured creditor when a debtor seeks to use cash collateral. (See *In re Triplett*, 87 B.R.
3 25 (Bankr. W.D.Tex. 1988). See also *In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982)). In *Stein*, the
4 Court found that, as a general rule, a debtor may use cash collateral where such use would
5 enhance or preserve the value of the collateral, and allowed the debtor therein to use cash
6 collateral even though the secured party had no equity cushion for protection. The *Stein* Court
7 determined that the use of cash collateral was necessary to the continued operations of the debtor,
8 and that the creditor's secured position could only be enhanced by the continued operation of the
9 debtor's business. (See also *In re McCombs Properties VI, Ltd.*, 88 B.R. 261 (C.D. Cal. 1988) ,
10 where the court determined that the debtor's use of cash collateral for needed repairs, renovations
11 and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral
12 and such use would more likely increase cash collateral).

13    Such adequate protection of any existing liens is present in the Debtor's case because
14 without the proposed financing from EIPI, the Debtor would be unable to press forward with the
15 sand quarry project, lose the opportunity to obtain the necessary permits and would have no choice
16 but to permanently shut down. If the foregoing occurs, the value of the Debtor's assets would
17 decline and all of Debtor's going concern value would be immediately and permanently lost. In
18 contrast, the EIPI financing enables Debtor to pay critical expenses, commence operations, perform
19 exploratory drilling, and create value for all parties, particularly the secured lenders in these cases,
20 and realize the full potential of Debtor's business operations. Detailed analyses of the effect of
21 a $7.5 million funding are set forth in Exhibit __. This analysis clearly concludes that the return on
22 investment greatly exceeds the investment. As a result, not only is every existing lien holder
23 not harmed by the granting of the priming liens in favor of EIPI, any and all such lien holders are
24 benefited (and positions improved) from the granting of such priming liens in favor of
25 EIPI. Indeed, the proposed financing will allow Debtor to increase the productivity of Debtor's Real
26 Properties exponentially, prove the existence of the sand deposit, obtain requisite permitting, and
27 begin removal operations..

28 //

---

1   Finally, Debtors have reduced and will continue with their efforts to reduce further

2   their operating expenses as much as possible in order to maximize Debtors' profitability. In a

3   similar situation, the Court in the Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713 (Bankr.

4   D. Del. 1996), considered this issue and allowed the use of cash collateral, accepting the debtor's

5   argument that no additional adequate protection payments need be made:

6       "if there is no actual diminution in the value of [the] collateral through the
        date of the hearing, and [Debtor] can operate profitably post-petition,
7       [creditor] is adequately protected for the use of its cash collateral." 11
        U.S.C. Section 361; *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R.
8       444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr.
        D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D.
9       Fla. 1994).

10  **4.      The Financing from EIPI is Necessary and Proper**

11  While in determining whether to approve such a transaction, a Court is authorized

12  to act in its informed discretion, *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37

13  (Bankr. S.D.N.Y. 1990), the Court should give broad deference to the business decision of a

14  Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for

15  and proposed use of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311

16  (5th Cir. 1985). As the Court noted in *In re Ames Dept. Stores Inc.*, supra, "the court's discretion

17  under section 364 is to be utilized on the grounds that permit the reasonable business judgment

18  [of the Debtor] to be exercised . . . ." *In re Ames Department Stores, Inc.*, 115 B.R. at 40.

19  Without additional financing, Debtor will be required to permanently shut down its business

20  operations as Debtor would not be able to pay any operating expenses, insurance, or fees for

21  required permits. This would result in irreparable harm for Debtor and all creditors of the estate.

22  In contrast, the potential value of the business, if Debtor is able to operate and initiate the

23  changes management envisions, would increase exponentially based on the analysis prepared by

24  Watley. Debtor has therefore concluded that obtaining post-petition financing on the proposed

25  terms herein is in the best interests of the Debtors' estates.

26  ///

27  ///

28  ///

1

**CONCLUSION**

2    WHEREFORE, Debtor respectfully request that this Court: (1) approve the Financing

3 Motion in its entirety; (2) authorize the Debtor to borrow up to $7,50,000 from EIPI in accordance

4 with the terms set forth above and in the Financing Documents, increasing to a maximum of

5 $20,000,000 upon confirmation; (3) authorize the Debtors to execute all documents

6 (including all loan and security agreements, promissory notes and related documents)

7 necessary to enable the Debtor to implement the terms of the financing; and(4) grant such

8 other and further relief as the Court deems just and proper.

9

Dated: October 15, 2010                              /s/ John L. Smaha

10                                                   John L. Smaha, Esq.
                                                     SMAHA LAW GROUP, APC
11                                                   *Attorney for Debtor,*
                                                     SARGENT RANCH, LLC
12

13    W:\Sargent Ranch\DIP Financing Motion\100.Points.Authorities.DIP.Financing.wpd

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---