John L. Smaha, Esq., Bar No. 95855
Gustavo E. Bravo, Esq., Bar No. 218752
**SMAHA LAW GROUP, APC**
7860 Mission Center Court, Suite 100
San Diego, California 92108
Telephone: (619) 688-1557
Facsimile: (619) 688-1558

Attorneys for Debtor, Sargent Ranch, LLC

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>SARGENT RANCH, LLC<br><br>Debtor. | CASE NO. 10-00046-PB11<br><br>Chapter 11<br><br>**DECLARATION OF WAYNE F. PIERCE IN SUPPORT OF MOTION OF DEBTOR-IN-POSSESSION TO OBTAIN DEBTOR-IN-POSSESSION FINANCING UNDER 11 U.S.C. § 364**<br><br>Date: November 22, 2010<br>Time: 10:30 a.m.<br>Dept.: 4<br>Judge: Hon. Peter L. Bowie |

I, Wayne F. Pierce, hereby declare:

    1.    I am the managing member of the Debtor and Debtor-In-Possession, Sargent Ranch, LLC (the "Debtor" and/or "Sargent") and am the responsible party for the Debtor. If called upon to testify I could and would testify to the facts stated below under the penalty of perjury.

    2.    Sargent Ranch, LLC was created in, or about, May of 2000. The purpose for Debtor's creation was to take title to various real properties located in the County of Santa Clara, State of California and further described as Assessor Parcel Numbers: 841-36-010, 810-38-002, 810-38-009, 810-38-014, 810-38-015, 810-38-016, 810-38-017, 810-37-006, 810-37-007, 810-37-008, along with any and all lot line adjustments thereof (the "Debtor's Properties"). The Debtor's Properties were obtained through my efforts as I had obtained an option to purchase the Debtor's Properties from

certain third parties including Fivestar Commerce, Inc. and WFP Financial, Inc.

3. Debtor obtained financing from First Blackhawk Financial Corporation ("Blackhawk") a full service mortgage company that gathered a number of "investors" in order to fund the loans made to Sargent. By recording of three separate notes and deeds of trust, Blackhawk loaned a total of $43,000,000 to Sargent. The loans were funded in four separate installments in the following general order:

| | | |
|---|---|---|
| 1. | First Deed of Trust (June, 2000) | $15,000,000.00 |
| 2. | Second Deed of Trust (Nov. 2000) | $15,000,000.00[1] |
| 3. | First Deed of Trust Modification (Nov., 2000) | $10,000,000.00 |
| 4. | Third Deed of Trust (Oct. 2003) | $ 3,000,000.00 |

In fact, in addition to the $43,000,000 in original loans, Blackhawk arranged additional protective advances which raised the total loans to as much as $47,846,532.00 based on copies of bank statements previously held, controlled and managed by Blackhawk. These protective advances were used for project expenses and costs as per the direction of Blackhawk, without the direction of the Debtor or authority of the Debtor.

4. The Debtor's Properties were initially obtained by Sargent with the goal of developing residential homes and ranches for sale with a golf course and several other commercial opportunities. However, as the market for residential construction and certain limitations to construction in Santa Clara became evident to Sargent, Sargent sought to expand the scope of potential projects on the Debtor's Properties and began efforts to expand the use of the Debtor's Properties for other purposes. Among these opportunities, was Sargent's efforts to have a tribe of native Americans obtain federal recognition of its tribe and to have a portion of, if not all, of the Debtor's Properties identified as federal property. Other opportunities were later identified, such as the potential to develop a sand quarry on a portion of the Debtor's Properties and the idea of developing a riparian credit bank for the sale of environmental credits to private and government entities. Sargent spent significant amounts of money to develop these opportunities and established

---

[1] In fact, this distribution to Sargent occurred over time, with Blackhawk first issuing the note and then selling portions of the note to its "investors" over a brief period of time.

potential projects that have exponentially multiplied the potential value, if not the actual value, of the Debtor's Properties from a purchase price of approximately $16,000,000 to as much as $700,000,000.

     5.     Although misleading allegations have been made by certain creditors, Debtor never controlled the funds loaned to it by Blackhawk and its "investors". It was Blackhawk's investors that insisted upon having Blackhawk control all loan funds, required that all funds be maintained by Blackhawk in their bank accounts and all releases to Debtor were made subject to the approval of Blackhawk. Debtor did not control the funds and could not direct those funds at its own discretion. Further, all funds paid to any and all parties, myself were approved by Blackhawk. Any indication that Sargent misappropriated funds without Blackhawk's approval is completely unfounded.[2] Further, certain of Blackhawk's investors have gone so far as to make the ridiculous claim that the Debtor squandered the $47,846,532.00 that Blackhawk "lent" to Sargent. Sargent has reviewed bank records for Blackhawk's various "Sargent Ranch" bank accounts. This review has revealed that Blackhawk paid both pre-paid and other interest payments to these same "investors" in the amount of $14,678,076.14. Blackhawk itself received fees on these loans in the amount of $2,375,709.00. These amounts alone indicate that Sargent never even received almost seventeen million of the original forty-three million dollar loan. Further, the acquisition of the Debtor's Properties cost a total of $17,756,132.28, further payments for unpaid property taxes in the amount of $1,682,519.26 all went directly into the Debtor's Properties. After that, Blackhawk also "loaned" as much as $500,000.00 to its insiders, Griffin and Appleton. Finally, Blackhawk made protective advances, at its own direction, not at Debtor's request, to other entities known as Mare Island and Roddy Ranch in order to protect Blackhawk's interests in those projects in the total amount of $837,440.26. In all, Sargent never saw $37,829,876.94 of the initial loans. With the remaining $10,016,655.06, Debtor worked continuously towards the identification and development of the various raw material assets and potential projects that have left the Debtor's Properties with a potential value of over

---

[2] It is important to note that Sargent had a contractual relationship with Blackhawk and had no relationship with Blackhawk's individual "investors" other than those contracts with Blackhawk.

**DECLARATION OF WAYNE F. PIERCE**
3

seven hundred million dollars.

6. Since the filing of the bankruptcy, Debtor has faced much the same staunch opposition to any of its efforts to reorganize, refinance or in any way make progress towards an effective bankruptcy. Debtor has sought and found avenues by which to develop the sand quarry site, having entered into a tentative agreement for Debtor to obtain the necessary permits to begin extraction of the valuable sand deposits on a portion of Debtor's Properties. This motion was met with objections from Burton Benson and other investors. Debtor also sought to sell a portion of the Subject Properties to an entity looking to develop a solar facility. This motion was also met with objections from Burton Benson and other investors. Debtor then filed a motion to determine release prices on various portions of the Debtor's Properties in order to make the systematic and organized liquidation of the Debtor's Properties a possibility moving forward. Not surprisingly, that motion was also met with objections from Burton Benson and other investors. Finally, Debtor filed a motion to employ the brokerage firm of Cassidy Turley, simply to find potential buyers for a portion, or the entirety, of the Subject Property. The employment of Cassidy Turley would not have resulted in any payment to Cassidy Turley until such time as a separate motion to approve any sale was filed, however, in line with Burton Benson's strategy, that motion was also met with objections from Burton Benson and other investors.

7. It is clear to the Debtor that the select "investors" opposing every motion will not be satisfied unless they are the direct owners of the Debtor's Properties. Debtor will need to put its best foot forward to try and get a viable and feasible plan on file. As such, Debtor sought and obtained an order allowing the Debtor to employ the Watley Group, LLC ("Watley"). Among other things, the agreement with Watley calls for Watley to assist the Debtor in the things that are most crucial to a reorganization at this point, obtaining Debtor-In-Possession Financing ("DIP Financing"), developing a strategy for Debtor's reorganization based on such DIP Financing and to assist the Debtor in drafting a feasible Plan. Debtor could have sought a statement of position from the United States Trustee and attempted to get a court order by ex parte application as allowed by the Local Rules, but Debtor somehow anticipated that Admiral Benson and perhaps other "investors" would seek to stop this motion as well. Not surprisingly, Admiral Benson, through ERG has filed another

opposition. Debtor also received an objection from the United States Trustee raising a number of concerns over the Watley Group's employment. Despite these anticipated objections, the Court was convinced that the Watley Agreement was a valid and necessary step towards reorganization and, with a number of changes to the Agreement, approved the Agreement by an order entered after hearing.

8.     As of the filing of the bankruptcy, the Debtor had successfully identified and developed a number of potential projects to be accomplished and needed additional funding from one source or another to convert these viable and promising opportunities into a reality for the benefit of itself and its creditors. The Debtor strongly believes that the in ground assets in the Debtor's Properties has a substantial value and that said value can be realized with a limited investment, one that has finally been obtained and is pending approval through this motion. At the inception of this case, the Debtor would argue that the Debtor's Properties were worth much more than the substantial claims of the secured creditors.

9.     A number of the secured creditors, however, have argued that the Debtor's business opportunities are simply too conjectural in nature to generate an actual fair market value at this time. These select secured creditors, chief among them being Energy Research & Generation, Inc. ("ERG") and Admiral (Ret.) Benson, claim that the Debtor's Properties, without the benefit of developed businesses upon them, are worth less than $20,000,000.00. Debtor contacted John Barsochini, a real estate agent with Cassidy Turley BT Commercial. Mr. Barsochini is in agreement that, if the Debtor did not have an opportunity to market and/or develop the various business opportunities on the Debtor's Properties, the bare land which currently makes up the Debtor's Properties would likely sell for only $25,000,000 in a forced liquidation in a stressed condition and a relatively down market.

10.     The Debtor filed this matter on January 4, 2010. During the first several months of this case, the Debtor used of all of its available assets and very limited liquid assets to move the case forward. As expressed above, the Debtor ran into constant objections to his various efforts to develop the Debtor's Properties. Whether it was an attempt to employ Freeman Associates to obtain the necessary permits to develop the sand quarry, a motion to sell a portion of land for the

1 development of a solar facility or an attempt to employ Cassidy Turley to list various assets of the
2 Debtor for sale, the Debtor was opposed at every turn and Debtor's lack fo liquidity prevented it
3 from moving forward with any of these potential avenues. It was not until recently that the Debtor
4 took the significant and course altering step of obtaining permission from the court to employ the
5 Watley Group as a method of obtaining Debtor-In-Possession financing and obtaining the necessary
6 assistance and knowledge to get a plan of reorganization on file.

7     I declare under penalty of perjury that the foregoing is true and correct to the best of my
8 knowledge. Executed this 15th day of October 2010, at San Diego, California.

                                        /s/ Wayne F. Pierce
                                        Wayne F. Pierce

W:\Sargent Ranch\DIP Financing Motion\101.Declaration.WFP.wpd

---

**DECLARATION OF WAYNE F. PIERCE**
6