John L. Smaha, Esq., Bar No. 95855
Gustavo E. Bravo, Esq., Bar No. 218752
**SMAHA LAW GROUP, APC**
7860 Mission Center Court, Suite 100
San Diego, California 92108
Telephone: (619) 688-1557
Facsimile: (619) 688-1558

Attorneys for Debtor, Sargent Ranch, LLC

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>SARGENT RANCH, LLC<br><br>Debtor. | CASE NO. 10-00046-PB11<br><br>Chapter 11<br><br>**DECLARATION OF GARY POST IN SUPPORT OF MOTION OF DEBTOR-IN-POSSESSION TO OBTAIN DEBTOR-IN-POSSESSION FINANCING UNDER 11 U.S.C. § 364**<br><br>Date: November 22, 2010<br>Time: 10:30<br>Dept.: 4<br>Judge: Hon. Peter L. Bowie |

I, Gary Post, hereby declare:

1. I am a senior managing director for the Watley Group, LLC ("Watley"). If called upon to testify I could and would testify to the facts stated below under the penalty of perjury.

2. Shortly after its retention by the Debtor, Sargent Ranch, LLC ("Debtor" and/or "Sargent"). Watley began to develop a four-phase Business Plan with key elements and objectives as shown below.

Phase 1: Stabilization and Planning (Starting in July 2010 and continuing for a 4- 6 week period.)

a. Secure services of key Management personnel and other critical Company resources.

b. Engage (or re-engage) top engineering, land use/entitlement and environmental firms to further assess and validate approaches to maximizing individual business opportunities.

c. Develop and specify action plans and time tables to achieve objectives, such as determining which Mitigation Credits to "finish" (and at what time frame) and which to sell immediately. An additional activity would be the further planning and implementation of the liquid asphalt extraction business.

3. Phase 1 Milestones that have been achieved

a. Skip Spiering (Project Director) was retained by Debtor. Mr. Spiering is critical to the project since he has the most knowledge on the team of various details of the project and its advanced entitlement processes. Further, he has been and now continues to be the main contact person to several critical outside consultants including those involved in permitting and starting the sand quarry operations and selling mitigation rights.

b. Mike Baldridge (Chief Financial Officer) was retained by Debtor. Mr. Baldridge is critical to the project and its emergence from bankruptcy since he has the most knowledge of the financing history of the project and actions of certain parties throughout this process.

c. The Debtor has been successful in receiving updated assessments and proposals from key consultants, particularly related to the sand quarry and sale of mitigation rights. These consultants will be formerly retained pending court approval of the DIP financing and these consulting agreements. (See Declarations of Verne Freeman of Freeman Associates and Rick Hopkins of Live Oak Associates, attached hereto as Exhibit A.)

d. The Debtor has worked with a third party specialty energy company and received an assessment from this third party that the asphalt materials on the Property are suitable as a base for the manufacture of a variety of asphalt related products. (See Declaration of Stan Ellis of Ellis Energy Investments attached hereto as Exhibit B). The Company

is in continuing discussions with Ellis Energy regarding the further evaluation of this business opportunity, its size, and its profit economics.

e. The Debtor received a written updated assessment of its value in a liquidation scenario and in a longer term development perspective. (See Declaration of John Barsocchini of Cassidy Turley attached hereto as Exhibit C).

4. Additional activities will be added as they emerge from the Phase 1 process over time. Phase 2 Milestones Achieved

5. The Company has agreed to engage Live Oak Associates to help structure and design a mitigation bank.

6. Phase 3: Forensic and Litigation (Commenced immediately upon Watley's retention.)

1. Investigate the actions of certain individuals and entities have caused significant damage to the company pre-petition and aggressively pursue litigation against these individuals and entities to recover assets. Phase 3 Milestones Achieved.

7. The Debtor completed a comprehensive investigation of the details surrounding the various financings completed in the past by the Debtor, particularly as related to certain actions detrimental to the Debtor by First Blackhawk Financial, certain of its principals and certain investors introduced by First Blackhawk.

The Debtor has now assembled a large body of evidence proving substantial wrong doing and certain illegal acts by First Blackhawk, its principals and certain As a result of these investigations, the Company filed a lawsuit against First Blackhawk, its principals and most of the investors in the financings.

8. Phase 4: Plan of Reorganization: (Commenced immediately after retention and continuing through the entire bankruptcy process.)

9. The Debtor has completed a detailed and well supported Plan of Reorganization and has filed this Plan with the Court. The Debtor has also obtained financing for this Plan pending approval of the Court by this motion.

10. In summary, the Company has reached essentially all of the milestones required to implement its Business Plan designed to bring substantially more value to creditors than a liquidation process. It is prepared to execute its value creation activities immediately upon Court approval of the

financing and other necessary items to proceed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 15th day of October 2010, at San Diego, California.

/s/ Gary Post
Gary Post

W:\Sargent Ranch\DIP Financing Motion\103.Declaration.Post.wpd

# EXHIBIT A

**DECLARATION OF RICK HOPKINS**

**Ph.D. Principal-/Senior Conservation Biologist**

**Live Oak Associates**

I am a Senior Conservation Biologist in the San Jose office of Live Oak Associates, Inc. ("LOA"). LOA (www.loainc.com) provides professional ecological consulting services to a diverse client base throughout California and the western United States. LOA has a team of biologists and technical and support staff for data collection, scientific analysis, and document preparation to protect sensitive biotic resources while securing environmental clearances for proceeding with land and water development projects. LOA has completed over 1,800 projects for over 600 private and public sector clients since its founding in 1995. Our projects are normally in environmental permitting and planning, endangered and special status species surveys, habitat management and mitigation planning, preparation of California Environmental Quality Act (CEQA) and National Environmental Policy Act (NEPA) documents and construction and mitigation monitory.

I have 20 years of experience in developing conservation strategies and mitigation programs, including 11 years with LOA. I have a BA Wildlife Zoology from San Jose State University, a MA Biology, from San Jose State University and a Ph.D. in Wildlands Resource Science from University of California, Berkeley, CA.

My firm and I are very familiar with the Sargent Ranch project (the "Property"). My staff or I have visited the site over 40 times since 2004. We have studied Sargent Ranch extensively and have produced several reports as a consultant to Sargent Ranch.

Based on our knowledge of the site, current government mitigation requirements and demand for mitigation credits we have the following conclusions:

1. The Federal Government encourages wildlife preservation and the prudent use of land and other natural resources through the Clean Water Act and the Endangered Species Act. It has therefore mandated that developers who destroy riparian/wetland or endangered species habitats in their development processes must offset their destruction in some way. The offset method preferred most by regulators is for developers to purchase mitigation "credits" from third parties who have preserved or restored such habitats. Thus, a there is a market for entities with credits above their own needs to sell them to third parties in the private or public sectors.

2. Our surveys completed on the Property starting in 2004 and continuing through November 2009 verify a substantial amount of Riparian and Endangered Species Credits available beyond its own projected needs, which Sargent Ranch could sell to third parties who require these credits.

3. We believe that there could be as many as (or more) 800 Riparian Credits on the Property with a sale value of $50,000 to $75,000 per credit on an "unfinished" basis and $150,000 to $225,000 per credit on a "finished" basis. ("Finished" means that endowment funds and procedures have been created to ensure the proper monitoring of the habitat sites in perpetuity.) Purchasers of these credits are primarily public agencies, but also include private land developers. The cost to "finish" ranges from $10,000 to $35,000 and therefore adds substantial value to the estate.

4. Likely buyers of the Company's Riparian Credits include the Santa Clara County Water District, the Pajaro Valley Water District, the Valley Transportation Authority, the counties of Santa Clara, Santa Cruz, San Benito and Monterey, as well as others within a 75-mile radius of the property that must mitigate their disruption of riparian environments in the context of long-term infrastructure development.

5. The Property can also generate Habitat Mitigation Credits for various threatened species, including the steelhead trout, California Tiger Salamander, Red-legged Frog, and certain plant species. We would have to conduct some additional confirmation studies, but we believe that there are at least 1,000 Salamander and Frog Habitant credits combined which we value at $30,000 to $50,000+ each (when "finished").

6. We can confirm that Sargent Ranch has already received interest from the Santa Clara Valley Water District to purchase 52 red-legged frog credits, which could yield the Company in excess of $2.6 million based on Santa Clara County value estimates of similar habitat credits. Based on management's research, including the amount ($81,400 per credit) that Santa Clara County expects to pay for similar habitat credits (see the Santa Clara County Habitat Conservation Plan: Mitigation Measure 3.3.5a), Management believes that the unfinished Frog Habitat and Salamander Habitat credits could be conservatively valued at $20,000 each.

7. Frog and Salamander Habitat credits also increase in value when "finished." Management's research and conclusion on the value of these credits are partly based on a key report, the Economic Analysis of Critical Habitat Designation for the California Red-Legged Frog. This report, prepared in 2009 by Industrial Economics, Inc and Berkeley Economic Consulting for the U.S. Fish and Wildlife Service, concluded that finished

Red-Legged Frog credits are worth an average of $50,000 each. Management believes that the finished Salamander Habitat credits will be worth a similar amount each.

8. We are aware that Sargent Ranch is contemplating a number of land resource uses over the longer term, thus we recommend additional studies to determine what credits can be sold and which credits should be retained so that Sargent Ranch can execute its long term plan.

9. Nonetheless, I believe that Sargent Ranch could reasonably sell approximately 377 unfinished credits (165 riparian credits varying from $75,000 to $137,500 per credit over time; and 212 species credits at $20,000 per credit) during 2011 through 2017, providing total revenue of approximately $23,646,000 during this time period without compromising any of its long term plans for development of the property for various planned uses.

I declare under penalty of perjury that the foregoing is true and correct as to the best of my knowledge.

Executed this 13th day of October, 2010 by:

Rick A. Hopkins, Ph.D.

# EXHIBIT B

**DECLARATION OF STAN ELLIS, CEO**

**ELLIS ENERGY INVESTMENTS INC.**

I am the CEO of Ellis Energy Investments (Ellis"). Ellis provides products, services and processes that capture renewable materials and energy sources, as well as applications for concentrated recycling. Ellis Energy was founded in 2008. I have worked in this field for 15 years and I have BA degree from South Dakota School of Mines

Our Chief Chemist and Vice President for Research and Development efforts is Dr. John Eric Partanen, PHD. Dr. Partanen has 39 years of experience in this field and has a MA and Ph.D. degree from Columbia Pacific University.

Together, and with other members of our team, we have substantial knowledge of liquid asphalt including methodologies to recover and process this resource. We are also knowledgeable about the markets for the end products that can be produced from liquid asphalt.

In particular, our Sierra Process Systems unit provides oil recovery, oily residuals separation, and recycling services to its customers. The company installs equipment and operates portable and fixed systems to process hazardous and non-hazardous oily residuals on site or at a central location. Oily residuals are mixtures and emulsions of hydrocarbons, water, and solids (organic and inorganic). Sierra Process Systems applies a suite of technologies to separate oily residuals into component parts. Oil is reused for productive use. Water is disposed of or reused. Organic solids can be reused (e.g., in refinery processes, cement kilns) in the refining process. Inorganic solids are treated to become inert, non-hazardous materials. We anticipate our Sierra Process will provide the equipment and knowledge to process the liquid asphalt at Sargent Ranch.

In August 2010, we were requested to visit the Sargent Ranch property and assess the feasibility of extracting liquid asphalt on the Sargent Ranch property at a net profit. I visited the site on September 9, 2010 and Dr. Partanen visited the site on both August 7 and September 9, 2010.

We took samples of the bituminous materials from Tar Creek on August 7, and September 9, 2010. These samples were labeled as Liquid Tar Creek Bitumen and Semi-solid Tar Creek Bitumen. The Liquid Tar Creek Bitumen was scooped off the surface of the "ponds" adjacent to Tar Creek section of Sargent Ranch. The Semi-solid Tar Creek Bitumen is from underneath the liquid, to a depth of 18 inches. A third type of material at the sites is very hard, oxidized bitumen and was not sampled, but may be economically useful and a valuable asset.

Dr. Partanen, PhD subsequently analyzed these liquid and semi-solid materials at our facilities.

Our conclusions based on these analyses and our additional market knowledge and other factors are as follows:

1. It is obvious that a variety of bituminous mastic products could be produced from the liquid asphalt found on the Sargent Ranch property.

2. Dr. Partanen has successfully formulated the following types of products from The Sargent Ranch Tar Creek Bitumen:

    a. Hot Applied Crack Filler and Joint Sealant meeting ASTM specifications,

    b. Emulsified Asphalt Mastics meeting ASTM specifications for Roofing Products,

    c. Emulsified Asphalt Mastics meeting specifications for recycled tire rubber modified slurry seal coatings for asphalt pavements,

    d. Emulsified Asphalt Mastics useful as Cold Applied Crack Filler and Joint Sealants, and

    e. Cold Applied asphalt pavement materials useful for Pothole Repair.

3. Each of these products has active and large markets with a ton of these products selling at wholesale in a range from $150 to $600 per ton. We would have to conduct further research to determine the profitability for Sargent Ranch of this endeavor.

4. Our company remains interested in a joint effort with Sargent Ranch to profitably extract and process liquid asphalt. Ellis Energy could supply equipment and expertise for this effort.

5. Our estimate of time frame to begin operations would be approximately 6 months after funding is obtained, which budgets 2 months for further testing and analysis (including scope of deposits) and the remaining time to secure required grading permits and set up portable processing equipment.

I declare under penalty of perjury that the foregoing is true and correct as to the best of my knowledge.

Executed this 13th day of October, 2010 by:

Stan Ellis, CEO
Ellis Energy Investments Inc.

# EXHIBIT C



1350 Bayshore Highway, Suite 900 Burlingame, CA 94010
T 650.347.3700 F 650.347.4307 www.ctbt.com

DECLARATION OF JOHN BARSOCHINI, VICE PRESIDENT

CASSIDY TURLEY/BT COMMERCIAL

I am a professional commercial real estate agent for over twenty-four (24) years with several well-known national/international and regional firms. I have specialized in larger properties including land development, land acquisition and disposition, office, industrial and agricultural properties and have successfully completed transactions worldwide.

I have been involved with the Sargent Ranch property since 2003 and have toured the site extensively on foot, by vehicle and from the air. I am particularly familiar with the approximately 5,250 acres of the total 6,400 acres located in Santa Clara County, California. I have provided information in the preparation of various appraisals and opinion of value related to the Property. We have prepared marketing packages, solicited the property and toured the property with various prospects on numerous occasions.

Based on my prior investigations, research and analyses of information provided to me by ownership regarding the Property, I have the following conclusions:

1. If sold today in a swift, forced liquidation, as purely agricultural/ranch land, given no value to future entitlements, sand deposits, water rights, oil and gas royalties, wind and solar energy uses, liquid asphalt, mitigation rights or any other value or use other than agriculture and open space ranch land, the value would be approximately $5,000 per acre for 5,000 eligible acres, or a total of $25 million.

2. On the other hand, if an ownership group could take a longer term patience view to achieve value with future entitlements and permits, I believe that the Property value on a 'highest and best use' would be substantially higher, as follows in the sections of the Property located in Santa Clara alone:

   ξ 3,446 acres could be valued at approximately **$ 86,150,000** - based upon $25,000/acre average value for "Certificates of Compliance" and the current County and General plan development allowances for low density commercial, industrial, residential and retail land uses.

   ξ Additional value from the potential Sand Quarry and Riparian Credits, the additional value can be calculated as follows: 1,000 acres **$400,000,000** based on certification of in place value for 200,000,000 tons of concrete sand. 804 acres **$160,800,000** based on in place certification value for 804 Riparian Credits.




- ξ My views of the above assigns no value top to potential water rights, additional sand and aggregate deposits and oil and gas royalties that are not calculated as part of this opinion of value. As well as the additional acreage in Santa Cruz County.

Sincerely,

Cassidy Turley/BT Commercial

John Barsocchini
Vice President
Lic. #00893147

Cassidy Turley/BT Commercial, Broker, is not authorized to give legal or tax advice. No representation or recommendation is made by Cassidy Turley/BT Commercial, Broker, or its agents or employees to the legal sufficiency, legal effect or tax consequences of this document or any transaction relating thereto since these are matters which should be discussed with your attorney.

**BROKER DISCLAIMER**

Broker has made no independent investigation regarding the present or future use or zoning of the Property; ADA-related issues, matters relating to Hazardous Materials, or the compliance of the Property with the Occupational Safety and Health Act or any other federal, state, county or municipal Law. Broker has not investigated, and is not qualified to provide any opinion about the structural, mechanical, or soils conditions of the Property. Broker has not independently verified the size, measurements, or boundaries of the Property, and any representation thereof is made solely based upon information provided to Broker, which Broker deems reliable but does not warrant to be accurate. You should consult your advisors on these matters. Buyer agrees to make its own investigation and determination regarding all matters affecting the value, condition, utility, size, compliance with Laws, and all aspects of the Property's suitability for Buyer's intended use.