John L. Smaha, Esq., Bar No. 95855
Gustavo E. Bravo, Esq., Bar No. 218752
**SMAHA LAW GROUP, APC**
7860 Mission Center Court, Suite 100
San Diego, California 92108
Telephone:     (619) 688-1557
Facsimile:     (619) 688-1558

Attorneys for Debtor, Sargent Ranch, LLC

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | CASE NO.   10-00046-PB11 |
| SARGENT RANCH, LLC | Chapter 11 |
| Debtor. | **DECLARATION OF STEVEN DURBIN IN SUPPORT OF MOTION OF DEBTOR-IN-POSSESSION TO OBTAIN DEBTOR-IN-POSSESSION FINANCING UNDER 11 U.S.C. § 364** |
| | Date:     November 22, 2010<br>Time:     10:30 a.m.<br>Dept.:     4<br>Judge:   Hon. Peter L. Bowie |

I, Steven Durbin, hereby declare:

1.     I am a managing director for the Watley Group, LLC.  If called upon to testify I could and would testify to the facts stated below under the penalty of perjury.

2.     Since being retained by the Debtors, Watley has gone out to the marketplace to obtain post-petition DIP and permanent financing for the Debtor. Mr. Bryan, other Watley employees, and placement agents engaged by Watley have contacted and/or spoken with representatives of more than 45 possible investment groups, including institutional lenders, hedge funds, and individuals with financial wherewithal and interest in investments such as Sargent Ranch.

3.     A few investors expressed concern with the previous management team and the potential for them to continue to be involved in future decisions related to the business.

---

**DECLARATION OF STEVEN DURBIN**

1

1    4.    To date, the only commitment received by the Debtor was from EIPI as set forth

2 below.  The Debtor did receive indications of interest from a handful of other investors, but

3 the terms of such proposals were not competitive with the commitment from EIPI. Negotiations

4 with EIPI were extensive, with numerous drafts of the proposed loan documents exchanged and

5 modified. At the conclusion of such negotiations, the parties agreed to the terms of the DIP Financing.

6    5.    Equity Investment Properties, Inc. ("EIPI") has offered a $7.5 million DIP facility (the

7 "DIP Facility") as set forth in the term sheet and loan documents.  Furthermore, EIPI has advised

8 the Debtor and will confirm to the Court that it has agreed to extend the facility up to $20.0

9 million upon confirmation of an acceptable plan of reorganization. The terms of this plan of

10 reorganization financing ("POR Financing") are contained in the loan documents.  True and

11 correct copies of the proposed promissory note and security agreement (collectively, the "DIP

12 Loan Documents") are attached hereto as Exhibits "A" and "B", respectively.

13    6.    A more detailed description of the efforts Watley took to obtain DIP Financing is

14 attached hereto as Exhibit C.

15    I declare under penalty of perjury that the foregoing is true and correct to the best of my

16 knowledge.  Executed this 15th day of October 2010, at San Diego, California.

17

18                                            /s/ Steven Durbin
                                            Steven Durbin
19

W:\Sargent Ranch\DIP Financing Motion\104.Declaration.Durbin.wpd
20

21

22

23

24

25

26

27

28

**DECLARATION OF STEVEN DURBIN**
2

# EXHIBIT A

# SECURED NOTE

As revised 10 04 10

FOR VALUE RECEIVED, SARGENT RANCH, LLC, a California Limited Liability Company ("**Sargent Ranch**"), a debtor and a debtor-in-possession under Title 11, Chapter 11 of the United States Code (the "**Maker**"), promises to pay to EQUITY INVESTMENT PROPERTIES, INC, a California Corporation (the "**Holder**") or its registered assigns or successors in interest, the minimum sum of Seven Million Five Hundred Thousand and No/100 Dollars ($7,500,000.00) or, if different, the aggregate amount of all Loans (as defined in the Debtor-In-Possession Financing and Security Agreement referred to below), not to exceed $20,000,000 together with any accrued and unpaid interest hereon, if not sooner due (by reason of acceleration or otherwise) or paid, on _____, 2012 or if the Debtor's Plan of Reorganization is confirmed _____, 2015 (the "**Maturity Date**").

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Debtor-In-Possession Financing and Security Agreement by and between the Maker and the Holder dated as of the date hereof (as amended, modified and/or supplemented from time to time, the "**Security Agreement**"). The payment of this Secured Note (this "**Note**", and together with the Security Agreement, the Ancillary Agreements, and all related agreements or documents and court orders: the "**DIP Documents**") and all interest, fees, costs, and charges herein and therein are evidenced and secured by the DIP Documents.

The following terms shall apply to this Note:

## ARTICLE 1
## CONTRACT RATE

1.1     Contract Rate.   Interest payable on the outstanding principal amount of this Note (the "**Principal Amount**") shall accrue at a rate per annum equal to eleven and 75/100 percent (11.75%) (the "**Contract Rate**"). Interest shall be calculated on the basis of a 360 day year and shall be payable on the Maturity Date or sooner based solely on the mandatory payment of 75% of any net asset sale prior to maturity. All interest on the Principal Amount shall be compounded annually.

1.2     Maturity Date.  The earlier of (a) 24 months or 60 months after funding, or (b) the date upon which a final order is entered by the Bankruptcy Court either (i) converting the Maker's Chapter 11 case to a case under Chapter 7 or (ii) any material change of management in the Maker's Chapter 11 case, unless such management change is approved by Lender or (iii) the occurrence of an event of default under the DIP Financing that has not been cured as per the Security Agreement after notice to the Maker.

1.3    Closing Date.  The Loan shall be funded upon approval by the Bankruptcy Court.

1.4    Payments.  All payments hereunder, whether in the ordinary course, after acceleration, after foreclosure or otherwise, shall be as follows: (1) To costs and expenses, if any, incurred by the Holder in collecting amounts hereunder or under any DIP Document, (2) to other costs, charges, expenses, fees, payments or other sums due to Holder hereunder or under any DIP Documents or on account of any Obligations, (3) to any late payment charges or fees and interest accrued at the Default Rate, if any, (4) to past due interest, if any, and (5) to all unpaid principal or amounts due on account of Loans. Maker hereby expressly agrees that, upon acceleration of the Maturity Date as a result of any Event of Default including, without limitation, any acceleration upon transfer of any interest in the real property or leased property securing this Note, a tender by Maker or by anyone on behalf of Maker of payment of the amount necessary to satisfy the indebtedness evidenced hereby made at any time prior to or in connection with a foreclosure sale or a sale under a power of sale contained in any DIP Document, shall be deemed to be voluntary prepayment hereunder, and such amounts shall include all amounts due hereunder or under any DIP Document.

## ARTICLE II
## EVENTS OF DEFAULT AND DEFAULT RELATED PROVISIONS

2.1    Events of Default.  The occurrence of an Event of Default under the Security Agreement shall constitute an event of default ("**Event of Default**") hereunder.

2.2    Default Interest.  Following the occurrence and during the continuance of an Event of Default, maker shall pay additional interest in an amount equal to two hundred and fifty (250) basis points, and all outstanding Obligations shall continue to accrue interest at such interest rate from the date of such Event of Default until such Event of Default is cured or waived.

2.3    Acceleration.  Upon the occurrence of an Event of Default hereunder or under any other DIP Document beyond any cure period determined therein, Holder may at its option, in addition to any other remedies to which it may be entitled, declare the total unpaid principal balance of the indebtedness evidenced hereby, together with all accrued but unpaid interest thereon, any applicable fees and costs, and all other sums owing, immediately due and payable, and all such amounts thereafter shall bear interest at the Default Rate. All such interest shall be paid at the time of and as a condition precedent to the curing of any Event of Default if such Event of Default is cured in accordance with applicable provisions of law or should Holder, in its sole discretion, allow such Event of Default to be cured. TIME IS OF THE ESSENCE IN THIS NOTE. This note shall be immediately due and payable upon the occurrence of any of the

following, each of which shall constitute an Event of Default: (i) confirmation of a plan of reorganization that alters the treatment of Holder as set forth herein or in the Security Agreement or Ancillary Agreements, unless otherwise agreed in writing by Holder; (ii) dismissal of the Chapter 11 Case; or (iii) conversion of the Chapter 11 Case to Chapter 7.

## ARTICLE III
## MISCELLANEOUS

3.1     Prepayment. Subject to the terms of the Security Agreement, Maker may prepay this Note at any time. In the event Sargent Ranch sells any assets prior to the Maturity Date, seventy-five percent (75%) of net proceeds from such sales will be used to prepay this Note until the Note is paid in full. Prepayments shall be credited in accordance with Section 1.4.

3.2     Cumulative Remedies. The remedies under this Note shall be cumulative.

3.3     Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof of any right, power or privilege. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

3.4     Notices. Any notice herein required or permitted to be given shall be in writing and shall be deemed effective given (a) upon personal delivery to the party notified, (b) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to Maker at the address provided for maker in the Security Agreement executed in connection herewith, and to the Holder at the address provided in the Security Agreement for the Holder (with appropriate copies as set forth therein), or at such other address as Maker or the Holder may designate by ten days advance written notice to the other parties hereto. All notices to Holder shall be copied by email transmission at the email addresses specified in the Security Agreement.

3.5     Amendment Provision. The term "Note" and all references thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented, and any successor instrument as such successor instrument may be amended or supplemented.

3.6     Assignability. This Note shall be binding upon Maker and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns, and may be

assigned by the Holder in accordance with the requirements of the Security Agreement. Maker may not assign any of its obligations under this Note without the prior written consent of the Holder, any such purported assignment without such consent being null and void.

3.7     <u>Cost of Collection.</u>  Maker promises to pay all costs, including but not limited to, reasonable attorneys' fees and all reasonable expenses incurred by Holder in connection with the collection of this Note, the protection or realization of the collateral and enforcement of any guaranty on account of such collection, whether or not suit is filed hereon; provided, however, that the prevailing party (by way of settlement, dismissal or final judgment) in any action between Maker and Holder shall be entitled to its reasonable costs and expenses incurred in connection with such litigation, including reasonable attorneys' fees. Such fees shall include, without limitation, costs and attorneys' fees incurred in any appeal. Any and all references to the payment of attorneys' fees and disbursements herein shall include those incurred before, during and after litigation, whether negotiating, drafting, closing, attempting collection without litigation, investigating and litigating in all trial and appellate levels as well as those incurred in any bankruptcy proceeding and post-judgment proceedings. Attorneys' fees include actual fees of paraprofessionals such as paralegals and investigators, administrative costs and all other reasonable charges whatsoever billed by counsel to the Holder and shall include allocation of costs of Holder's in house counsel, billed at the average hourly rate of attorneys in mid to large law firms located in the location of Holder's in house counsel.

3.8     <u>Payment of Legal Expenses.</u>  If the within loan is approved by the Bankruptcy Court, Maker shall reimburse Holder for legal expenses incurred in connection with drafting the Secured Note and Security Agreement, as well as all legal expenses related to diligence prior to the initial funding of the Note up to a maximum of Thirty Thousand and No/100 Dollars ($30,000.00). Maker shall reimburse Holder for such costs within ten (10) days following the funding of the Note.

3.9     <u>Conversion to Plan of Reorganization Financing.</u>  Upon confirmation of a Plan of Reorganization that has been currently filed by the Debtor as later amended and approved reasonably by EIPI, (i) All outstanding loan amounts due EIPI by the Maker (the DIP Financing) shall be converted to become part of the POR Financing, (ii) The term of the POR Financing shall be five (5) years. The beginning date for the POR Financing shall be the confirmation date of the Plan of Reorganization, (iii) Beginning in year two (2), and continuing through year five (5), or at the retirement of all outstanding amounts due EIPI by the Maker, whichever comes first, EIPI shall accrue, on a pro-rata annual basis, One Million Five Hundred Thousand and No/100 dollars ($1,500,000.00) designated as principal reduction amortization, and (iv) Amortization accrued as per this <u>Section 3.10</u> shall be paid from Maker net profits on a priority basis before payment of other Maker debt.

3.10   Break-Up Clause.  Post execution and Court approval of this Note, should Maker decide to accept other financing in place of EIPI prior to EIPI funding this Note, EIPI shall receive a penalty equal to four percent (4%) of Note amount.

3.11   Governing Law, Jurisdiction and Waiver of Jury Trial.

(a)  THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

(b)  MAKER HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE STATE OF FEDERAL COURTS LOCATED IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE MAKER, ON THE ONE HAND, AND THE HOLDER, ON THE OTHER HAND, PERTAINING TO THIS NOTE OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE; PROVIDED THAT THE HOLDER AND THE MAKER ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD OUTSIDE OF THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA; AND FURTHER PROVIDED, THAT, IN THE EVENT THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM, JURISDICTION, NOTHING IN THIS NOTE SHALL BE DEEMED OR OPERATE TO PRECLUDE THE HOLDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE HOLDER. MAKER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND MAKER HEREBY WAIVES ANY OBJECTION THAT IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. MAKER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT OR OTHER PROCESS MAY BE REGISTERED OR CERTIFIED MAIL ADDRESSED TO MAKER AT THE ADDRESS SET FORTH IN THE SECURITY AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF MAKER'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

(c)  MAKER DESIRES THAT ITS DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST

COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, MAKER HERETO WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN THE HOLDER, AND/OR MAKER ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS NOTE, THE SECURITY AGREEMENT, ANY OTHER ANCILLARY AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO.

3.13    Severability.  In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

3.14    Maximum Payments.  Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law. In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum rate permitted by such law, any payments in excess of such maximum rate shall be credited against amounts owed by the Maker to the Holder and thus refunded to the Maker.

3.15    Security Interest.  The Holder has been granted a security interest in all assets of the Maker as more fully described in the Security Agreement.

3.16    Construction.  Each party acknowledges that its legal counsel participated in the preparation of this Note and, therefore, stipulated that the rule of construction that ambiguities are to be resolved against the drafting party shall not be applied in the interpretation of this Note to favor any party against the other.

3.17    Right to Proceed.  No single or partial exercise of any power hereunder shall preclude other or further exercise thereof or the exercise of any power. The Holder hereof shall at all times have the right to proceed against any portions of security held by the Holder in such order and in such manner as the Holder may deem fit, without waiving any rights with respect to any other security. No delay or omission on the part of the Holder hereof in exercising any right or remedy hereunder or the acceptance of one or more installments from any person after default hereunder or under any other Loan Document shall operate as a waiver of such right or remedy or of any right or remedy under this Note nor as a waiver of such right or remedy in connection with any future default.

3.18    Joint and Severable.  If more than one party has executed this Note or becomes obligated under this Note, the obligations and covenants of each party shall be joint and several.

The release by Holder of any party liable on this Note shall not operate to release any other party liable hereon.


**IN WITNESS WHEREOF**, Maker has caused this Note to be signed in its name effective as of this ___ day of _____, 2010.


**WITNESS:**                               **SARGENT RANCH, LLC, a California Limited**
                                           **Liability Company**


_____            **By:** _____

                                           **Name:  A. John Bryan, Jr.**
                                           **Title:   CEO**

# EXHIBIT B

# DEBTOR-IN-POSSESSION FINANCING AND SECURITY AGREEMENT

### As Revised 10/05/10

This DEBTOR-IN-POSSESSION FINANCING AND SECURITY AGREEMENT (the "**Agreement**") is made as of October ___, 2010 by and among EQUITY INVESTMENT PROPERTIES, INC (EIPI) and SARGENT RANCH, LLC, a California limited liability company ("**Company**"). This Agreement, and the parties' rights hereunder, are subject to, and conditioned upon, approval by the Bankruptcy Court (as defined below) for the Southern District of California.

## BACKGROUND

On January 4, 2010 (the "**Petition Date**"), the Company filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the Southern District of California ("**Court**") (such Chapter 11 proceedings are herein collectively referred to as the "**Chapter 11 Case**"), and the Company continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Company and EIPI propose to enter into that certain Debtor-In-Possession Financing and Security Agreement as of October ___, 2010 ("**Financing Agreement**") and the Company to delivered that certain Secured Note dated as of October ___, 2010 ("**Note**") in connection therewith, wherein EIPI agreed to provide a senior secured, super-priority debtor in possession credit facility of a minimum of Seven Million Five Hundred Thousand and No/100 Dollars ($7,500,000.00) Dollars. The Company advised EIPI that the Company would like to expand such credit facility up to Twenty Million and 00/100 Dollars ($20,000,000.00) (the "**Maximum Facility**").

EIPI is willing to provide such loans and other extensions of credit to the Companies only upon the terms and conditions set forth herein, including the requirement that, except as provided herein, such loans and other extensions of credit shall constitute allowed administrative expense claims in the Companies' Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code having priority over all administrative expenses of any kind; and shall be secured by an enforceable first priority priming Lien pursuant to Section 364(c)(2) and (d)(1) of the Bankruptcy Code on all of the Collateral, superior to all other Liens held by any other lien holders, on substantially all of the assets of the Company, pursuant to Section 364(c)(3) of the Bankruptcy Code.

The Company has agreed to secure all of its obligations under this Agreement and the DIP Documents by granting to EIPI a security interest in and lien upon the Collateral.

All capitalized terms used and not otherwise defined herein shall have the meanings ascribed thereto in <u>Annex A</u> and these background paragraphs shall be construed as part of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and undertakings and the terms and conditions contained herein, the parties hereto agree as follows:

1. **General Definitions and Terms; Rules of Construction.**

(a)    General Definitions.    Capitalized terms used in this Agreement without definition shall have the meanings assigned to them in Annex A.

(b)    Accounting Terms.    Any accounting terms used in this Agreement which are not specifically defined shall have the meanings customarily given them in accordance with GAAP and all financial computations shall be computed, unless specifically provided herein, in accordance with GAAP consistently applied.

(c)    Other Terms.    All other terms used in this Agreement and defined in the UCC shall have the meaning given therein unless otherwise defined herein.

(d)    Rules of Construction.    All Schedules, Addenda, Annexes and Exhibits hereto or expressly identified to this Agreement are incorporated herein by reference and taken together with this Agreement constitute but a single agreement. The words "herein", "hereof" and "hereunder" or other words of similar import refer to this Agreement as a whole, including the Exhibits, Addenda, Annexes and Schedules thereto, as the same may be from time to time amended, modified, restated or supplemented, and not to any particular section, subsection or clause contained in this Agreement. Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. The term "or" is not exclusive. The term "including" (or any form thereof) shall not be limiting or exclusive. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. All references in this Agreement or in the Schedules, Addenda, Annexes and Exhibits to this Agreement to sections, schedules, disclosure schedules, exhibits, and attachments shall refer to the corresponding sections, schedules, disclosure schedules, exhibits, and attachments of or to this Agreement. All references to any instruments or agreements, including references to any of this Agreement or the DIP Documents shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.

(e)    Currency.    All principal, interest and other amounts owing under this Agreement and any Ancillary Agreements, that, in accordance with their terms, are to be paid in cash shall be paid in US dollars.

2. **Loan Facility.**

(a)    Subject to the terms and conditions set forth herein and in the DIP Documents, EIPI shall make loans (the "**Loans**") to the Company from time to time during the Term which, in the aggregate at any time outstanding, will not exceed the Capital Availability Amount less EIPIs' legal costs to complete each transaction. The Company shall execute and deliver to EIPI on the Closing Date the Note.

2

(b)     Subject to the terms and conditions set forth herein and in the DIP Documents, Loans shall be extended to fund (1) payment of fees and costs of professionals employed by the Company pursuant to order of the Bankruptcy Court; (2) the payment of expenditures as set forth on the "**Budget**" attached hereto as <u>Exhibit A</u> as approved by EIPI, as such Budget may be updated from time to time with the consent of EIPI, which Budget shall be consistent with the business plan attached hereto as <u>Exhibit B</u> (the "**Business Plan**"), as such Business Plan may be updated from time to time with the consent of EIPI, (3) the payment of EIPIs' professionals.

(c)     Notwithstanding the limitations set forth above, if requested by the Company, EIPI retains the right to lend to the Company from time to time such amounts in excess of such limitations as EIPI may determine in its sole discretion, provided that funding, in the aggregate, does not exceed the Maximum Facility.

(d)     If any interest, fees, costs or charges payable to EIPI hereunder are not paid when due and remain unpaid through and upon expiration of any applicable cure period, the Company shall thereby be deemed to have requested, and EIPI is hereby authorized at its discretion to make and charge to the Companies' account, a Loan as of such date in an amount equal to such unpaid interest, fees, costs or charges.

(e)     If Company at any time fails to perform or observe any of the covenants contained in this Agreement or any DIP Document, EIPI may, but need not, perform or observe such covenant on behalf and in the name, place and stead of such Company (or, at EIPIs' option, in EIPIs' name) and may, but need not, take any and all other actions which EIPI may deem necessary to cure or correct such failure (including, but not limited to, the payment of taxes, the payment of lease payments, the satisfaction of Liens, the performance of obligations owed to Account Debtors, lessors or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments).    The amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by EIPI in connection with or as a result of the performance or observance of such agreements or the taking of such action by EIPI shall be charged to the Companies' account as a Loan and added to the Obligations.  .

(f)     During the Term, the Company may borrow and prepay Loans only in accordance with the terms and conditions hereof.

(g)     <u>Conversion to Plan of Reorganization Financing.</u>

Upon confirmation of a Plan of Reorganization the Parties agree:

(1)     All outstanding loan amounts due EIPI by the Company (The DIP financing) shall be converted to become part of the Plan of Reorganization Financing.

(2)     The term of the Plan of Reorganization Financing shall be five (5) years. The beginning date for the Plan of Reorganization Financing shall be the confirmation date of the Plan of Reorganization.

3

(3)    Beginning in year two (2), and continuing through year five (5), or at the retirement of all outstanding amounts due EIPI by the Company, whichever comes first, EIPI shall accrue, on a pro-rata annual basis, one million five hundred thousand dollars ($1,500,000.00) designated as principal reduction amortization.

(4)    Amortization accrued as per Section 2(g)(3) shall be paid from Company net profits on a priority basis before payment of other Company debt.

(h)    <u>Break-Up Clause.</u>  Post execution of the Note, and Court approval thereof should Company decide to accept other financing in place of EIPI prior to EIPI funding the Note, EIPI shall receive a penalty equal to four percent (4%) of Note amount.

3.    **Repayment of the Loans.**  The Company: (a) may prepay the Obligations from time to time in accordance with the terms and provisions of the Note (and <u>Section 20</u> hereof if such prepayment is due to a termination of this Agreement) and EIPIs' commitments relative thereto may be reduced or terminated upon written notice from the Company in such amounts as may be jointly agreed upon by the Company and EIPI; (b) shall repay on the expiration of the Term (i) the then aggregate outstanding principal balance of the Loans together with accrued and unpaid interest, fees and charges and; (ii) all other amounts owed EIPI under this Agreement and the DIP Documents.  Seventy-five percent (75%) of all net proceeds of Collateral, including, without limitation, insurance receipts in respect of the loss of any Collateral, shall be applied to reduce the Loans (and a corresponding block against the availability of Loans).  The foregoing shall not be deemed to be implied consent to any such sale or other disposition of the Collateral. Any payments of principal, interest, fees or any other amounts payable hereunder or under any DIP Document shall be made prior to 12:00 noon (California time) on the due date thereof in immediately available funds.

4.    **Procedure for Loans.**  The conditions precedent for the initial Loan, which shall be in the amount of Seven Million Five Hundred Thousand and No/100 Dollars ($7,500,000.00) are set forth in Sections 21 and 22 hereof, and such initial Loan shall be made within fifteen (15) Business Days of the Final Order.  Once the initial Loan has been made to the Company, the Company Agent may by written notice request a borrowing of Loans prior to 12:00 noon (California time) on the Business Day of its request to incur a Loan.  All such subsequent loan requests must be for a minimum amount of One Million Dollars ($ 1,000,000.00) or such larger amount required by Company, unless agreed otherwise by EIPI in its sole discretion.  Together with each request for a Loan (or at such other intervals as Company may request), the Company Agent shall deliver to EIPI a borrowing certificate (in the form attached hereto as <u>Exhibit C</u>) that all of the conditions precedent to such Loan (including, without limitations,  the conditions precedent set forth in <u>Section 22</u> hereof), which shall be certified as true and correct by the Chief Executive Officer, with all supporting documentation relating thereto and all other documents and certifications which EIPI shall reasonably request.  All Loans shall be disbursed from whichever office or other place EIPI may designate from time to time and shall be charged to the Companies' account on EIPIs' books.  Subject to the terms herein, the proceeds of each Loan made by EIPI shall be made available to the Company Agent on the tenth (10th) Business Day following the Business Day so requested in accordance with the terms of this <u>Section 4</u> by way of credit to the Company's operating account maintained with

4

such bank as the Company Agent designated to EIPI. Any and all Obligations due and owing hereunder may be charged to the Companies' account and shall constitute Loans.

5. **Interest and Payments.**

    (a)    Interest.

        (i)    Interest and payments shall be computed on the basis of actual days elapsed in a year of 360 days.

        (ii)    Effective upon the occurrence of any Event of Default and for so long as any Event of Default shall be continuing, the Contract Rate shall automatically be increased as set forth in the Note (such increased rate, the "**Default Rate**"), and all outstanding Obligations, including unpaid interest, shall continue to accrue interest from the date of such Event of Default at the Default Rate applicable to such Obligations.

        (iii)    In no event shall the aggregate interest payable hereunder or under the Note exceed the maximum rate permitted under any applicable law or regulation, as in effect from time to time (the "**Maximum Legal Rate**"), and if any provision of this Agreement or any DIP Document is in contravention of any such law or regulation, interest payable under this Agreement and each DIP Document shall be computed on the basis of the Maximum Legal Rate (so that such interest will not exceed the Maximum Legal Rate).

        (iv)    The Company shall jointly and severally pay principal, interest and all other amounts payable hereunder, or under any DIP Document, without any deduction whatsoever, including any deduction for any set-off or counterclaim or deduction or withholding for any taxes, levies, imposts, deductions, charges or withholdings of whatever kind or nature. If the Company shall be required by law to deduct or withhold any taxes from or in respect of any sum payable hereunder to EIPI, then:

        (1)    the sum payable to EIPI shall be increased as necessary so that after making all required deductions and withholdings EIPI receives an amount equal to the sum it would have received had no such deductions or withholdings been made;

        (2)    Company shall make such deductions and withholdings; and

        (3)    Company shall pay the full amount deducted or withheld to the relevant taxing authority or other authority in accordance with applicable law.

    (b)    Payments; Certain Closing Conditions, Fees.

        (i)    *Closing Fee/Loan Accommodation Fee.* Upon execution of this Agreement by the Company and EIPI (or any later applicable time), and in connection with the issuance by EIPI of the Loans, the Company shall jointly and severally pay to The Watley Group, from financing proceeds, a closing fee in cash, in an amount equal to five and one quarter percent (5.25%) of the loan amount or such other amount allowed by the Bankruptcy Court if less.

(ii)   *Prepayments*. On each date on which any asset disposition is consummated, whether by sale, lease or other transfer or disposition, an amount equal to 75% of the Net Sale Proceeds of such asset sale shall be paid over to EIPI for application to the Obligations outstanding under the Note, credited in the order as set forth in Section 1.3 of the Note. The remaining 25% of Net Sale Proceeds shall be paid to the Company.

(iii)   *Financial Information Default*.   Without affecting EIPIs' other rights and remedies, in the event the Company fails to deliver the financial information required by Section 12 on or before the date required by this Agreement, an Event of Default shall be incurred until such failure is cured to EIPIs' satisfaction or waived in writing by EIPI.

(iv)   *Expenses*. As a condition to the initial Loan, the Company shall jointly and severally reimburse EIPI, from proceeds of the financing, for its expenses (including reasonable legal fees and expenses) incurred in connection with the preparation and negotiation of the DIP Documents, and expenses incurred in connection with EIPIs' due diligence review of the Company and any Subsidiaries and all related matters up to a total of $30,000.00.

*Capitalization of Expenses and Fees*.   EIPI may, at its option, choose to have any fees or expenses capitalized into the Principal Amount of the Note instead of being promptly paid when incurred or due.

(c)   Taxes.

(i)   Any and all property tax payments due by Company hereunder shall pay be paid in full to the relevant governmental authority in accordance with applicable law.

(ii)   In addition, the Companies agrees to pay to the relevant governmental authority in accordance with applicable law any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Loan ("**Other Taxes**"). The Companies shall deliver to EIPI official receipts, if any, in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes or other evidence of payment reasonably acceptable to EIPI.

(iii)   The obligations of the Company under this Section 5(c) shall survive the termination of this Agreement and the payment of the Loan and all other amounts payable hereunder.

6.   **Nature of Obligations and EIPI Liens.**

(a)   The priority of the Liens granted to EIPI on the Collateral of the Company shall be senior and prior to the entire Company's Prepetition Indebtedness and Post Petition Indebtedness.

(b)   All Obligations shall constitute allowed super priority administrative expense claims of the Company in the Chapter 11 Cases pursuant to Section 364(c)(1) of the Bankruptcy Code (as to the Collateral) having priority over any and all administrative expenses

of the kind specified in or incurred pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) or 726 of the Bankruptcy Code ("**Super Priority Claims**") and shall at all times be senior to the rights of the Company, its estate, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code, in any case subject only to Permitted Exceptions.

(c)     EIPI hereby consents to the application by the Company for entry of an administrative procedures order that will allow all professionals to be paid their customary percentage of their reasonable professional fees on a monthly basis, so long as aggregate payments do not exceed the availability for such professionals under the Carve Out, and EIPI reserves all of its rights to object to the reasonableness of such professional fees pursuant to, *inter alia*, Section 330 of the Bankruptcy Code and does not waive any rights, requirements or procedures with respect to approval of such fees.

## 7.   **Lien and Security Interest.**

(a)     To secure the prompt payment to EIPI of the Obligations, all Obligations secured by Collateral shall constitute allowed perfected first priority priming Liens pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, subject only to Permitted Exceptions and the Company hereby assigns, pledges and grants to EIPI a continuing security interest in and Lien upon all of the Collateral of the Company.  Such assignment, pledge, or grant is in addition to any other security interest or Lien created at any time under any other document or agreement in favor of EIPI.  All of the Company's Books and Records relating to the Collateral shall be kept by such Company in trust for EIPI until all Obligations have been paid in full.

(b)     The Company hereby (i) authorizes EIPI to file any financing statements, continuation statements or amendments thereto and any other documents necessary to perfect the security including those that (x) indicate the Collateral (1) as well as all assets and personal property of the Company, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (2) as being of an equal or lesser scope or with greater detail, and (y) contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment and (ii) ratifies its authorization for EIPI to have filed any initial financial statements, or amendments thereto if filed prior to the date hereof.  The Company acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement without the prior written consent of EIPI and agrees that it will not do so without the prior written consent of EIPI, subject to such Company's rights under Section 9-509(d)(2) of the UCC.

(c)     The Company shall grant a deed of trust, fixture filing and any other instrument necessary to grant EIPI its first priority priming Lien in all of the Company's real property holdings or rights, mineral rights, mineral leases, fixtures, water rights, mining claims and leases, and other real property rights of any kind in form and substance satisfactory to EIPI, and hereby authorizes EIPI to file such deed(s) of trust and other documents in all applicable counties.

8.      **Representations, Warranties and Covenants Concerning the Collateral.**  The Company represents, warrants (each of which such representations and warranties shall be deemed repeated upon the making of each request for a Loan and made as of the time of each and every Loan hereunder) and covenants as follows, all of which shall survive the termination hereof:

(a)      all of the Collateral (i) is owned by it free and clear of all Liens (including any claims of infringement) except those in EIPIs' favor and Disclosed Liens and Permitted Exceptions and (ii) is not subject to any agreement prohibiting the granting of a Lien or requiring notice of or consent to the granting of a Lien.

(b)      it shall not encumber, mortgage, pledge, assign or grant any Lien in any Collateral or any other assets to anyone other than EIPI (except for any Lien to which EIPI consents in writing) or as set forth in Debtor's Plan of Reorganization.

(c)      following the entry of the Final Order, the Liens granted pursuant to this Agreement, upon completion of the filings of the DIP Documents, constitute valid perfected security interests in all of the Collateral in favor of EIPI as security for the prompt and complete payment and performance of the Obligations, enforceable in accordance with the terms hereof against any and all of its creditors and purchasers and such security interest in the Collateral is prior to all other Liens in existence other than Permitted Exceptions.

(d)      no effective security agreement, mortgage, deed of trust, financing statement, equivalent security or Lien instrument or continuation statement covering all or any part of the Collateral is or will be on filed or of record in any public office, except those relating to Disclosed Liens and Permitted Exceptions.

(e)      other than as agreed to by EIPI in writing or otherwise ordered by the Bankruptcy Court, and subject to Section 5(b)(ii) herein, it shall not dispose of any of the Collateral whether by sale, lease, refinance or otherwise except only to the extent that the proceeds of any such disposition are used to acquire replacement Equipment which is subject to EIPIs' security interest with the same priority and extent.

(f)      it shall perform in a reasonable time all other steps requested by EIPI to create and maintain in EIPIs' favor a valid perfected first Lien in all Collateral subject only to Permitted Exceptions.

(g)      it shall maintain and keep all of its Books and Records concerning the Collateral at its executive offices listed in Schedule 8(n).

(h)      All Inventory manufactured by it in the United States of America shall be produced in accordance with the requirements of the Federal Fair Labor Standards Act of 1938, as amended and all rules, regulations and orders related thereto or promulgated there under.

(i)      it shall promptly notify EIPI of any capital improvements, acquisitions of Post Petition Equipment, or any other acquisitions of personal property so that EIPI may obtain

or maintain a first priority perfected Lien in any such property or first priority purchase money Lien in such property.

9. **Payment of Accounts.**

The Company shall deposit any monies, checks, instruments, remittances, proceeds or other payments, including proceeds of accounts receivable, only in an account held with a bank as to which an Account Control Agreement is in full force and effect (each, an "**Approved Bank Account**").

10. **Collection and Maintenance of Collateral.**

(a)     EIPI may verify each Company Account from time to time upon reasonable notice to Company, but not more often than once every month, unless an Event of Default has occurred and is continuing, utilizing an audit control company or any other agent of EIPI.

(b)     Following an Event of Default, proceeds of Accounts received by EIPI will be deemed received on the Business Day after EIPIs' receipt of such proceeds in good funds in dollars of the United States of America to an account designated by EIPI.  Any amount received by EIPI after 12:00 noon (Ohio time) on any Business Day shall be deemed received on the next Business Day.

(c)     Following an Event of Default, EIPI, at its option, may (a) apply such proceeds to the Obligations in such order as EIPI shall elect, (b) hold all such proceeds as cash collateral for the Obligations and the Company hereby grants to EIPI a security interest in such cash collateral amounts as security for the Obligations and/or (c) do any combination of the foregoing.

11. **Inspections and Appraisals.**  At all times during normal business hours, EIPIs, and/or any agent of EIPI shall have the right, upon reasonable notice to Company Agent, to (a) have access to, visit, inspect, review, evaluate and make physical verification and appraisals of each Company's properties and the Collateral, (b) inspect, audit and copy (or take originals if necessary) and make extracts from each Company's Books and Records, including management letters prepared by the Accountants, and (c) discuss with each Company's managers, principal officers, and independent accountants, each Company's business, assets, liabilities, financial condition, results of operations, business prospects, and financing or purchase prospects and progress.  The Company will deliver to EIPI any instrument necessary for EIPI to obtain records from any service bureau maintaining records for the Company.  If any internally prepared financial information, including that required under this Section is unsatisfactory in any manner to EIPI, as determined by EIPI in its reasonable discretion, EIPI may request that the Accountants review the same.

12. **Financial Reporting.**  The Company Agent will deliver, or cause to be delivered, to EIPI each of the following, which shall be in form and detail reasonably acceptable to EIPI:

(a)     The Company Agent shall prepare and deliver to EIPI a monthly receipt and disbursement report for the Company's cash receipts and expenses in accordance with the Budget and in such reasonable form as EIPI shall require.

(b)     As soon as available, and in any event within ninety (90) days after the end of each financial year of the Company, the Company's financial statements (prepared in accordance with GAAP) with a report of independent certified public accountants of recognized standing selected by such Company and reasonably acceptable to EIPI (the "**Accountants**"), which annual financial statements shall be without qualification and shall include such Company's balance sheet as at the end of such fiscal year and the related statements of such Company's income, retained earnings and cash flows for the fiscal year then ended, all in reasonable detail and prepared in accordance with GAAP, together with (i) if and when available, copies of any management letters prepared by the Accountants; and (ii) a certificate of such Company's Chief Executive Officer, Controller, Chief Financial Officer, Chairman or Finance Director stating that such financial statements have been prepared in accordance with GAAP and whether or not such officer has knowledge of the occurrence of any Default or Event of Default hereunder and, if so, stating in reasonable detail the facts with respect thereto;

(c)     As soon as available and in any event within forty five (45) days after the end of each quarter of the Company, an unaudited/internal balance sheet and statements of income, retained earnings and cash flows of the Company as at the end of and for such quarter and for the year to date period then ended, in reasonable detail and stating in comparative form the figures for the corresponding date and periods in the previous year, all prepared in accordance with GAAP, subject to year-end adjustments and accompanied by a certificate of such Company's Chief Executive Officer, Controller, Chief Financial Officer, Chairman or Finance Director, stating (i) that such financial statements have been prepared in accordance with GAAP, and (ii) whether or not such officer has knowledge of the occurrence of any Default or Event of Default hereunder not theretofore reported and remedied and, if so, stating in reasonable detail the facts with respect thereto;

(d)     As soon as available and in any event within twenty (20) days after the end of each calendar month, an unaudited/internal balance sheet and statements of income, retained earnings and cash flows of each Company as at the end of and for such month and for the year to date period then ended, in reasonable detail and stating in comparative form the figures for the corresponding date and periods in the previous year, all prepared in accordance with GAAP, subject to year-end adjustments and accompanied by a certificate of such Company's Chief Executive Officer, Controller, Chief Financial Officer, Chairman or Finance Director, stating (i) that such financial statements have been prepared in accordance with GAAP, and (ii) whether or not such officer has knowledge of the occurrence of any Default or Event of Default hereunder not theretofore reported and remedied and, if so, stating in reasonable detail the facts with respect thereto; and

(e)     Within twenty (20) days after the end of each month (or more frequently if EIPI so requests but no more frequently than once a month unless an Event of Default has occurred and remains uncured), aging of the Company's Accounts, unaudited trial balances and their accounts payable and a calculation of the Company's Accounts, provided, however, that if EIPI shall request the foregoing information more often than as set forth in the immediately

preceding clause, the Company shall have fifteen (15) days from each such request to comply with EIPIs' demand.

13. **Additional Representations and Warranties.** The Company hereby represents, warrants (each of which such representations and warranties shall be deemed repeated upon the making of each request for a Loan and made as of the time of each and every Loan hereunder) and covenants as follows, all of which shall survive the termination hereof:

(a) <u>Organization, Good Standing and Qualification</u>. It is a California limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and/or incorporation. Subject to applicable limitations under the Bankruptcy Code, it has the power and authority to own and operate its properties and assets, to transact the business in which it is engaged and proposed to be engaged and, insofar as it is or shall be a party thereto, to (i) execute and deliver this Agreement and the Ancillary Agreements to which it is a party, (ii) to issue the Note, and (iii) to carry out the provisions of this Agreement and the Ancillary Agreements and to carry on its business as presently conducted. It is duly qualified and is authorized to do business and is in good standing as a foreign entity in all jurisdictions in which the nature or location of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so has not had, or could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) <u>Capitalization; Voting Rights</u>. To the best of Company's knowledge and to the extent compiled by Company:

(i) The authorized, issued and outstanding Membership Interests, as the case may be, of the Company are set forth on <u>Schedule 13(b)</u>, effective as of the date set forth in such Schedule.

(ii) Other than as set forth on <u>Schedule 13(b)</u>, effective as of the date set forth in such Schedule, there are no outstanding options, warrants, rights (including conversion or preemptive rights and rights of first refusal), proxy or operating agreements, or arrangements or agreements of any kind for the purchase or acquisition from the Company of any of its securities. Except as disclosed on <u>Schedule 13(b)</u>, neither the offer or issuance of the Note, nor the consummation of any transaction contemplated hereby will result in a change in the price or number of any securities of the Company outstanding, under anti-dilution or other similar provisions contained in or affecting any such securities.

(c) <u>Authorization; Binding Obligations</u>.

(i) All corporate or limited liability company, as the case may be, action on the Company's part (including its officers and managers) necessary for the authorization of this Agreement and the Ancillary Agreements, the performance of all of the Company's obligations hereunder and under the Ancillary Agreements and, the authorization, issuance and delivery of this Agreement, the Ancillary Agreements, and the Note by the Company has been taken or will be taken prior to the Closing Date.

11

(ii)     Upon the entry by the Bankruptcy Court of the Final Order, the Company has full power, authority and legal right to enter into this Agreement and the Ancillary Agreements and to perform all its duties and obligations hereunder and there under.  Upon the entry by the Bankruptcy Court of the Final Order, the execution, delivery and performance of this Agreement and of the Ancillary Agreements (a) are within the Company's limited liability powers, have been duly authorized, are not in contravention of law or any material terms of the Company's organizational documents or to the conduct of the Company's business or of any material agreement or undertaking to which the Company is a party or by which the Company is bound, and (b) will not conflict with nor result in any breach in any of any material provisions of or constitute a default under or result in the creation of any Lien (except Permitted Exceptions) upon any asset of the Company under the provisions of any organizational document or other instrument to which the Company or its property is a party or by which it may be bound.

(iii)     Upon the entry by the Bankruptcy Court of the Final Order, this Agreement is, and each Ancillary Agreement executed by the Company constitutes, the legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms.

(d)     <u>Liabilities</u>.  Except as set forth in the Company's schedules filed with the Bankruptcy Court and on <u>Schedule 13(d)</u>, which have been prepared based on the Company's good faith belief and to the best of Company's knowledge, the Company has no liabilities, except current liabilities incurred in the ordinary course of business.

(e)     <u>Agreements; Action</u>.  Except as set forth on <u>Schedule 13(e)</u> or otherwise disclosed in the Bankruptcy Schedules:

(i)     There are no agreements, understandings, instruments, contracts, proposed transactions, judgments, orders, writs or decrees to which it is a party or to its knowledge by which it is bound which may involve: (i) obligations (contingent or otherwise) of, or payments to, it in excess of One Hundred Thousand Dollars ($100,000) (other than obligations of, or payments to, it arising from purchase or sale agreements entered into in the ordinary course of business); or (ii) the transfer or license of any patent, copyright, trade secret or other proprietary right to or from it (other than licenses arising from the purchase of "off the shelf" or other standard products); or (iii) provisions restricting the development, manufacture or distribution of its products or services; or (iv) indemnification by it with respect to infringements of proprietary rights. For the purposes of this subsection, all indebtedness, liabilities, agreements, understandings, instruments, contracts and proposed transactions involving the same Person (including Persons it has reason to believe are affiliated therewith) shall be aggregated for the purpose of meeting the individual minimum dollar amounts of such subsections.

(ii)     The Company will utilize disclosure controls and procedures ("**Disclosure Controls**") reasonably designed to ensure that information required to be disclosed by the Company in the reports that it files or submits under applicable law and/or regulation is recorded, processed, summarized, and reported, within the time periods specified in the rules and forms required by such law and/or regulation.

(iii)     The Company will keep books, records, and accounts that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets. The

Company will maintain internal control over financial reporting ("**Financial Reporting Controls**") designed by, or under the supervision of, it's principal executive and principal financial officers, and effected by its managers, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, including that:

    (1) transactions are executed in accordance with management's general or specific authorization;

    (2) unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements are prevented or timely detected;

    (3) transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that its receipts and expenditures are being made only in accordance with authorizations of the Company's management and managers;

    (4) transactions are recorded as necessary to maintain accountability for assets; and

    (5) the recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences.

    (f) <u>Obligations to Related Parties</u>.  Except as set forth on <u>Schedule 13(f)</u>, the Company does not have any obligations to its officers, managers, members or employees other than:

    (i) for payment of salary for services rendered and for bonus payments;

    (ii) reimbursement for reasonable expenses incurred on its behalf;

    (iii) for other standard employee benefits made generally available to all employees (including Share or Unit option agreements outstanding under any Share or Unit option plan approved by its managers, as applicable); and

    (iv) obligations listed in its financial statements.

    (g) <u>Changes</u>.  Since the most recent date that Company provided financial disclosures to EIPI, except as disclosed in any Schedule to this Agreement or to any of the Ancillary Agreements or any Bankruptcy Schedule there has not been:

    (i) any change in its business, assets, liabilities, condition (financial or otherwise), properties, operations or prospects, which, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect;

(ii)      any resignation or termination of any of its officers, key employees or groups of employees;

(iii)      any material change, except in the ordinary course of business, in its contingent obligations by way of guaranty, endorsement, indemnity, warranty or otherwise;

(iv)      any damage, destruction or loss, whether or not covered by insurance, which has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(v)      any waiver by it of a material right or of a material debt owed to it;

(vi)      any direct or indirect material loans made by it to any of its members, employees, officers or managers, other than advances made in the ordinary course of business;

(vii)      any material change in any compensation arrangement or agreement with any employee, officer, manager or member;

(viii)      any declaration or payment of any dividend or other distribution of its assets;

(ix)      any labor organization activity related to it;

(x)      any debt, obligation or liability incurred, assumed or guaranteed by it, except those for immaterial amounts and for current liabilities incurred in the ordinary course of business;

(xi)      any sale, assignment or transfer of any Intellectual Property or other intangible assets;

(xii)      any change in any material agreement to which it is a party or by which it is bound which, either individually or in the aggregate, has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(xiii)      any other event or condition of any character that, either individually or in the aggregate, has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; or

(xiv)      any arrangement or commitment by it to do any of the acts described in subsection (i) through (xiii) of this Section 13(g).

(h)      Title to Properties and Assets; Liens, Etc.    Except as set forth on Schedule 13(h), it has good and marketable title to its properties and assets, and good title to its leasehold interests, in each case subject to no Lien, other than Disclosed Liens and Permitted Exceptions.    All facilities, Equipment, Fixtures, vehicles and other properties owned, leased or used by it are in good operating condition and repair and are reasonably fit and usable for the purposes for which they are being used.    Except as set forth on Schedule 13(h) or otherwise

14

disclosed in the Bankruptcy Schedules, it is in compliance with all material terms of each lease to which it is a party or is otherwise bound.

      (i)    <u>Intellectual Property</u>.

      (i)    It owns or possesses sufficient legal rights to all Intellectual Property necessary for its business as now conducted and, to its knowledge as presently proposed to be conducted, without any known infringement of the rights of others. There are no outstanding options, licenses or agreements of any kind relating to its Intellectual Property, nor is it bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other Person other than such licenses or agreements arising from the purchase of "off the shelf" or standard products.

      (ii)    It has not received any communications alleging that it has violated any of the Intellectual Property or other proprietary rights of any other Person, nor is it aware of any basis therefore.

      (iii)    It does not believe it is or will be necessary to utilize any inventions, trade secrets or proprietary information of any of its employees made prior to their employment by it, except for inventions, trade secrets or proprietary information that have been rightfully assigned to it.

      (j)    <u>Compliance with Other Instruments</u>. Except for those defaults occasioned by the bankruptcy filing, as well as the defaults set forth on <u>Schedule 13(j)</u>, it is not in violation or default of (x) any term of its organizational documents, or (y) any provision of any indebtedness, mortgage, indenture, contract, agreement or instrument to which it is party or by which it is bound or of any judgment, decree, order or writ, which violation or default, in the case of this clause (y), has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. The execution, delivery and performance of and compliance with this Agreement and the Ancillary Agreements to which it is a party, and the issuance of the Note pursuant hereto and thereto, will not, with or without the passage of time or giving of notice, result in any such material violation, or be in conflict with or constitute a default under any such term or provision, or result in the creation of any Lien upon any of its properties or assets or the suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to it, their businesses or operations or any of their assets or properties.

      (k)    <u>Litigation</u>. Except for the Chapter 11 Case and Lender Litigation Case as set forth on <u>Schedule 13(k)</u> or the Bankruptcy Schedules, there is no action, suit, proceeding or investigation pending or, to its knowledge, currently threatened against it that prevents it from entering into this Agreement or the Ancillary Agreements, or from consummating the transactions contemplated hereby or thereby, or which has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, or could result in any change in its current equity ownership, nor is it aware that there is any basis to assert any of the foregoing. It is not a party to or subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality. Except for the Chapter 11 Case and as set forth on <u>Schedule 13(k)</u> or the Bankruptcy Schedules, and the litigation filed

15

September 27, 2010 and any ancillary actions thereto, there is no other action, suit, proceeding or investigation by it currently pending or which it intends to initiate.

        (l)        <u>Tax Returns and Payments</u>.  Except as set forth on <u>Schedule 13(l)</u>, it has timely filed all tax returns (federal, state and local) required to be filed by it through the year 2007 and will cause to be filed all federal and state tax returns within 90 days from initial funding of Bankruptcy Court approval of this agreement.   All Post-Petition taxes have been paid or will be paid prior to the time within 90 days from Bankruptcy Court approval of this agreement.  Except as set forth on <u>Schedule 13(l)</u>, it has not been advised:

        (i)        that any of its returns, federal, state or other, have been or are being audited as of the date hereof; or

        (ii)        of any adjustment, deficiency, assessment or court decision in respect of its national, federal, state or other taxes.

Except as set forth on <u>Schedule 13(l)</u>, it has no knowledge of any liability of any tax to be imposed upon its properties or assets as of the date of this Agreement that is not adequately provided for in the budget to be paid.

        (m)        <u>Employees</u>.  Except as set forth on <u>Schedule 13(m)</u>, it does not have any collective bargaining agreements with any of its employees. There is no labor union organizing activity pending or, to its knowledge, threatened with respect to it.  Except as disclosed on <u>Schedule 13(m)</u>, it is not a party to or bound by any currently effective employment contract, deferred compensation arrangement, bonus plan, incentive plan, profit sharing plan, retirement agreement or other employee compensation plan or agreement.  To its knowledge, none of its employees, nor any consultant with whom it has contracted, is in violation of any term of any employment contract, proprietary information agreement or any other agreement relating to the right of any such individual to be employed by, or to contract with, it because of the nature of the business to be conducted by it; and to its knowledge the continued employment by it of its present employees, and the performance of its contracts with its independent contractors, will not result in any such violation.  It is not aware that any of its employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency that would interfere with their duties to it.  It has not received any notice alleging that any such violation has occurred.  Except for employees who have a current effective employment agreement with it, none of its employees has been granted the right to continued employment by it or to any material compensation following termination of employment with it.  Except as set forth on <u>Schedule 13(m)</u>, it is not aware that any officer, key employee or group of employees intend to terminate his, her or their employment with it, nor does it have a present intention to terminate the employment of any officer, key employee or group of employees.

        (n)        <u>Registration Rights and Voting Rights</u>.   Except as set forth on <u>Schedule 13(n)</u>, it is not presently under any obligation, and it has not granted any rights, to register any of its presently outstanding securities, if any, or any of its securities that may hereafter be issued. Except as set forth on <u>Schedule 13(n)</u>, to its knowledge, none of its members has entered into any agreement with respect to its voting of equity interests.

16

(o)     Compliance with Laws; Permits.  Except as set forth on Schedule 13(o), it is not in violation of the Sarbanes-Oxley Act of 2002 or any SEC related regulation or rule or any rule promulgated there under, to the extent applicable, or any other applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of its business or the ownership of its properties which has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.  Subject to the provisions of the Bankruptcy Code, no governmental orders, permissions, consents, approvals or authorizations are required to be obtained and no registrations or declarations are required to be filed in connection with the execution and delivery of this Agreement or any Ancillary Agreement or the legality, validity binding effect or enforceability of this Agreement, the Note or any Ancillary Agreement, except such as have been duly and validly obtained or filed, or with respect to any filings that must be made after the Closing Date, as will be filed in a timely manner.  It has all material franchises, permits, licenses and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(p)     Environmental and Safety Laws.  It is not in violation of any applicable statute, law or regulation relating to the environment or occupational health and safety, and to its knowledge, no material expenditures are or will be required in order to comply with any such existing statute, law or regulation.  Except as set forth on Schedule 13(p), no Hazardous Materials (as defined below) are used or have been used, stored, or disposed of by it or, to its knowledge, by any other Person on any property owned, leased or used by it.  For the purposes of the preceding sentence, "Hazardous Materials" shall mean:

(i)     materials which are listed or otherwise defined as "hazardous" or "toxic" under any applicable local, state, federal and/or foreign laws and regulations that govern the existence and/or remedy of contamination on property, the protection of the environment from contamination, the control of hazardous wastes, or other activities involving hazardous substances.

(q)     Valid Offering.  The offer and issuance of the Note will be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and will have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable national and state securities and bankruptcy laws.

(r)     Full Disclosure.  It has provided EIPI with all factual information requested by EIPI in connection with EIPIs' decision to enter into this Agreement, including all information such Company believes is reasonably necessary to make such investment decision, and all such factual information furnished is and will be true and accurate in all material respects on the date as of which such information is dated or certified.  Neither this Agreement, the Ancillary Agreements nor the exhibits and schedules hereto and thereto nor any other document delivered by it to EIPI or its attorneys or agents in connection herewith or therewith or with the transactions contemplated hereby or thereby, contain any untrue statement of a material fact nor omit to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances in which they are made, not misleading.  Any financial

17

projections and other estimates provided to EIPI by it were based on its experience in the industry and on assumptions of fact and opinion as to future events which it, at the date of the issuance of such projections or estimates, believed to be reasonable.

(s)   Insurance.  It has, or will obtain, general commercial, product liability, fire and casualty, workers compensation and other insurance policies with coverage's which it believes are customary for companies similarly situated to it in the same or similar business.

(t)   Financial Reports and Financial Statements.  The Company has furnished EIPI with copies of updated financial reports satisfactory to EIPI prior to the Final Order (collectively, the "**Financial Reports**").   Except as set forth on Schedule 13(t), or as otherwise disclosed in the Bankruptcy Schedules, each Financial Report was, at the time of its filing, if filed, in substantial compliance with the requirements of its respective form and none of the Financial Reports, nor the financial statements (and the notes thereto) included in the Financial Reports, as of the dates they were provided, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.   Such financial statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto or (ii) in the case of unaudited interim statements, to the extent they may not include footnotes or may be condensed) and fairly present in all material respects the financial condition, the results of operations and cash flows of the Company as of, and for, the periods presented in each such Financial Report.   The Budget, furnished to EIPI on the Closing Date, was prepared by the chief executive officer, chief financial officer or controller of the Company, is based on underlying assumptions which provide a reasonable basis for the forecasts contained therein and reflects the Company's judgment based on present circumstances of a reasonably anticipated set of conditions and course of action for the projected period, provided that EIPI acknowledges and agrees that such Budget contains forward looking statements and the actual results may differ from the forecasted results.

(u)   No Integrated Offering.   Neither it, nor any of its Affiliates, nor any Person acting on its or their behalf, has directly or indirectly made any offers or sales of any security or solicited any offers to buy any security under circumstances that would cause the offering of the Note pursuant to this Agreement or any Ancillary Agreement to be integrated with prior offerings by it for purposes of the Securities Act which would prevent it from issuing the Note pursuant to Rule 506 under the Securities Act, or any applicable exchange-related stockholder approval provisions, nor will it or any of its Affiliates or Subsidiaries take any action or steps that would cause the offering of the Note to be integrated with other offerings.

(v)   Dilution.   It specifically acknowledges that any fully agreed upon obligation to issue any Equity is binding upon any reorganized debtor and enforceable regardless of the dilution such issuance may have on the ownership interests of other members of such reorganized debtor.

(w)   Patriot Act.  It certifies that, to the best of its knowledge, it has not been designated, nor is or shall be owned or controlled, by a "suspected terrorist" as defined in Executive Order 13224.   It hereby acknowledges that EIPI seeks to comply with all applicable

laws concerning money laundering and related activities. In furtherance of those efforts, it hereby represents, warrants and covenants that: (i) none of the cash or property that it will pay or will contribute to EIPI has been or shall be derived from, or related to, any activity that is deemed criminal under United States law; and (ii) no contribution or payment by it to EIPI, to the extent that they are within its control shall cause EIPI to be in violation of the United States Bank Secrecy Act, the United States International Money Laundering Control Act of 1986 or the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001. It shall promptly notify EIPI if any of these representations, warranties and covenants ceases to be true and accurate regarding it. It shall provide EIPI with any additional information regarding it that EIPI deems necessary or convenient to ensure compliance with all applicable laws concerning money laundering and similar activities. It understands and agrees that if at any time it is discovered that any of the foregoing representations, warranties and covenants are incorrect, or if otherwise required by applicable law or regulation related to money laundering or similar activities, EIPI may undertake appropriate actions to ensure compliance with applicable law or regulation, including but not limited to segregation and/or redemption of EIPIs' investment in it. It further understands that EIPI may release confidential information about it and, if applicable, any underlying beneficial owners, to proper authorities if EIPI, in its sole discretion, determines that it is in the best interests of EIPI in light of relevant rules and regulations under the laws set forth in subsection (ii) above.

(x)    Company Name; Locations of Offices, Records and Collateral. Schedule 13(x) sets forth the Company's name as it appears in official filings in the state of its organization, the type of entity of the Company, the organizational identification number issued by the Company's state of organization, the Company's state of organization, and the location of the Company's chief executive office or head office, corporate offices, locations of Collateral and locations where records with respect to Collateral are kept (including in each case the county of such locations) and, except as set forth in such Schedule 13(x), such locations have not changed during the preceding twelve (12) months. As of the Closing Date, during the prior five (5) years, except as set forth in Schedule 13(x), the Company has not been known as or conducted business in any other name (including trade names). The Company has only one state of organization or country of incorporation.

(y)    ERISA. Based upon the Employee Retirement Income Security Act of 1974 ("ERISA"), and the regulations and published interpretations there under: (i) it has not engaged in any Prohibited Transactions (as defined in Section 406 of ERISA and Section 4975 of the Bankruptcy Code); (ii) it has met all applicable minimum funding requirements under Section 302 of ERISA in respect of its plans; (iii) it has no knowledge of any event or occurrence which would cause the Pension Benefit Guaranty Corporation to institute proceedings under Title IV of ERISA to terminate any employee benefit plan(s); (iv) it has no fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than its employees; and (v) it has not withdrawn, completely or partially, from any multi-employer pension plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980.

(z)    Proper Authorization.    The filing of the Bankruptcy was properly authorized by the Company.

14.    **Reorganization Matters.**

(a)    The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law. The Company shall give, on a timely basis as specified in the Final Order, all notices required to be given to all parties specified in the Final Order.

(b)    The Loans will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against each Company now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 504(a), 506(c), 507(a), 546(c), 726, 1114 or any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code, other than claims related to the Carve Out.

(c)    After the entry of the Final Order, the Loans will be secured by a valid and perfected first priority Lien on all the Collateral.

(d)    The Final Order (beginning on and after the date of entry of the Final Order), is in full force and effect and has not been reversed, stayed, vacated, modified or amended.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Loans, EIPI shall be entitled to immediate payment of such Loans and to enforce the remedies provided for hereunder, subject to the Final Order (with respect to the period from and after the date of entry of the Final Order).

15.    **Covenants.** The Company covenants and agrees with EIPI as follows:

(a)    <u>Use of Funds</u>. It shall use the proceeds of the Loans solely for the purposes set forth in <u>Section 2(b)</u> hereof and in accordance with the Budget and Business Plan.

(b)    <u>Access to Facilities</u>. It shall permit any representatives designated by EIPI (or any successor of EIPI), upon one (1) business day prior notice and during normal business hours, at Company's expense and accompanied by a representative of the Company (provided that no such prior notice shall be required to be given and no such representative shall be required to accompany EIPI in the event EIPI believes such access is necessary to preserve or protect the Collateral or Prepetition Equipment or following the occurrence and during the continuance of an Event of Default), to:

(i)    visit and inspect any of its properties;

(ii)    examine its corporate and financial records (unless such examination is not permitted by federal, state or local law or by contract) and make copies thereof or extracts there from; and

(iii)    discuss its affairs, finances and accounts with its managers, officers and Accountants.

20

In receiving any material, non-public information by EIPI pursuant to this or any other provision of this Agreement or any other Agreement between EIPI and the Company, EIPI shall comply with Regulation FD, under the federal securities laws. EIPI confirms that it is aware of:

(a)    the prohibition on dealings by insiders set out in the Criminal Justices Act 1993; and

(b)    the fact that the confidential information is given in confidence and the relevant parties should not base any behavior (as defined in section 118(6) of the Financial Services and Markets Act 2000 ("**FSMA**")) in relation to any Equity Interests in the Company which would amount to market abuse (as defined in section 118(1) of the FSMA) on any such information until after such information is generally available.

(c)    <u>Taxes</u>. It shall promptly pay and discharge, or cause to be paid and discharged, when due and payable, after giving effect to all applicable extensions, all lawful taxes, assessments and governmental charges or levies imposed upon its income, profits, property or business, as the case may be, incurred Post-Petition; provided, however, that any such tax, assessment, charge or levy need not be paid currently if (i) the validity thereof shall currently and diligently be contested in good faith by appropriate proceedings, (ii) it has set aside an amount equal to such contested amount into an Account controlled by EIPI prior to such dispute, and (iii) any such dispute or contest shall not have a Material Adverse Effect on the Collateral or pursuant hereto or to any Ancillary Agreement.

(d)    <u>Insurance</u>. It shall bear the full risk of loss from any loss of any nature whatsoever with respect to the Collateral. It shall keep its assets which are of an insurable character insured by financially sound and reputable insurers against loss or damage by fire, explosion and other risks customarily insured against by companies in similar business similarly situated as it; and it shall maintain, with financially sound and reputable insurers, insurance against other hazards and risks and liability to persons and property to the extent and in the manner which it reasonably believes is customary for companies in similar business similarly situated as it and to the extent available on commercially reasonable terms. It will bear the full risk of loss from any loss of any nature whatsoever with respect to the assets pledged to EIPI as security for its obligations hereunder and under the DIP Documents. At its own cost and expense in amounts and with carriers reasonably acceptable to EIPI, it shall (i) keep all of its insurable properties and properties in which it has an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to it, including business interruption insurance; (ii) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to it insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singularly or jointly with others at any time have access to its assets or funds either directly or through governmental authority to draw upon such funds or to direct generally the disposition of such assets; (iii) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (iv) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which it is engaged in business; and (v) furnish EIPI with  one (1) copy of all policies and

evidence of the maintenance of such policies at least thirty (30) days before any expiration date, (y) excepting its workers' compensation policy, endorsements to such policies naming EIPI as "co-insured" or "additional insured" and appropriate loss payable endorsements in form and substance satisfactory to EIPI, naming EIPI as lenders loss payee, and (z) evidence that as to EIPI the insurance coverage shall not be impaired or invalidated by any act or neglect of the Company and the insurer will provide EIPI with at least thirty (30) days notice prior to cancellation. It shall instruct the insurance carriers that in the event of any loss there under, the carriers shall make payment for such loss to EIPI and not to the Company and EIPI jointly. If any insurance losses are paid by check, draft or other instrument payable to the Company and EIPI jointly, EIPI may endorse, as applicable, the Company's name thereon and do such other things as EIPI may deem advisable to reduce the same to cash. EIPI is hereby authorized to adjust and compromise claims. All loss recoveries received by EIPI upon any such insurance may be applied to the Obligations, in such order as EIPI in its sole discretion shall determine or shall otherwise be delivered to the Company for the benefit of the Company. Any surplus shall be paid by EIPI to the Company for the benefit of the Company, or applied as may be otherwise required by law. Any deficiency thereon shall be paid, as applicable, by the Company to EIPI, on demand.

(e)     Intellectual Property.  It shall maintain in full force and effect it's corporate or limited liability company, as the case may be, existence, rights and franchises and all licenses and other rights to use Intellectual Property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business.

(f)     Properties.  It shall keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all needful and proper repairs, renewals, replacements, additions and improvements thereto; and it shall at all times comply with each provision of all leases to which it is a party or under which it occupies property if the breach of such provision could reasonably be expected to have a Material Adverse Effect.

(g)     Required Approvals.  It shall not do any of the following outside the ordinary course of business, without the prior written consent of EIPI or as otherwise permitted herein: (i) create, incur, assume or suffer to exist any indebtedness (exclusive of trade debt) whether secured or unsecured other than each Company's indebtedness to EIPI; (ii) cancel any debt owing to it in excess of One Hundred Thousand Dollars ($100,000) in the aggregate during any twelve (12) month period; (iii) assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by it for deposit or collection or similar transactions in the ordinary course of business; (iv) directly or indirectly declare, pay or make any dividend or distribution on its Stock or apply any of its funds, property or assets to the purchase, redemption or other retirement of any of its Stock outstanding on the date hereof; (v) purchase or hold beneficially any Stock or other securities or evidences of indebtedness of, make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person, including any partnership or joint venture, except (x) travel advances, and (y) loans to its officers and employees not exceeding at any one time an aggregate of Ten Thousand Dollars ($10,000); (vi) create or permit to exist any new Subsidiary unless such new Subsidiary is a wholly-owned Subsidiary and is designated by EIPI as either a co-borrower or guarantor

22

hereunder and such Subsidiary shall have entered into all such documentation required by EIPI, including, without limitation, to grant to EIPI a first priority perfected security interest in substantially all of such Subsidiary's assets to secure the Obligations; (vii) directly or indirectly, prepay any indebtedness (other than to EIPI and in the ordinary course of business), or repurchase, redeem, retire or otherwise acquire any indebtedness (other than to EIPIs and in the ordinary course of business) except to make scheduled payments of principal and interest thereof; (viii) enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a portion of the assets or Stock of any Person or permit any other Person to consolidate with or merge with it that does not pay off all Obligations in full, unless (1) the Company is the surviving entity of such merger or consolidation, (2) no Event of Default shall exist immediately prior to and after giving effect to such merger or consolidation, (3) the Company shall have provided EIPI copies of all documentation relating to such merger or consolidation and (4) the Company shall have provided EIPI with at least thirty (30) days' prior written notice of such merger or consolidation; (ix) materially change the nature of the business in which it is presently engaged; (x) become subject to (including, without limitation, by way of amendment to or modification of) any agreement or instrument which by its terms would (under any circumstances) restrict its right to perform the provisions of this Agreement or any of the DIP Documents; (xi) change its fiscal or financial year or make any changes in accounting treatment and reporting practices without prior written notice to EIPI except as required by GAAP or in the tax reporting treatment or except as required by law; (xii) enter into any transaction with any employee, director or Affiliate, except in the ordinary course on arms-length terms; (xiii) bill Accounts under any name except the present name of the Company; or (xiv) sell, lease, transfer or otherwise dispose of any of its properties or assets, except for (1) the sale of Inventory in the ordinary course of business and (2) the disposition or transfer in the ordinary course of business during any fiscal year of obsolete and worn-out Equipment and only to the extent that (x) the proceeds of any such disposition are used to acquire replacement Equipment which is subject to EIPIs' first priority security interest or are used to repay Loans or to pay general corporate expenses, or (y) following the occurrence of an Event of Default which continues to exist, the proceeds of which are remitted to EIPI to be held as cash collateral for the Obligations.

(h)    Legal Name, etc.  It shall not, without providing EIPI with 30 days prior written notice, change (i) its name as it appears in the official filings in the state of its organization, (ii) the type of legal entity it is, (iii) its organization identification number, if any, issued by its state of organization, (iv) its state of organization, (v) its election to be treated as a corporation for local, state and federal income tax purposes, or (vi) amend its certificate of formation, operating agreement or other organizational document.

(i)    Compliance with Laws.  The operation of its business is and shall continue to be in compliance in all material respects with all applicable federal, state and local laws, rules and ordinances, including to all laws, rules, regulations and orders relating to taxes, payment and withholding of payroll taxes, employer and employee contributions and similar items, securities, employee retirement and welfare benefits, employee health and safety and environmental matters.

(j)    Notices.  It shall promptly inform EIPI in writing of:  (i) the commencement of all proceedings and investigations by or before and/or the receipt of any

notices from, any governmental or nongovernmental body and all actions and proceedings in any court or before any arbitrator against or in any way concerning any event which could reasonably be expected to have singularly or in the aggregate, a Material Adverse Effect; (ii) any change which has had, or could reasonably be expected to have, a Material Adverse Effect; (iii) any Event of Default or Default; and (iv) any default or any event which with the passage of time or giving of notice or both would constitute a default under any agreement for the payment of money to which it is a party or by which it or any of its properties may be bound the breach of which would have a Material Adverse Effect.

(k)     Margin Stock.  It shall not permit any of the proceeds of the Loans made hereunder to be used directly or indirectly to "purchase" or "carry" "margin stock" or to repay indebtedness incurred to "purchase" or "carry" "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect.

(l)     Financing Right of First Refusal.  It shall not agree, directly or indirectly, to any restriction with any Person which limits the ability of EIPI to consummate a transaction with it involving the incurrence of any additional indebtedness (an **"Additional Financing"**), provided, however, that nothing in this Section 15(l) shall be deemed to otherwise prevent it from entering into a letter of intent with another Person for a specific Additional Financing or consummating an Additional Financing with another Person, provided that EIPI is promptly informed and regularly updated with respect to any prospective Additional Financing.  This provision shall not apply to any large "exit" or reorganization financing in which such financing satisfy all Obligations and all consideration due EIPI in full.

(m)     Repayment of Indebtedness.     Except pursuant to a confirmed reorganization plan and except as specifically permitted hereunder, without the express prior written consent of EIPI or pursuant to the Final Order or other order of the Bankruptcy Court after notice and a hearing, it shall not make any payment or transfer with respect to any Prepetition Indebtedness, or any other Lien or Indebtedness incurred or arising Prepetition, that is subject to the automatic stay provisions of the Bankruptcy Code, whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

(n)     Reclamation Claims.  It shall not enter into any agreement to return any Inventory to any of its creditors for application against any Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims under Section 546(g) of the Bankruptcy Code or consent to the set off by any creditor against any of its Prepetition Indebtedness, Prepetition trade payables or other Prepetition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement or set off the aggregate amount of Prepetition Indebtedness, Prepetition trade payables and other Prepetition claims subject to all such agreements, setoffs since the Petition Date would exceed Thirty Thousand Dollars ($30,000), provided that the Company shall not be deemed to have failed to comply with this Section 15(n) to the extent the Bankruptcy Court orders such set off after notice and a hearing and over the objection of the Company.

(o)     Chapter 11 Claims.  It shall not incur, create, assume, suffer to exist or permit any other super priority administrative claim that is *pari passu* with or senior to the claims

of EIPI against the Company other than the Permitted Exceptions. Any *pari passu* super priority claims of other lenders or Co-investors within the Maximum Facility amount shall be approved by EIPI, which approval will not be unreasonably withheld.

(p)  No Additional Debtor-in-Possession Financing.  Unless and until (i) all Obligations have been paid in full in cash, and (ii) the Loan facility described in this Agreement has been terminated, the Company shall not obtain or incur any additional debtor-in-possession financing in excess of the Maximum Facility or Indebtedness or obtain nonconsensual use of EIPIs' cash collateral or Collateral, unless otherwise agreed to by EIPI, which approval will not be unreasonably withheld, or pursuant to a Financing Order; and provided that any funding up to the Maximum Facility that is not advanced by EIPI (and is provided by any Co-investors or otherwise) shall be subject to the consent and approval of EIPI, which consent and approval will not be unreasonably withheld.

(q)  No Other Claim or Lien.  So long as there remains any outstanding Obligations hereunder, no other person or entity shall be granted super priority claim status or a Post Petition Lien on any property of the Company (other than those that are expressly permitted under this Agreement and the DIP Documents) under the Bankruptcy Code or otherwise, except for Co-investors approved by EIPI, which approval will not be unreasonably withheld, within the Maximum Facility.

(r)  No Default of Indebtedness.  From and after the commencement of the Chapter 11 Case, other than as a result of the commencement of the Chapter 11 Case, the Company shall not be in default in the payment of the principal of or interest on any Indebtedness incurred Post Petition in excess of Thirty Thousand Dollars ($30,000) which is not in bona fide dispute or under any instrument or agreement under or subject to which any Indebtedness incurred Post-Petition in excess of Thirty Thousand Dollars ($30,000) has been issued, which is not in bona fide dispute, and no event shall have occurred under the provisions of any such instrument or agreement which with or without the lapse of time or the giving of notice, or both, constitutes or would constitute an event of default there under.

(s)  Budget Compliance and Reporting.  It shall comply with the terms and conditions of the Budget in all respects; provided, however, that a variance of less than twenty percent (20%) on a two year aggregate basis as set forth in the Budget shall be permitted during the term of the Loan.  The Company shall regularly deliver financial reports to EIPI regarding actual Company results and reconciliation with the Budget at least once per month within twenty (20) days of the first (1st) day of the month, in form and substance satisfactory to EIPI.

(t)  Plan of Reorganization.  Subject to the Final Order, the Company and EIPI shall agree on reasonably appropriate milestones for:  (i) the Company's delivery of a plan of reorganization (the "**Plan of Reorganization**") term sheet; (ii) the Company's delivery of the Plan of Reorganization; (iii) the filing of a disclosure statement and the Plan of Reorganization; (iv) the solicitation and confirmation of the Plan of Reorganization; and (v) the consummation of the Plan of Reorganization.

(u)  Forward Sale Contracts.  Although certain "forward sale contracts" may be considered sales of Inventory or other Company assets in the ordinary course of business in

the mining industry, the Company shall not enter into any such forward sale contracts or agreements during the term or while any Obligations remain outstanding, and for the purposes of this Agreement and the DIP Documents any such transaction shall be considered a financing transaction that creates a Lien on assets of the Companies.

(v)    <u>Prepetition Agreements</u>.  Provided to the extent they exist and have been properly disclosed to EIPI, EIPI will not challenge any Prepetition Agreements and any agreements, sales or documents entered into in connection therewith or any rights or positions set forth therein, and will actively support and promote the Prepetition Agreements and any rights or positions set forth therein or in any associated agreements or documents.

(w)    <u>Permits and Plans</u>.  The Company shall maintain all applicable permits, if any, and shall timely submit all applicable plans to allow Company to continually operate their businesses.

(x)    <u>Larger Financings or Purchases</u>.  The Company shall keep EIPI regularly and promptly appraised of all financing, loan and purchase prospects and progress for the Company, including all potential large financings or purchases that may result in emergence from bankruptcy proceedings, and shall promptly provide EIPI with any and all information it requests with respect to the foregoing.  EIPI shall have the right to participate in all such processes and in the fundraising for such purposes.  EIPI will be promptly delivered all additional diligence materials or reports generated by or for the purpose of any larger financing or sale so that it may provide such materials or reports to its potential prospects and its investors on a confidential basis.

(i)    <u>Post Petition Equipment; Post Petition Improvements and Fixtures</u>. The Company shall ensure EIPI obtains and/or maintains a valid first priority perfected Lien and/or first priority perfected purchase money perfected Lien that covers all Post Petition Equipment, Post Petition Improvements and Fixtures of any kind, and any other acquired, added or constructed property or capital improvements of Companies, on Companies' property, or used in connection with Companies' property.

16.    **Further Assurances.**  At any time and from time to time, upon the written request of EIPI and at the sole expense of the Company, the Company shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as EIPI may reasonably request (a) to obtain the full benefits of this Agreement and the DIP Documents, (b) to protect, preserve and maintain EIPIs' rights in the Collateral under this Agreement or any DIP Document, and/or (c) to enable EIPI to exercise all or any of the rights and powers herein granted or in any DIP Document.

17.    **Representations, Warranties and Covenants of EIPI.**  EIPI hereby represents, warrants and covenants to the Company as follows:

(a)    <u>Requisite Power and Authority</u>.  EIPI has all necessary power and authority under all applicable provisions of law to execute and deliver this Agreement and the Ancillary Agreements and to carry out their provisions.  All corporate action on EIPIs' part required for the lawful execution and delivery of this Agreement and the Ancillary Agreements

have been or will be effectively taken prior to the Closing Date. Upon their execution and delivery, this Agreement and the Ancillary Agreements shall be valid and binding obligations of EIPI, enforceable in accordance with their terms, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights, and (b) as limited by general principles of equity that restrict the availability of equitable and legal remedies.

(b)    <u>EIPI Bears Economic Risk</u>.  EIPI has substantial experience in evaluating and investing in private placement financing transactions of companies similar to the Company so that it is capable of evaluating the merits and risks of its investment in the Company and has the capacity to protect its own interests.

(c)    <u>EIPI Can Protect Its Interest</u>.  EIPI represents that by reason of its, or of its management's, business and financial experience, EIPI has the capacity to evaluate the merits and risks of its investment in the Note, and to protect its own interests in connection with the transactions contemplated in this Agreement, and the Ancillary Agreements.

(d)    <u>Accredited Investor</u>.  EIPI represents that it is an accredited investor within the meaning of Regulation D under the Securities Act.

(e)    <u>Patriot Act</u>.  EIPI certifies that, to the best of EIPIs' knowledge, EIPI has not been designated, and is not owned or controlled, by a "suspected terrorist" as defined in Executive Order 13224.  EIPI seeks to comply with all applicable laws concerning money laundering and related activities.  In furtherance of those efforts, EIPI hereby represents, warrants and covenants that:  (i) none of the cash or property that EIPI will use to make the Loans has been or shall be derived from, or related to, any activity that is deemed criminal under United States law; and (ii) no disbursement by EIPI to the Company to the extent within EIPIs' control, shall cause EIPI to be in violation of the United States Bank Secrecy Act, the United States International Money Laundering Control Act of 1986 or the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001.  EIPI shall promptly notify the Company if any of these representations ceases to be true and accurate regarding EIPI.  EIPI agrees to provide the Company any additional information regarding EIPI that the Company deems necessary or convenient to ensure compliance with all applicable laws concerning money laundering and similar activities.  EIPI understands and agrees that if at any time it is discovered that any of the foregoing representations are incorrect, or if otherwise required by applicable law or regulation related to money laundering similar activities, EIPIs may undertake appropriate actions to ensure compliance with applicable law or regulation, including but not limited to segregation and/or redemption of EIPIs' investment in the Company.  EIPI further understands that the Company may release information about EIPI and, if applicable, any underlying beneficial owners, to proper authorities if the Company, in its sole discretion, determines that it is in the best interests of the Company in light of relevant rules and regulations under the laws set forth in subsection (ii) above.

18.    **Power of Attorney.**  Upon an occurrence of an Event of Default that has not been cured as per this Agreement, the Company hereby appoints EIPI, or any other Person whom EIPI may designate as such Company's attorney, with power to:  (i) endorse such Company's name on any checks, notes, acceptances, money orders, drafts or other forms of

payment or security that may come into EIPIs' possession; (ii) sign such Company's name on any invoice or bill of lading relating to any Accounts, drafts against Account Debtors, schedules and assignments of Accounts, notices of assignment, financing statements and other public records, verifications of Account and notices to or from Account Debtors; (iii) verify the validity, amount or any other matter relating to any Account by mail, telephone, telegraph or otherwise with Account Debtors; (iv) do all things necessary to carry out this Agreement, any DIP Document and all related documents; and (v) on or after the occurrence and during the continuation of an Event of Default, notify the post office authorities to change the address for delivery of such Company's mail to an address designated by EIPI, and to receive, open and dispose of all mail addressed to such Company. The Company hereby ratifies and approves all acts of the attorney. Neither EIPI, nor the attorney will be liable for any acts or omissions or for any error of judgment or mistake of fact or law, except for gross negligence or willful misconduct. This power, being coupled with an interest, is irrevocable so long as EIPI has a security interest and until the Obligations have been fully satisfied.

19. **Term of Agreement.** EIPIs' agreement to make Loans and extend financial accommodations under and in accordance with the terms of this Agreement or any Ancillary Agreement shall continue in full force and effect until the earliest of: (i) the effective date of any plan of reorganization in the Chapter 11 Case; (ii) the occurrence of an Event of Default following the passage of any applicable notice and/or cure periods, subject to the terms of the Final Order; (iii) October ___, 2012 if the Final Order has not been entered; or (iv) October ___, 2012 (the "**Term**"), unless sooner terminated as herein provided or extended by EIPI in writing. The Company may terminate this Agreement at any time upon thirty (30) days' prior written notice to EIPI, contingent upon payment in full of the Obligations. The termination of the Agreement shall not affect any of EIPIs' rights hereunder or any DIP Document and the provisions hereof and thereof shall continue to be fully operative until all transactions entered into, rights or interests created and the Obligations have been irrevocably disposed of, concluded or liquidated.

20. **Termination of Lien.** The Liens and rights granted to EIPI hereunder and any DIP Documents and the financing statements filed in connection herewith or therewith shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that any Company's account may from time to time be temporarily in a zero or credit position, until all of the Obligations have been indefeasibly paid or performed in full after the termination of this Agreement. EIPI shall not be required to send termination statements to any Company, or to file them with any filing office, unless and until this Agreement and the Ancillary Agreements shall have been terminated in accordance with their terms and all Obligations indefeasibly paid in full in immediately available funds.

21. **Conditions to Initial Loan.**

(a)    Agreement; Note. EIPI shall have received counterpart copies of this Agreement and shall have received the Note duly executed and delivered by the Chief Executive Officer of the Company.

(b)    Secretary's Certificates. EIPI shall have received a certificate of the Secretary (or an acceptable substitute officer having similar duties and powers, including, for

instance, a general partner or managing member) of the Company, dated the Closing Date, in a form acceptable to EIPI, certifying as to (i) the incumbency and signature of the officers (or other representatives) of such Company executing this Agreement and any Ancillary Agreements, (ii) the authorizations by the manager (or other governing Person or body) of such Company to such officers or other representatives to enter into and carry out such transactions as are contemplated pursuant to this Agreement and the Ancillary Agreements; and including therewith copies of the organizational documents of such Company as in effect on the Closing Date; and (iii) that each of the applicable conditions to the making of the initial Loan as set forth in this Section 21 and Section 22 have been satisfied.

(c)    Litigation.  Other than with respect to the Chapter 11 Case and the Lender Litigation Case, (i) no action, suit, litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing or threatened against the Company or against the officers or managers of the Company (A) in connection with this Agreement or the Ancillary Agreements or any of the transactions contemplated hereby or thereby and which, in the reasonable opinion of EIPI, is deemed material, or (B) which could, in the opinion of EIPI, reasonably be expected to have a Material Adverse Effect, and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to the Company or the conduct of its business or inconsistent with the due consummation of the transactions contemplated herein shall have been issued by any Governmental Body.

(d)    Fees.  Consistent with the terms of the Final Order, EIPI shall have received all fees and expenses payable to EIPI on the Closing Date, from financing proceeds, pursuant hereto or under any DIP Document, including fees payable pursuant to Section 5(b)(i) and expenses payable pursuant to Section 5(b)(iv) hereof.

(e)    Insurance.  EIPI shall have received, in form and content satisfactory to EIPI, certificates of insurance of the Company's casualty insurance policies, together with loss payable endorsements naming EIPI as loss payee, and certificates of insurance of each Company's liability insurance policies, together with endorsements naming EIPI as a co-insured.

(f)    Deposit Accounts.  EIPI shall have received duly executed Account Control Agreements establishing its control over the bank accounts in the Event of a Default.

(g)    No Material Adverse Change.  Since the Petition Date, there shall not have occurred any event, condition or state of facts which could reasonably be expected to have a Material Adverse Effect and no representations made or information supplied to EIPI shall have been proven to be inaccurate or misleading in any material respect; and there shall not have occurred a material adverse change or condition with respect to the market for debtor-in-possession financings, the bank syndication market or the capital markets generally; and there shall have not been a material adverse change in copper and precious metal prices.

(h)    Intellectual Property.  To the extent that any Company owns on the Closing Date any trademarks or patents (or applications therefore) which are registered with the United States Patent and Trademark Office, or any copyrights (or applications therefore) which are registered with the United States Copyright Office, the Company shall have executed in favor

29

of EIPI, as appropriate, a patent security agreement, a trademark security agreement, and/or a copyright security agreement; such to be in form and content reasonably satisfactory to EIPI.

(i)     Deeds of Trust.  The Company shall have delivered and recorded in all applicable counties duly executed and notarized Deed(s) of Trust and fixture filing(s) granting EIPI a first priority lien on all of the Company's real property holdings, mineral rights, mineral leases, fixtures, water rights, mining claims and leases, and other real property rights of any kind in form and substance satisfactory to EIPI.

(j)     Compliance With Law.  Any and all Loans made by EIPI, and the consummation of the transactions contemplated herein shall be in full compliance with applicable law.  EIPI shall be satisfied with each Company's compliance with ERISA (and any other applicable pension legislation), applicable environmental, health and safety statutes and regulations, margin regulations and all other applicable laws.

(k)     Budget and Other Financial Information.  EIPI shall have received (i) the Budget, in form and substance reasonably satisfactory to EIPI, (ii) unaudited financial statements of the Company for the latest available time periods (including, without limitation, monthly financial statements for any such period of less than three (3) months), (iii) projected income statements of the Company through December 31, 2010, and (iv) such other financial statements with respect to such prior or future periods as EIPI may reasonably request, all of the foregoing described in clauses (i) through (iv) to be in form and substance reasonably satisfactory to EIPI.

(l)     All Other Matters.  EIPI shall have received all DIP Documents which EIPI reasonably determines to be necessary to consummate the transactions contemplated to occur on or after the Closing Date pursuant to this Agreement, and all corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated herein shall be satisfactory in form and substance to EIPI and its legal counsel.

(m)     No Approvals.  All necessary governmental (domestic and foreign) and third party approvals in connection with the transactions contemplated by this Agreement, the Note or any Ancillary Agreement and otherwise referred to herein or therein shall have been obtained and remain in effect, and all applicable waiting periods shall have expired without any action being taken by any competent authority which restrains, prevents or imposes materially adverse conditions upon the consummation of the transactions contemplated by this Agreement, and the other DIP Documents and otherwise referred to herein or therein.  Additionally, there shall not exist any judgment, order, injunction or other restraint issued or filed or a hearing seeking injunctive relief or other restraint pending or notified prohibiting or imposing materially adverse conditions upon the making of Loans.

(n)     Liens.  The Company shall have disclosed all existing Liens on any of the Collateral properties and shall have provided EIPI with updated UCC searches and/or real estate title reports, as applicable, with respect to all of the Companies' assets.

(o)     Satisfactory Consultant Meetings.  EIPI shall have had meetings with all third party consultants (and certain employees) for the Company with respect to the mining,

milling and drilling and other aspects of the Budget and future operations of Companies, which consultants shall have explained and approved such elements of Companies' Business Plan and operations to the reasonable satisfaction of EIPI.  If desired by EIPI, EIPI shall have also had the opportunity to hire its own consultants to discuss and examine aspects of the Business Plan and future operations with such consultants for Companies.

22.    **Conditions to Each Loan.**  The agreement of EIPI to make any Loan requested to be made on any date (including, without limitation, the initial Loan) is subject to the satisfaction of the following conditions precedent as of the date such Loan is made (and also after giving effect to the making of each Loan thereof):

(a)    <u>Representations and Warranties</u>.    Each of the representations and warranties made by the Company in or pursuant to this Agreement and any Ancillary Agreement to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished pursuant to this Agreement, any Ancillary Agreement or any related agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date, except to the extent that any of such representations or warranties specifically relate to an earlier date or became untrue by reason of events or conditions otherwise permitted to occur hereunder.

(b)    <u>No Default</u>.  No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Loan requested to be made on such date and, in the case of the initial Loan, after giving effect to the consummation of the transactions contemplated hereby, and EIPI shall not have determined not to make such Loan or not to make any Loans whatsoever during the pendency of such Event of Default or Default.

(c)    <u>Budget</u>.  Except for the variances agreed to by EIPI in writing, the Company shall be in material compliance in all respects with the Budget.

(d)    <u>Business Plan and Progress</u>.  The Company shall have adhered to the Business Plan provided to EIPI to the reasonable satisfaction of EIPI, and have progressed and achieved its goals and milestones to the reasonable satisfaction of EIPI.

(e)    <u>Maximum Credit Advances</u>.  In the case of any Loan requested to be made, after giving effect thereto, the aggregate Loans shall not exceed the maximum amount of Loans permitted under <u>Background</u> hereof.

(f)    <u>Bankruptcy Matters</u>.

(i)    The Final Order shall provide that good, sufficient and proper notice of the motion seeking approval of the Financing Order and this Agreement and the hearing to consider approval of the Final Order, has been given by the Company;

(ii)    As to the funding of any Loan (i) the Final Order shall have been entered by the Bankruptcy Court upon a motion of the Company satisfactory in form and substance to EIPI and its counsel in their sole discretion and on such prior notice as is reflected in the Final Order as being good, sufficient and adequate, (ii) the Final Order shall be in full

force and effect, and (iii) the Final Order shall not have been vacated, reversed, stayed, vacated, modified or amended without the prior written consent of EIPI; and

(iii)    All other orders entered by the Bankruptcy Court on or prior to the entry of the Final Order shall be satisfactory in form and substance to EIPI and its counsel in their sole discretion.

Each request for a Loan by the Company hereunder shall constitute a representation and warranty by the Company as of the date of such Loan that all conditions contained in this subsection shall have been satisfied.

23.    **Events of Default.**    The occurrence of any of the following shall constitute an "**Event of Default**":

(a)    failure to make payment of any of the Obligations when required hereunder, and, in any such case, such failure shall continue for a period of thirty (30) Business Days following the date upon which any such payment was due;

(b)    failure by the Company to pay any taxes incurred Post-Petition when due, after giving effect to any applicable extensions, which failure shall continue without remedy for a period of thirty (30) days after the occurrence thereof; unless such taxes are being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been set aside;

(c)    failure to perform under, and/or committing any breach of, in any material respect, this Agreement or any covenant contained herein, which failure or breach shall continue without remedy for a period of thirty (30) days after the occurrence thereof;

(d)    For issues other than those associated with the acceleration of the permitting of the Sand Quarry, a cumulative negative variance of more than twenty percent (20%) on a two-year aggregate basis as set forth in the Budget, as finalized prior to the Final Order and as thereafter amended with the consent of EIPI, which consent will not be unreasonably withheld;

(e)    any representation, warranty or statement made by any Company, in any DIP Document, any certificate, statement or document delivered pursuant to the terms hereof, or in connection with the transactions contemplated by this Agreement should prove to be false or misleading in any material respect on the date as of which made or deemed made;

(f)    attachments or levies in excess of Fifty Thousand Dollars ($50,000) in the aggregate are made upon the Company's assets or a judgment is rendered against any Company property involving a liability of more than Fifty Thousand Dollars ($50,000) which shall not have been vacated, discharged, stayed or bonded within thirty (30) days from the entry thereof;

(g)    any material change in any Company condition or affairs (financial or otherwise) after the date hereof, which in EIPIs' reasonable, good faith opinion, could reasonably be expected to have a Material Adverse Effect;

32

(h)     failure by Company to (i) furnish financial information when due or when requested pursuant thereto, which is un-remedied for a period of thirty (30) Business Days after receipt of request from EIPI, or (ii) permit the inspection of its books or records by EIPI when reasonably requested pursuant hereto;

(i)     any Lien created hereunder or under any DIP Document for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (as to the Collateral) other than as a result of EIPIs' failure to file initial financing statements in the form provided to legal counsel of the Companies or continuation statements;

(j)     any Change of Ownership shall occur without the approval of EIPI;

(k)     without the approval of EIPI, which approval shall not be unreasonably withheld, the Company directly or indirectly sells, assigns, transfers, conveys, or suffers or permits to occur any sale, assignment, transfer or conveyance of any assets of the Company or any interest therein, except (i) assets, other than Inventory, the aggregate fair market value of which shall not exceed Fifty Thousand Dollars ($50,000) in any fiscal year of the Company; provided that such permitted sale, assignment, transfer or conveyance shall be in an arm's-length transaction and (ii) as otherwise permitted herein;

(l)     (i) any "Person" or "group" (as such terms are defined in Sections 13(d) and 14(d) of the Exchange Act, as in effect on the date hereof), other than EIPI, is or becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of thirty percent (30%) or more on a fully diluted basis of the then outstanding Voting Equity Interests of the Company, (ii) the directors and officers of any Company shall cease to consist of a majority of such directors and officers of the Company on the date hereof, or (iii) the Company merges or consolidates with, or sells all or substantially all of its assets to, any other Person or entity;

(m)     the conviction of the Company or any executive officer of the Company under any criminal statute, or conviction of criminal or civil proceeding against the Company or any executive officer of the Company pursuant to which statute or proceeding penalties or remedies sought or available include forfeiture of any of the property of the Company;

(n)     an Event of Default shall occur under and as defined in the Note or in any other DIP Document;

(o)     the Company shall breach any term or provision of any DIP Document to which it is a party, in any material respect which breach is not cured within any applicable cure or grace period provided in respect thereof (if any);

(p)     the Company attempts to terminate, challenges the validity of, or its liability under this Agreement or any DIP Document, or any proceeding shall be brought to challenge the validity, binding effect of any DIP Document or any DIP Document ceases to be a valid, binding and enforceable obligation of the Company (to the extent such Persons are a party thereto);

(q)     Any of the following shall occur in the Chapter 11 Case:

33

(i)     unless the Obligations will be fully and indefeasibly paid and EIPIs' commitments to make Loans terminated pursuant thereto, the bringing of a motion, taking of any action, or the filing of any plan of reorganization or disclosure statement attendant thereto by the Company in the Chapter 11 Case: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (x) to grant any Lien upon or affecting any Collateral; (y) except as provided in the Final Order, as applicable, to use cash collateral of EIPI under Section 363(c) of the Bankruptcy Code without the prior written consent of EIPI; or (z) any other action or actions adverse to EIPI or its rights and remedies hereunder or its interest in the Collateral;

(ii)     unless the Obligations will be fully and indefeasibly paid and EIPIs' commitments to make Loans terminated pursuant thereto, the filing of any plan of reorganization or disclosure statement attendant thereto by any Company or any other Person in the Chapter 11 Case to which EIPI does not consent or otherwise agree to the treatment of its claims;

(iii)     except as may otherwise be approved by EIPI, in its sole discretion, the entry of an order in the Chapter 11 Case confirming a plan or plans of reorganization that does not contain provision for termination of the Loans and repayment in full in cash of all of the Obligations on or prior to the effective date of such plan;

(iv)     the entry of an order amending, supplementing, staying, vacating or otherwise modifying this Agreement or the DIP Documents or the Final Order, as applicable, without the written consent of EIPI, or the filing of a motion for reconsideration with respect to the Final Order;

(v)     the payment of, or application for authority to pay, any Prepetition Indebtedness without EIPIs' prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement or any DIP Document;

(vi)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against EIPI or with respect to any of the Collateral;

(vii)     the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or examiner in the Chapter 11 Case with expanded powers (i.e., powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code pursuant to Section 1106(b) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of any Company; or the sale, without EIPIs' consent, of all or substantially all of the Company's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Case, or otherwise that does not provide for payment in full of the Obligations and termination of EIPIs' commitment to make Loans;

(viii)     the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code, or the filing by any Company of a motion or other pleading seeking the dismissal of the Chapter 11

Case under Section 1112 of the Bankruptcy Code or otherwise, in each instance without EIPIs' written consent;

(ix)     the entry of an order by the Bankruptcy Court granting relief from, terminating, or modifying the automatic stay of Section 362 of the Bankruptcy Code (or holding that such stay does not apply) with respect to Collateral or otherwise entered as to either of the Company or its operations;

(x)     the entry of an order by the Bankruptcy Court pursuant to Section 365 of the Bankruptcy Code, under circumstances that would have a Material Adverse Effect, ordering that one or more executor contracts to which the Company is a party are to be rejected, if such rejection has not been consented to by the Company and EIPI;

(xi)     the entry of an order by the Bankruptcy Court that subordinates any claim or Lien of EIPI under this Agreement, the Final Order or any DIP Document;

(xii)     except with the consent of EIPI or in connection with a final determination of the Bankruptcy Court that EIPI has breached provisions of this Agreement applicable to such payments, the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement and each Ancillary Agreement, provided that it shall not constitute an Event of Default under this clause (xii) if a payment that is required to be repaid or is avoided is a payment that was made to EIPI for the purpose of reimbursing EIPI for professional fees or expenses incurred by professionals advising or representing EIPI;

(xiii)     the failure of the Company to perform any of its obligations under the Final Order or the breach of any order related to use of Collateral; or

(xiv)     the entry of an order in the Chapter 11 Case granting any other super priority administrative claim or Lien equal or superior to that granted to EIPI without EIPIs' consent.

24.     **Remedies.**  Subject to the Cure provisions set forth in Section 25 below, EIPI shall have all of the following cumulative Remedies following the expiration of the Cure Period:

(a)     Following the occurrence of an Event of Default, all Obligations shall be immediately due and payable and this Agreement and all commitments of EIPI hereunder may be deemed terminated by EIPI in its sole discretion.  Until all Obligations have been fully and indefeasibly satisfied, EIPI shall retain its Lien in all Collateral.  EIPI shall have, in addition to all other rights provided herein and in each DIP Document, the rights and remedies of a secured party under the UCC in all relevant jurisdictions, and under other applicable law, all other legal and equitable rights to which EIPI may be entitled, including the right to take immediate possession (in person or by agents or attorneys) of the Collateral (from the Company or any other Person whosoever has possession of any part thereof with or without notice or process of law). Further, EIPI may, at any time or times after the occurrence of an Event of Default, sell and deliver all Collateral held by or for EIPI at public or private sale for cash, upon credit or otherwise, at such prices and upon such terms as EIPI, in EIPIs' sole discretion, deems advisable

35

or EIPI may otherwise recover upon the Collateral in any commercially reasonable manner as EIPI, in its sole discretion, deems advisable. In connection with the exercise of the foregoing remedies, EIPI is granted permission to use all of each Company's Intellectual Property. The proceeds of sale shall be applied first to all costs and expenses of sale, including reasonable attorneys' fees, and second to the payment (in whatever order EIPI elects) of all Obligations, and in accordance with the Bankruptcy Code. After the indefeasible payment and satisfaction in full of all of the Obligations, and after the payment by EIPI of any other amount required by any provision of law, including Section 9-608(a)(1) of the UCC (but only after EIPIs has received what EIPI considers reasonable proof of a subordinate party's security interest), the surplus, if any, shall be paid to the Company or its representatives or to whosoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct. The Company shall remain to EIPI for any deficiency. The Company and EIPI acknowledge that the actual damages that would be incurred by EIPI after the occurrence of an Event of Default would be difficult to quantify and that the Company and EIPI have agreed that the fees and obligations set forth in this Section and in this Agreement would constitute fair and appropriate liquidated damages in the event of any such termination. The parties hereto each hereby agree that the exercise by any party hereto of any right granted to it or the exercise by any party hereto of any remedy available to it (including, without limitation, the issuance of a notice of redemption, a borrowing request and/or a notice of default), in each case, hereunder or under any Ancillary Agreement shall not constitute confidential information and no party shall have any duty to the other party to maintain such information as confidential. Notwithstanding the foregoing, the rights and remedies of EIPI set forth in this <u>Section 24</u> and elsewhere in this Agreement shall be subject to the terms and provisions of the Final Order and to the extent that this Agreement and the Final Order are in conflict, the terms of the Final Order shall prevail.

(b)     Except as set forth in the Final Order, no rights or remedies available to EIPI shall require any application or motion to, or order of, the Bankruptcy Court; provided, however, that enforcement of rights or remedies against the Collateral shall require five (5) Business Days' notice to the Company Agent, to the United States Trustee, to counsel for any statutory committee, with a copy of such notice to be filed with the Bankruptcy Court, and, if any hearing shall be requested after delivery of such notice (which request shall be made within three (3) Business Days' after the date of such notice, by way of objection), the sole issue to be determined at such hearing shall be whether an Event of Default has occurred. Except as otherwise provided in the Final Order, subject to the calendar of the Bankruptcy Court, any such hearing requested shall be permitted on shortened time, on the earliest available date.

(c)     The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other right or remedies provided for herein or in any DIP Document or otherwise provided by law from and after the occurrence of any Event of Default and during its continuation, all of which shall be cumulative and not alternative.

25.    **Cure of Default.**  Upon discovery by management of the Company ("Management") of the existence of an Event of Default or being notified by EIPI of an Event of Default, the Company shall have a period of thirty (30) days from the earlier of discovery by Management or notification by EIPI of the relevant Event of Default or, provided that the Company makes substantial reasonable progress towards the cure of the relevant Event of

Default ("**Cure**") during such thirty (30) day period, such longer period of time as is reasonably necessary to Cure ("**Cure Period**"). If the Company does not Cure during the Cure Period, then EIPI may pursue any and all available remedies.

26.    **Expenses; Board Observation.**

(a)    EIPI shall be reimbursed for its out-of-pocket costs and expenses up to $30,000.00.

(b)    EIPI anticipates incurring regular monthly fees and expenses from in house counsel and accountants in connection with monitoring all Loans and the Company's affairs, and in advising and assisting Company when requested, and thus requires that Company pay EIPI a monthly collateral monitoring fee equal to One Thousand Five Hundred Dollars ($1,500) each month in advance ("**Collateral Monitoring Fee**").

(c)    If any tax by any Governmental Authority is or may be imposed on or as a result of any transaction between the Company, on the one hand, and EIPI on the other hand, which EIPI is or may be required to withhold or pay, the Company hereby jointly and severally indemnifies and holds EIPI harmless in respect of such taxes, and the Company will repay to EIPI the amount of any such taxes which shall be charged to the Companies' account; and until the Company shall have furnished EIPI with indemnity therefore (or supply EIPI with evidence satisfactory to it that due provision for the payment thereof has been made), EIPI may hold without interest any balance standing to the Company's credit and EIPI shall retain its Liens in any and all Collateral.

(d)    A representative designated by EIPI shall be appointed as an observer of the Board of Directors or Board of Managers of Companies, which representative shall have the right to attend all meetings of the Board of Directors or Board of Managers of Companies and receive all materials and information in connection therewith, but shall no legal right to vote and no duties to any person or entity other than EIPI. Such board observer designated by EIPI shall receive notice of all meetings of the Board of Directors or Board of Managers of Companies, and shall be reimbursed for his or her expenses in attending any such meetings.

27.    **No Waiver; Cumulative Remedies.** Failure by EIPI to exercise any right, remedy or option under this Agreement, any DIP Document or any supplement hereto or thereto or any other agreement between or among the Company and EIPI or delay by EIPI in exercising the same, will not operate as a waiver; no waiver by EIPI will be effective unless it is in writing and then only to the extent specifically stated. EIPIs' rights and remedies under this Agreement and the DIP Documents will be cumulative and not exclusive of any other right or remedy which EIPI may have.

28.    **Application of Payments.** The Company irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by EIPI from or on the Company's behalf and the Company hereby irrevocably agrees that EIPI shall have the continuing exclusive right to apply and reapply any and all payments received at any time or times hereafter against the Obligations hereunder in such manner as EIPI may deem advisable notwithstanding any entry by EIPI upon any of EIPIs' books and records.

29.    **Indemnity.**    Provided that the Company has available funds for the foregoing purposes of this <u>Section 29</u> from financing or otherwise, the following shall apply:

(a)    The Company hereby jointly and severally indemnifies and holds EIPI, and its respective affiliates, employees, attorneys and agents (each, an "**Indemnified Person**"), harmless from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses of any kind or nature whatsoever (including attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) which may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement or any of the DIP Documents or with respect to the execution, delivery, enforcement, performance and administration of, or in any other way arising out of or relating to, this Agreement, the DIP Documents or any other documents or transactions contemplated by or referred to herein or therein and any actions or failures to act with respect to any of the foregoing, except to the extent that any such indemnified liability is finally determined by a court of competent jurisdiction to have resulted solely from such Indemnified Person's willful misconduct. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY COMPANY OR TO ANY OTHER PARTY OR TO ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR ANY DIP DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

(b)    The Company hereby jointly and severally indemnifies and holds each Indemnified Person harmless from and against the increased cost of capital resulting from reserve requirements or otherwise imposed, in each case subject to customary increased costs, capital adequacy and similar provisions.

30.    **Revival.**    The Company further agrees that to the extent the Company makes a payment or payments to EIPI, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the obligation or part thereof intended to be satisfied shall be revived and continued in full force and effect as if said payment had not been made.

31.    **Borrowing Agency Provisions.**

(a)    The Company hereby designates John Bryan, or a designated successor, as "**Company Agent**" to be its agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of the Company, and hereby authorizes EIPI to pay over or credit all loan proceeds hereunder in accordance with the request of the Company Agent.

(b)     All Obligations shall be joint and several, and the Company shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of the Company shall in no way be affected by any extensions, renewals and forbearance granted by EIPI to the Company, failure of EIPI to give the Company notice of borrowing or any other notice, any failure of EIPI to pursue to preserve its rights against the Company, the release by EIPI of any Collateral now or thereafter acquired by the Company, and such agreement by the Company to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by EIPI to the Company or any Collateral for the Company's Obligations or the lack thereof.

(c)     The Company represents and warrants to EIPI that (i) the Company has one or more common shareholders, directors and officers, (ii) the businesses and corporate activities of Company substantially benefit, the business and corporate activities of the Company, (iii) The Company will receive a substantial economic benefit from entering into this Agreement and will receive a substantial economic benefit from the application of each Loan hereunder, in each case, whether or not such amount is used directly by the Company and (iv) all requests for Loans hereunder by the Company Agent are for the exclusive and indivisible benefit of the Company.

32.     **Notices.**  Any notice or request hereunder may be given to the Company, Company Agent or EIPI at the respective addresses set forth below or as may hereafter be specified in a notice designated as a change of address under this Section.  Any notice or request hereunder shall be given by registered or certified mail, return receipt requested, hand delivery, overnight mail or telecopy (confirmed by mail).  Notices and requests shall be, in the case of those by hand delivery, deemed to have been given when delivered to any officer of the party to whom it is addressed, in the case of those by mail or overnight mail, deemed to have been given three (3) Business Days after the date when deposited in the mail or with the overnight mail carrier, and, in the case of a telecopy, when confirmed.  All notices to EIPI shall be copied by email deliver at the addresses specified below.

Notices shall be provided as follows:

|  |  |
|---|---|
| If to EIPI: | Equity Investment Properties, Inc. |
|  | _____ |
|  | _____ |
|  | _____ |
|  | Phone: |
|  | Email: |

|  |  |
|---|---|
| With a copy to: | Sargent Ranch, LLC |
|  | Attn: John Bryan |
|  | 8031 La Jolla Scenic Drive North |
|  | La Jolla, CA 92037 |
|  | Tel: (310) 777-8889 |

|  |  |
|---|---|
| With a copy to: | The Watley Group, LLC |
|  | Attn: John A. Bryan, Jr. |
|  | 1801 Century Park East, Suite 1830 |
|  | Los Angeles, CA 90067 |
|  | Tel: (310) 777-8889 |

|  |  |
|---|---|
| With a copy to: | Smaha Law Group |
|  | Attn:  John L. Smaha, Esq. |
|  | 7860 Mission Center Court, Ste. 100 |
|  | San Diego, CA  92108 |
|  | Tel: (619) 688-1557 |

or such other address as may be designated in writing hereafter in accordance with this Section 32 by such Person.

33.    **Governing Law, Jurisdiction and Waiver of Jury Trial.**

(a)    THIS AGREEMENT AND THE DIP DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

(b)    THE COMPANY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT, AND IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA SHALL HAVE EXCLUSIVE

JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE COMPANY, ON THE ONE HAND, AND EIPI, ON THE OTHER HAND, PERTAINING TO THIS AGREEMENT OR ANY OF THE DIP DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE DIP DOCUMENTS; PROVIDED, THAT EIPI AND THE COMPANY ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA; AND FURTHER PROVIDED, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE EIPI FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR PREPETITION EQUIPMENT ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF EIPI.  THE COMPANY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH COMPANY HEREBY WAIVES ANY OBJECTION THAT IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS.  THE COMPANY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO THE COMPANY AGENT AT THE ADDRESS SET FORTH IN SECTION 35 AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF THE COMPANY AGENT'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

(c)    THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.  THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN ALTUS, AND/OR ANY COMPANY ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT, ANY DIP DOCUMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO.

34.    **Limitation of Liability.**  The Company acknowledges and understands that in order to assure repayment of the Obligations hereunder, EIPI may be required to exercise any and all of EIPIs' rights and remedies hereunder and agrees that, except as limited by applicable law, neither EIPI nor any of EIPIs' agents shall be liable for acts taken or omissions made in connection herewith or therewith except for actual bad faith.

35.    **Entire Understanding; Maximum Interest.**  This Agreement and the DIP Documents contain the entire understanding among the Company and EIPI as to the subject matter hereof and thereof and any promises, representations, warranties or guarantees not herein contained shall have no force and effect unless in writing, signed by the Company's and EIPIs'

respective officers.    This Agreement amends and replaces any Prior Financing Agreement. Neither this Agreement, the DIP Documents, nor any portion or provisions thereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.    Nothing contained in this Agreement, any DIP Document or in any document referred to herein or delivered in connection herewith shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum rate permitted by applicable law.    In the event that the rate of interest or dividends required to be paid or other charges hereunder exceed the maximum rate permitted by such law, any payments in excess of such maximum shall be credited against amounts owed by the Company to EIPI and thus refunded to the Company.

36.    **Severability.**    Wherever possible each provision of this Agreement or the DIP Documents shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or the DIP Documents shall be prohibited by or invalid under applicable law such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions thereof.

37.    **Survival.**    The representations, warranties, covenants and agreements made herein shall survive any investigation made by EIPI and the closing of the transactions contemplated hereby to the extent provided therein.    All statements as to factual matters contained in any certificate or other instrument delivered by or on behalf of the Company pursuant hereto in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by the Company hereunder solely as of the date of such certificate or instrument.    All indemnities set forth herein shall survive the execution, delivery and termination of this Agreement and the DIP Documents and the making and repaying of the Obligations.

38.    **Captions.**    All captions are and shall be without substantive meaning or content of any kind whatsoever.

39.    **Counterparts; Electronic Signatures.**    This Agreement may be executed in one or more counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same agreement.    Any signature delivered by a party via facsimile or email transmission shall be deemed to be any original signature hereto.

40.    **Construction.**    The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

41.    **Publicity.**    The Company hereby authorizes EIPI to make appropriate announcements of the financial arrangement entered into by and among the Company and EIPI, including, without limitation, announcements which are commonly known as tombstones, in such publications and to such selected parties as EIPI shall in its sole and absolute discretion deem appropriate, or as required by applicable law.

42.  **Joinder.**  It is understood and agreed that any Person that desires to become a company hereunder, or is required to execute a counterpart of this Agreement after the date hereof pursuant to the requirements of this Agreement or any DIP Document, shall become a company hereunder by (a) executing a Joinder Agreement in form and substance satisfactory to EIPI, (b) delivering supplements to such exhibits and annexes to this Agreement and the DIP Documents as EIPI shall reasonably request and (c) taking all actions as specified in this Agreement as would have been taken by such company had it been an original party to this Agreement, in each case with all documents required above to be delivered to EIPI and with all documents and actions required above to be taken to the reasonable satisfaction of EIPI.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SARGENT RANCH, LLC**

By:_____
Name:  A. John A. Bryan, Jr.
Title:    CEO

**EQUITY INVESTMENT PROPERTIES, INC**

By:_____
Name:  Michael Scott
Title:

43

## ANNEX A

### Definitions

"**Account Debtor**" means any Person who is or may be obligated with respect to, or on account of, an Account.

"**Accountants**" has the meaning given to such term in <u>Section 12(b)</u>.

"**Account Control Agreement**" shall mean an agreement entered into between EIPI and Company, pursuant to which upon the occurrence of an Event of Default, EIPI shall have the right to direct the disbursement of cash held in Company bank account(s), in form and substance satisfactory to EIPI.

"**Accounts**" means all "accounts", as such term is defined in the UCC, now owned or hereafter acquired by any Person, including: (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper or Instruments) (including any such obligations that may be characterized as an account or contract right under the UCC); (b) all of such Person's rights in, to and under all purchase orders or receipts for goods or services; (c) all of such Person's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods); (d) all rights to payment due to such Person for Goods or other property sold, leased, licensed, assigned or otherwise disposed of, for a policy of insurance issued or to be issued, for a secondary obligation incurred or to be incurred, for energy provided or to be provided, for the use or hire of a vessel under a charter or other contract, arising out of the use of a credit card or charge card, or for services rendered or to be rendered by such Person or in connection with any other transaction (whether or not yet earned by performance on the part of such Person); and (e) all collateral security of any kind given by any Account Debtor or any other Person with respect to any of the foregoing.

"**Additional Financing**" has the meaning given such term in <u>Section 15(1)</u>.

"**Affiliate**" means, with respect to any Person, (a) any other Person (other than a Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person or (b) any other Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"**Ancillary Agreements**" means the Note, each Security Document and all other agreements, instruments, documents, mortgages, deeds of trust, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, trust agreements and guarantees whether heretofore, concurrently, or hereafter executed by or on behalf of the Company, any of its Subsidiaries or any other Person or delivered to EIPI, relating to this Agreement or to the transactions contemplated by this Agreement or otherwise relating to the relationship between or

among the Company and EIPI, to the Loans or to the Collateral, as each of the same may be amended, supplemented, restated or otherwise modified from time to time; provided however that Ancillary Agreements shall not include any agreement or document issued in connection with the indebtedness to EIPI.

"**Approved Bank Account**" shall have the meaning ascribed to such term in Section 9.

"**Assets**" has the meaning given such term in Section 15.

"**Bankruptcy Code**" shall mean the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. or other applicable bankruptcy, insolvency or similar laws.

"**Bankruptcy Court**" shall have the meaning ascribed to it in the background paragraphs to this Agreement.

"**Bankruptcy Schedule**" shall mean and be a reference to each Company's Schedules and Statements of Financial Affairs; specifically, as to Sargent Ranch, LLC BK-Case No. 10-00046-PB11, filed on January 4, 2010.

"**Books and Records**" means all books, records, board minutes, contracts, licenses, insurance policies, environmental audits, business plans, files, computer files, computer discs and other data and software storage and media devices, accounting books and records, financial statements (actual and pro forma), filings with Governmental Authorities and any and all records and instruments relating to the Collateral or otherwise necessary or helpful in the collection thereof or the realization thereupon.

"**Budget**" shall mean the budget commencing January 2011 attached hereto as Exhibit A, prepared by the Company prior to the Final Order, in form and substance satisfactory to EIPI, as updated from time to time in accordance with Section 2(b)(2).

"**Business Day**" means a day on which EIPI is open for business and that is not a Saturday, a Sunday or other day on which banks are required or permitted to be closed in the State of California.

"**Business Plan**" shall have the meaning given to such term in Section 2(b)(2).

"**Capital Availability Amount**" means Seven Million Five Hundred Thousand and 00/100 ($7,5000,000.00) Dollars, which may be increased to Twenty Million and 00/100 Dollars ($20,000,000.00) upon agreement of the parties and satisfaction of the closing conditions set forth in Section 22.

"**Carve Out**" shall mean: a carve out for certain allowed professional fees and expenses of professionals employed pursuant to an order of the Bankruptcy Court, in an amount not to exceed Two Million Dollars ($2,000,000), which shall be reduced by any amounts paid or distributed to such professionals.

"**Change of Ownership**" shall mean that more than thirty percent (30%) of the Voting Equity Interests of any Company is, or becomes, owned or Controlled by any Person or Persons other than the Present Owners (including for the purposes of the calculation of percentage ownership, any shares of Voting Equity Interests into which any Equity Interests of the Company are convertible or for which any such shares of the Equity Interests of the Company may be exchanged and any shares of such Voting Equity Interests issuable upon exercise of any warrants, options or similar rights which may at the time of calculation); or (b) any merger, consolidation of the Company occurs in which the Company is not the surviving corporation (or other entity); or (c) a sale of all or substantially all of the property or assets of the Company shall occur, except to EIPI; or (d) any Equity Interest of EIPI is, or becomes the subject of, any consensual Lien except in favor of (or assigned to) Altus pursuant hereto.

"**Chapter 11 Case**" shall have the meaning ascribed to it in the background paragraphs to this Agreement.

"**Chattel Paper**" means all "chattel paper," as such term is defined in the UCC, including electronic chattel paper, now owned or hereafter acquired by any Person.

"**Closing Date**" means the date of satisfaction or waiver by EIPI of all conditions precedent to the effectiveness of the Agreement and the DIP Documents and the Final Closing occurs.

"**Collateral**" means all of the Company's property and assets, whether real or personal, tangible or intangible, and whether now owned or hereafter acquired, or in which it now has or at any time in the future may acquire any right, title or interests including all of the following property in which it now has or at any time in the future may acquire any right, title or interest:

    (a)    all Inventory;

    (b)    all Post Petition Equipment;

    (c)    all Fixtures;

    (d)    all Goods;

    (e)    all General Intangibles;

    (f)    all Accounts;

    (g)    all Deposit Accounts, other bank accounts and all funds on deposit therein;

    (h)    all Investment Property;

    (i)    all Stock;

    (j)    all Chattel Paper;

(k)    all Letter-of-Credit Rights (Companies represent that no such Letter-of-Credit Rights exist at the time of execution);

(l)    all Instruments;

(m)    all commercial tort claims set forth on Schedule 1(A);

(n)    all Books and Records;

(o)    all Intellectual Property;

(p)    all Supporting Obligations including letters of credit and guarantees issued in support of Accounts, Chattel Paper, General Intangibles and Investment Property;

(q)    (i) all money, cash and cash equivalents and (ii) all cash held as cash collateral to the extent not otherwise constituting Collateral, all other cash or property at any time on deposit with or held by EIPI for the account of any Company (whether for safekeeping, custody, pledge, transmission or otherwise);

(r)    all causes of action, but excluding those actions under Chapter 5 of the Bankruptcy Code.  For avoidance of doubt, the term "Collateral" shall not include property affirmatively recovered and brought into the estate pursuant to, *inter alia*, 11 U.S.C. §547; however, in the event that lien avoidance is accomplished via 11 U.S.C. §547, and the property is subject to the prepetition liens of EIPI or any other Person (or would be but for the operation of 11 U.S.C. §552), such property shall constitute Collateral;

(s)    all tax refunds;

(t)    all real property, whether owned or leased;

(u)    all mining claims and leases and mineral rights of any type, water rights, and as-extracted collateral;

(v)    all intercompany indebtedness (including loans to non U.S. subsidiaries);

(w)    all products and Proceeds of all or any of the foregoing, tort claims and all claims and other rights to payment including (i) insurance claims against third parties for loss of, damage to, or destruction of, the foregoing Collateral and (ii) payments due or to become due under leases, rentals and hires of any or all of the foregoing and Proceeds payable under, or unearned premiums with respect to policies of insurance in whatever form.

"**Collateral Monitoring Fee**" has the meaning given such term in <u>Section 26</u>.

"**Company Agent**" means John Bryan (or designated successor)

"**Contract Rate**" has the meaning given such term in the Note.

"**Control**" shall mean the power, whether direct or indirect, (i) to vote ten percent (10%) of more of the Voting Equity Interests of a Person, or (ii) to direct, or cause the direction of, the management and/or policies of a Person, whether by contract or otherwise.

"**Court**" shall mean the United States Bankruptcy Court for the Southern District of California.

"**Cure**" has the meaning given such term in <u>Section 25</u>.

"**Cure Period**" has the meaning given such term in <u>Section 25</u>.

"**Default**" means any act or event that, with the giving of notice or passage of time or both, would constitute an Event of Default.

"**Default Rate**" means the note rate plus 250 basis points.

"**Deposit Accounts**" means all "deposit accounts" as such term is defined in the UCC, now or hereafter held in the name of any Person.

"**DIP Documents**" means this Agreement, the Note, the Ancillary Agreements, any other agreement, document related to or securing the Obligations hereunder and under the Note, and shall also include the Final Order.

"**Disclosed Liens**" shall mean and be a reference to those Liens described in Schedule D of each Company's Bankruptcy Schedule.

"**Disclosure Controls**" has the meaning given such term in <u>Section 13(e)(ii)</u>.

"**Documents**" means all "documents", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including all bills of lading, dock warrants, dock receipts, warehouse receipts, and other documents of title, whether negotiable or non-negotiable.

"**Equipment**" means all "equipment" as such term is defined in the UCC.

"**Equity Interests**" shall mean: (i) in the case of a corporation, all capital stock, including common and preferred stock, and warrants to acquire capital stock; (ii) in the case of a partnership, all partnership interests therein, including special, limited and general interests; (iii) in the case of a limited liability company, all membership interests therein; and (vi) in the case of any other entity, all interests evidencing equity ownership therein.

"**ERISA**" has the meaning given such term in <u>Section 13(y)</u>.

"**Event of Default**" means the occurrence of any of the events set forth in <u>Section 23</u>.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Final Closing**" shall mean the closing of the initial Loan to occur within fifteen (15) Business Days of entry of the Final Order.

"**Final Order**" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case in compliance with Bankruptcy Rules 4001, which order shall be satisfactory in form and substance to EIPI together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Companies to obtain credit, incur (or guaranty) Indebtedness and grant Liens under this Agreement and the Ancillary Agreements as the case may be, includes customary rulings and findings by the Bankruptcy Court binding on all parties (including, without limitation, finding and ruling that the loans made pursuant to the Final Order are made in good faith within the meaning of Section 364(e) of the Bankruptcy Code), and provides for the super priority of EIPIs' claims.

"**Financial Reporting Controls**" has the meaning given such term in Section 13(e)(iii).

"**Financial Reports**" has the meaning given such term in Section 13(t).

"**Financing Agreement**" shall have the meaning ascribed to it in the background paragraphs to this agreement.

"**Fixtures**" means all "fixtures" as such term is defined in the UCC, now owned or hereafter acquired by any Person.

"**FSMA**" has the meaning given such term in Section 15(b).

"**GAAP**" means generally accepted accounting principles, practices and procedures in effect from time to time in the United States of America.

"**General Intangibles**" means all "general intangibles" as such term is defined in the UCC, now owned or hereafter acquired by any Person including all right, title and interest that such Person may now or hereafter have in or under any contract, all Payment Intangibles, customer lists, Licenses, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, Software, data bases, data, skill, expertise, experience, processes, models, drawings, materials, Books and Records, Goodwill (including the Goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key-person, and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, deposit accounts, rights to receive tax refunds and other payments, rights to received dividends, distributions, cash, Instruments and other property in respect of or in exchange for pledged Stock and Investment Property, and rights of indemnification.

"**Goods**" means all "goods", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including embedded software to the extent

Annex A-6

included in "goods" as defined in the UCC, manufactured homes, fixtures, standing timber that is cut and removed for sale and unborn young of animals.

"**Goodwill**" means all goodwill, trade secrets, proprietary or confidential information, technical information, procedures, formulae, quality control standards, designs, operating and training manuals, customer lists, and distribution agreements now owned or hereafter acquired by any Person.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Indebtedness**" of any Person shall mean, without duplication, (a) all indebtedness for borrowed money; (b) all obligations issued, undertaken or assumed as the deferred purchase price of property or services (other than trade payables, including payroll-related liabilities, incurred in the ordinary course of business on ordinary terms); (c) all non-contingent reimbursement or payment obligations; (d) all obligations evidenced by notes, bonds, debentures or similar instruments, including obligations so evidenced incurred in connection with the acquisition of property, assets or businesses; (e) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by the Person (even though the rights and remedies of the seller or bank under such agreement in the event of default are limited to the repossession or sale of such property); (f) all obligations with respect to capital leases; (g) all indebtedness referred to in clauses (a) through (f) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness; and (i) all guarantees in respect of in-debtedness or obligations of others if the kinds referred to in clauses (a) through (f) above.

"**Indemnified Person**" has the meaning given such term in Section 29(a).

"**Instruments**" means all "instruments", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including all certificated securities and all promissory notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"**Intellectual Property**" means any and all patents, trademarks, service marks, trade names, copyrights, trade secrets, Licenses, information and other proprietary rights and processes.

"**Inventory**" means all "inventory", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located, including all inventory, merchandise, goods and other personal property that are held by or on behalf of such Person for sale or lease or are furnished or are to be furnished under a contract of service or that constitute raw materials, work in process, finished goods, returned goods, or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Person's

business or in the processing, production, packaging, promotion, delivery or shipping of the same, including all supplies and embedded software.

"**Investment Property**" means all "investment property", as such term is defined in the UCC, now owned or hereafter acquired by any Person, wherever located.

"**Letter-of-Credit Rights**" means "letter-of-credit rights" as such term is defined in the UCC, now owned or hereafter acquired by any Person, including rights to payment or performance under a letter of credit, whether or not such Person, as beneficiary, has demanded or is entitled to demand payment or performance.

"**License**" means any rights under any written agreement now or hereafter acquired by any Person to use any trademark, trademark registration, copyright, copyright registration or invention for which a patent is in existence or other license of rights or interests now held or hereafter acquired by any Person.

"**Lien**" means any mortgage, security deed, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the UCC or comparable law of any jurisdiction.

"**Loans**" has the meaning given such term in Section 2(a) and shall include all other extensions of credit hereunder and under any Ancillary Agreement.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, liabilities, condition (financial or otherwise), properties, operations or prospects of any Company or any of its Subsidiaries (taken individually and as a whole), (b) any Company's or any of its Subsidiary's ability to pay or perform the Obligations in accordance with the terms hereof or any DIP Document, (c) the value of the Collateral or Prepetition Equipment, EIPI's Liens on the Collateral or Prepetition Equipment or the priority of any such Lien or (d) the practical realization of the benefits of EIPI's rights and remedies under this Agreement and the DIP Documents.

"**Maximum Facility**" has the meaning given to such term in the Background paragraphs.

"**Maximum Legal Rate**" has the meaning given such term in Section 5(a)(iii).

"**Net Sale Proceeds**" shall mean, for any sale, lease, transfer or other disposition of assets, (a) the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received or other form of consideration paid as is acceptable to Altus in their sole and absolute discretion) received by either Company from such sale, lease, transfer or other disposition, net of (b) reasonable

Annex A-8

transaction costs (including to the extent included in the Carve-Out, reasonable legal, advisory and other fees and expenses, including title and recording expenses and reasonable expenses incurred for preparing such assets for sale, associated therewith).

"**Note**" means that certain Secured Note dated as of the Closing Date made by the Company in favor of EIPI in the original face amount of Seven Million Five Hundred Thousand Dollars ($7,500,000), as same may be amended, supplemented, restated and/or otherwise modified from time to time.

"**Obligations**" means all Post Petition Loans, all advances, debts, fees, reimbursements, charges, liabilities, obligations, covenants and duties owing by the Company to EIPI (or any corporation that directly or indirectly controls or is controlled by or is under common control with EIPI) of every kind and description (whether or not evidenced by any note or other instrument and whether or not for the payment of money or the performance or non-performance of any act), direct or indirect, absolute or contingent, due or to become due, contractual or tortious, liquidated or unliquidated, whether existing by operation of law or otherwise now existing or hereafter arising including any debt, liability or obligation owing from the Company to others which EIPI may have obtained by assignment or otherwise and further including all interest (including interest accruing at the then applicable rate provided in this Agreement after the maturity of the Loans and interest accruing at the then applicable rate provided in this Agreement after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding), charges, fees or any other payments the Company makes by law or otherwise arising under or as a result of this Agreement, the DIP Documents or otherwise, together with all reasonable expenses and reasonable attorneys' fees chargeable to the Company accounts or incurred by EIPI in connection therewith.

"**Other Taxes**" has the meaning given such term in Section 5(c).

"**Payment Intangibles**" means all "payment intangibles" as such term is defined in the UCC, now owned or hereafter acquired by any Person, including, a General Intangible under which the Account Debtor's principal obligation is a monetary obligation.

"**Permitted Exceptions**" shall mean the Statutory Liens and the Carve Out.

"**Person**" means any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, entity or government (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof), and shall include such Person's successors and assigns.

"**Petition Date**" has the meaning ascribed to it in the Background paragraphs to this Agreement.

"**Plan of Reorganization**" shall have the meaning given to such term in Section 15(t).

Annex A-9

"**Post Petition**" shall mean the time period beginning immediately upon the filing of the Chapter 11 Case.

"**Post Petition Indebtedness**" shall mean all Indebtedness of any Company to EIPI or any other Person outstanding or arising Post petition.

"**Prepetition**" shall mean the time period ending immediately prior to the commencement of the Chapter 11 Case.

"**Present Owners**" shall mean the owner(s) of the Equity Interests of the Company on the Closing Date.

"**Proceeds**" means "proceeds", as such term is defined in the UCC and, in any event, shall include: (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to any Company or any other Person from time to time with respect to any Collateral; (b) any and all payments (in any form whatsoever) made or due and payable to any Company from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of any Collateral by any governmental body, governmental authority, bureau or agency (or any person acting under color of governmental authority); (c) any claim of any Company against third parties (i) for past, present or future infringement of any Intellectual Property or (ii) for past, present or future infringement or dilution of any trademark or trademark license or for injury to the goodwill associated with any trademark, trademark registration or trademark licensed under any trademark License; (d) any recoveries by any Company against third parties with respect to any litigation or dispute concerning any Collateral, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, Collateral; (e) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock; and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of Collateral.

"**SEC**" means the Securities and Exchange Commission.

"**Securities Act**" has the meaning given such term in <u>Section 13(q)</u>.

"**Shares**" means shares of Equity Interests in any Company.

"**Software**" means all "software" as such term is defined in the UCC, now owned or hereafter acquired by any Person, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"**Stock**" means all certificated and uncertificated shares, options, warrants, membership interests, general or limited partnership interests, participation or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including ordinary shares, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Securities Exchange Act of 1934).

"**Subsidiary**" means, with respect to any Person, (i) any other Person whose shares of stock or other ownership interests having ordinary voting power (other than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the directors or other governing body of such other Person, are owned, directly or indirectly, by such Person or (ii) any other Person in which such Person owns, directly or indirectly, more than fifty percent (50%) of the Equity Interests at such time.

"**Super Priority Claims**" has the meaning given such term in Section 6(b).

"**Supporting Obligations**" means all "supporting obligations" as such term is defined in the UCC.

"**Taxes**" has the meaning given such term in Section 5(c).

"**Term**" shall have the meaning set forth in Section 19, and is subject to acceleration at the option of EIPI upon the occurrence of an Event of Default hereunder and expiration of the Cure Period or other termination hereunder.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time be in effect in the State of California; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, EIPIs' Lien on any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of California, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions of this Agreement relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions; provided further, that to the extent that UCC is used to define any term herein or in any DIP Document and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 shall govern.

"**Voting Equity Interests**" shall mean Equity Interests having ordinary voting power to elect members of the board of directors, partners, managers or comparable governing body of a Person.

# EXHIBIT A

## <u>Budget</u>

--- See Attached ---

## EXHIBIT B

## <u>Business Plan</u>

--- See Attached ---

**EXHIBIT C**

**Officer's Borrowing Certificate**

THIS BORROWING CERTIFICATE (this "**Certificate**") is made and delivered as of the date accepted below ("**Effective Date**") by the Chief Executive Officer, Controller or Chief Financial Officer of SARGENT RANCH, LLC, a California limited liability company ("**Company**") to EQUITY INVESTMENT PROPERTIES, INC ("**EIPI**").

A.        Company and EIPI have entered into that certain Secured Note ("**Note**") and that certain Amended Debtor-In-Possession Financing and Security Agreement dated as of October __, 2010 ("**Financing Agreement**"). Terms used herein but not defined herein shall have the meanings ascribed to such terms in the Financing Agreement

B.        The Company would like to request a Loan pursuant to the DIP Documents as more specifically detailed below.

NOW, THEREFORE, the Company agrees and the relevant officer of Companies executing this Certificate represent as follows:

1.        **Loan Amount.** Companies hereby request a Loan in the minimum amount of Seven Million Five Hundred Thousand Dollars and no/100 ($7,500,000) with possible expansion of said Loan to Twenty Million and Dollars and no/100 ($20,000,000), which shall be funded in accordance with the terms of the DIP Documents.

2.        **Satisfaction of Conditions Precedent.** The Company has satisfied all applicable conditions precedent to this Loan set forth in Sections 21 and 22 and elsewhere in the Financing Agreement.

3.        **Closing Deliveries.** The Company has delivered, or shall deliver as of the funding of the Loan requested herein, all required closing deliveries to EIPI. The Company reaffirms all information, Exhibits and Schedules provided to EIPI or set forth in the Financing Agreement and associated agreements, or has delivered updated information, Exhibits and Schedules prior to the Effective Date.

4.        **Note.** The Loan amount requested herein is hereby specifically incorporated into the Note.

5.        **Officer.** The Officer delivering this certificate has the requisite authorizations from Companies to deliver this certificate and bind Companies in accordance herewith.

6.        **Representations and Warranties.** The Company and the officer delivering this certificate (i) have accurately represented the Company's financial condition to EIPI in all financial statements, documents and projections provided to EIPI, and (ii) reaffirm and make all representations and warranties set forth in the Financing Agreement as of the date hereof.

7. **Covenants**. The Company has, and shall continue to comply with all covenants set forth in the DIP Documents.

8. **Effectiveness**. EIPI shall acknowledge and accepted this Certificate by executing below and returning to Company Agent.

9. **Miscellaneous**. This Certificate and all related agreements shall be governed by, and construed in accordance with, the internal laws (as opposed to conflict of laws provisions) of the State of California. This Certificate is delivered in accordance with the Financing Agreement, and is subject to all applicable provisions of the Financing Agreement. The Financing Agreement and all related agreements shall continue in full force and effect.

IN WITNESS WHEREOF, the below company officer delivers this Certificate, which has been duly authenticated and executed, and represents the foregoing as true and accurate as of the date set forth below.

**SARGENT RANCH, LLC**

By: _____
Name: John Bryan
Title:  CEO

**DATE:** _____

ACKNOWLEDGED AND ACCEPTED:

**EQUITY INVESTMENT PROPERTIES, INC**

By: _____
Name:
Title:

**DATE:** _____

## SCHEDULE 8(n)

### Executive Offices and Collateral Locations

    i)       8031 La Jolla Scenic Drive North, La Jolla CA 92037

    ii)      TBD, Gilroy, CA

**SCHEDULE 8(p)**

**Bank Accounts**

(1)  Wells Fargo Bank – Checking Account

(2)  US Bank – Debtor-In-Possession Checking Account

## SCHEDULE 13(b)

### Outstanding Membership Interests

**Stock Issued:**

N/A

**Sargent Ranch, LLC Ownership Interests:**

Wayne and Marci Pierce Living Trust, Wayne and Marci Pierce, Trustees 70%

14th Green, LLC (Greg Griffin) 15%

AIA Consulting (Arthur Appleton) 15%

## SCHEDULE 13(d)

## <u>Liabilities</u>

--- See attached schedules filed with the Bankruptcy Court---

## SCHEDULE 13(e)

## <u>Exceptions to Agreements and Controls</u>

    (a)    The Watley Group, LLC

    (b)    Affeld, Grivakes, Zucker, LLP

    (c)    Smaha Law Group

## SCHEDULE 13(f)

### <u>Obligations with Respect to Related Persons</u>

-- None --

## SCHEDULE 13(h)

## **Exceptions to Good Title**

-- See attached schedules filed with the Bankruptcy Court --

## SCHEDULE 13(j)

## <u>Defaults</u>

-- See attached schedules filed with the Bankruptcy Court --

**SCHEDULE 13(k)**

**<u>Litigation</u>**

(a)    Chapter 11 Case

(b)    Lender Litigation Case

## SCHEDULE 13(l)

### Unfiled Tax Returns, Taxes on Assets

**Federal and State returns to be filed within 90 days of funding:**

2008

2009

**Taxes included in Budget that are in dispute as to the final amount due:**

Santa Clara County Property Taxes

Santa Cruz County Property Taxes

## SCHEDULE 13(m)

### Collective Bargaining Agreements, Employment or Compensation Contracts

There are no collective bargaining, employee or labor union agreements in effect as of the execution of this Debtor-In-Possession Financing and Security Agreement. And while none are anticipated, business activities contained in the Business Plan could result in the Company entering such agreements.

## SCHEDULE 13(n)

## <u>Registration Rights and Voting Rights</u>

**Member Agreements Affecting Equity Interests with Voting Rights:**

-- None --

**Member Agreements Affecting Equity Interests without Voting Rights:**

(1) 14th Green, LLC (Greg Griffin) has pledged its ownership interest (15%) as collateral to various holders of notes from Greg Griffin, as an individual.

The total number of such claims is unknown to the Company.

(2) AIA Consulting (Arthur Appleton) has pledged its ownership interest (15%) as collateral to various holders of notes from Arthur Appleton, as an individual.

The total number of such claims is not known to Company.

## SCHEDULE 13(o)

### Non-compliance with Laws or Permits

-- None --

## SCHEDULE 13(p)

## <u>Hazardous Materials</u>

<u>Oil and associated derivatives</u>

These are covered by an existing lease with Patriot Resources. As a condition of said lease, Patriot is responsible for any and all clean up and remediation.

## SCHEDULE 13(t)

## Non-complying Financial Reports

Company has no knowledge of any Financial Statements that have failed to be satisfactory to EIPI. Company relies upon notification from EIPI of such an occurrence and to date has received no such notification.

The Budget, was prepared by representatives of the Company and The Watley Group, LLC under the supervision and review of the Company's CEO and CFO.

## SCHEDULE 13(x)

### Company Name; Locations of Offices, Records and Collateral

(a)  8031 La Jolla Scenic Drive North, La Jolla, CA 92037

(b)  TBD, Gilroy, CA.

# EXHIBIT C

Since being retained by the Debtor, Watley has gone out to the marketplace to obtain post-petition DIP and permanent financing for the Debtor. Mr. Bryan, other Watley employees, and placement agents engaged by Watley have contacted and/or spoken with representatives of more than 45 possible investment groups, including institutional lenders, hedge funds, and individuals with financial wherewithal and interest in investments such as Sargent Ranch.

Watley first contacted individuals and firms in which it has a strong relationship and who Watley believed would have a high level of interest in investing in Sargent Ranch. This list of potential investors includes:

1. Avro Capital (to act as placement agent)
2. Empire Advisors
3. Equity Investment Properties, Inc. ("EIPI")
4. Mr. Roderick Thomson
5. Mr. Mark Arioto

EIPI reacted quickly to the opportunity and conducted extensive diligence, including a review of available documents, discussions with management/consultants, and chartering a helicopter to fly over the entire property. EIPI is the only investor to submit a committed term sheet and its terms are superior to what all other investors have indicated. Therefore, Watley elected to accept this proposal and is currently working to get it approved by the bankruptcy court.

All of the other investors listed above also expressed significant interest in the business. Mr. Thomson met with Sargent Ranch's management team several times, but decided to pass on the opportunity due to timing commitments with other projects. Mr. Arioto feels the opportunity is compelling and remains interested; however, he is concurrently raising funds for his investment vehicle, which makes the timing of an investment in Sargent Ranch unclear. Avro Capital felt the opportunity was attractive, but the handful of investors it contacted were either unable to commit the time for diligence or unwilling to invest in what they perceived as a complex real estate deal. Empire Advisors, who has significant experience with complex restructuring investments and DIP financing in particular, conducted significant due diligence and remains highly interested in investing; however, their indicated terms are somewhat higher than EIPI's. Watley believes Empire represents a good financing back-up.

The second method Watley used to identify potential investors was referrals and various databases. The investor databases allowed Watley to screen for funds with an interest in real estate, distressed situations, complex situations, and several other criteria that might indicate they would have an interest in Sargent Ranch. In total, Watley contacted 23 firms, including:

1. Audax
2. Adjacent Capital
3. Balmoral Advisors
4. Blue Wolf
5. Comvest
6. Crystal Financial
7. DDJ Capital
8. Dimeling, Schreiber & Park
9. EFO Financial Group
10. Indigo Asset Management
11. Industry Capital
12. Longroad Asset Management
13. Monomoy Capital Partners
14. Renewal Capital
15. San Jacinto
16. Signature Capital Advisors
17. Stairway Capital
18. Summit Investment Management
19. ValStone
20. Vintage Capital Group
21. Wall Street Venture Capital
22. Yorkville Advisors

23. Versa Capital

Of the firms listed above, San Jacinto expressed the most interest in investing. They conducted significant diligence and submitted a term sheet with terms that were in line with the market for similar transactions, but inferior to those committed to by EIPI. Like Empire Advisors, Watley believes that San Jacinto represents a good financing alternative in the event that EIPI is unable to invest.

The vast majority of other investors listed above conducted very limited due diligence or elected to pass based on the business plan provided by Watley. Based on feedback from these investors, Watley believes the primary challenges include:

a) The economic climate remains very uncertain and many investment funds stated that they were putting all investments on hold for the immediate future;
b) Several investors required amortization from cash flow but Sargent Ranch has no current operations or revenue stream (more simply put, these investors were unwilling to be secured solely by real estate value);
c) The deal has been shopped extensively and several investors shared a perception that the situation was complex and contained unknown risks;
d) The asset value of the property would be significantly impaired if the business was unable to obtain the necessary permits;
e) A general aversion to real estate investing given the turmoil in the residential and commercial markets;
f) Many real estate funds are regionally focused and would not explore opportunities in Northern California;
g) The business has historically suffered from terrible public relations; and
h) A few investors expressed concern with the previous management team and the potential for them to continue to be involved in future decisions related to the business.

The third avenue Watley pursued to find potential investors was to engage CIM Securities, LLC ("CIM"), a placement agent who describes themselves as "an independent investment bank that serves microcap companies by providing capital raising solutions and also merger and acquisition services." Watley has been in discussions with CIM regarding Sargent Ranch since early September and on September 28, 2010, CIM's provided to Watley a list of 127 potential investors. However, Watley felt a more targeted investor list would be preferable because: (i) investment funds generally are highly averse to large auctions in which there is little chance of actually winning (i.e., it's not worth their effort to even try); (ii) it would be highly difficult to manage a process with well over 100 firms and it would result in poor response times to investors and delays in receiving commitments; and (iii) a more limited list of investors creates a more competitive bidding environment. Therefore, Watley worked with CIM to limit there list of investors to no more than 20 firms. CIM continues to work with several of these investors; however, none of them have submitted terms superior to those of EIPI. CIM's list of 19 investors includes:

1. AEA Investors
2. Altaris Capital Partners
3. Avenue Capital Group
4. Blackstone Mezzanine
5. Canyon Partners
6. Chanin Capital Partners
7. DE Shaw
8. Fortitude Merchant Bankers
9. Fortress investment Group
10. GE Capital
11. Harbinger
12. JCR Capital
13. Mt. Kellitt Capital
14. Paul Capital Partners
15. Rain Tree Investments
16. Resource Land Fund
17. Royalty Capital Management
18. Second Street Ventures
19. Solamere