1 | John L. Smaha, Esq., Bar No. 95855
Gustavo E. Bravo, Esq., Bar. No. 218752
2 | **SMAHA LAW GROUP**
7860 Mission Center Court, Suite 100
3 | San Diego, California 92108
Telephone:   (619) 688-1557
4 | Facsimile:    (619) 688-1558

5 | Attorneys for Debtor, Sargent Ranch LLC

6

7

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 | In re

12 | SARGENT RANCH LLC,

13

14 | Debtor.

| CASE NO.   10-00046-PB11

| Chapter 11

| **JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC., RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS TO SAME**

| Date:     December 17, 2010
Time:     9:00 a.m.
Dept.:     4
Judge:   Hon. Peter L. Bowie

Sargent Ranch, LLC as Debtor and Debtor-in-Possession herein ("Debtor" and/or "Sargent"), respectfully submits the following opposition to Energy Research & Generation, Inc.'s  ("ERG" and/or "Movant") Motion For an Order Pursuant to 11 U.S.C. Section 1104(a) for appointment of a chapter 11 trustee or examiner or, in the alternative, for conversion of this case to a chapter 7 bankruptcy under 11 U.S.C. Section 1112(b).  The opposition is based on the following points and authorities and upon the declaration of Wayne Pierce, the Debtor's managing member, John Bryan, John Smaha and Chris Grivakes.

# I.

## **INTRODUCTION**

From the inception of this case, ERG, and those creditors that have allied themselves with ERG, have attempted to walk a tight rope before this Court. ERG has attempted to balance its desire to fool this Court into the lie that ERG is an innocent, hapless and helpless victim that was fooled into lending money to a company that holds an allegedly worthless plot of land, against the truth of its overwhelming, needful greed to obtain ownership over the Debtor's extremely valuable real property to the inevitable detriment of the Debtor, other secured creditors of the Debtor and, most importantly, unsecured creditors of the Debtor.

Over the first several months of this bankruptcy, ERG was satisfied with adamantly opposing any of Debtor's attempts to reorganize and find ways to pay off all creditors in a fair and orderly matter. ERG was confident that a strategy of delaying and opposing any proposed move by the Debtor, much as ERG had employed on a pre-petition basis to great success, would be enough to frustrate the Debtor and cause this bankruptcy to fail. Not surprisingly, now that the Debtor has shown the ability to fight through ERG's plan-blocking efforts and having found a viable methodology, not only for the approval of a plan but, for the approval of a plan that will pay all creditors 100% of their claims, ERG's strategy has now shifted. ERG and its few creditor co-conspirators are taking one last, futile, yet aggressive stab at getting the end result that they have always sought. Namely, the dissolution of the Debtor and ERG's complete and total ownership and control of the Debtor's extremely valuable real property.     As will be shown below, ERG cannot establish that current cause exists for the appointment of a trustee, that appointment of a trustee is not in the interest of **all** creditors[1], and that conversion of this case to that of a liquidation would irreparably harm more creditors than it would help anyone but ERG and a few limited creditors. At the very least, the Court should deny this motion as untimely until such time as the Debtor has been allowed to make a good faith attempt at having the pending motion for priming financing and for its

---

[1] Debtor will acknowledge one fact, that the appointment of a trustee and/or conversion of this case to a chapter 7 would likely provide a windfall for ERG, a fact that ERG is only too aware of and this Court should now also be aware.

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC., RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS TO SAME

1

1   plan of reorganization approved.  The Court approved the Watley Group's involvement in this case

2   in order to give the Debtor its best chance to obtain financing and propose a valid plan of

3   reorganization, now that the Debtor and the Watley Group have done so, ERG untimely requests that

4   the Court, in essence, dissolve the Debtor one step away from obtaining the goal that every debtor

5   should seek to obtain.

## II.

### STATEMENT OF FACTS

Sargent Ranch, LLC was created in, or about, May of 2000.  The purpose for Debtor's creation was to take title to various real properties located in the County of Santa Clara, State of California and further described as Assessor Parcel Numbers: 841-36-010, 810-38-002, 810-38-009, 810-38-014, 810-38-015, 810-38-016, 810-38-017, 810-37-006, 810-37-007, 810-37-008, along with any and all lot line adjustments thereof (the "Debtor's Properties").  The Debtor's Properties were obtained through the efforts of Wayne F. Pierce, who had obtained an option to purchase the Debtor's Properties from certain third parties including Fivestar Commerce, Inc. and WFP Financial, Inc.  (See Declaration of Wayne F. Pierce, ¶ 2).

Debtor obtained financing from First Blackhawk Financial Corporation ("Blackhawk") a full service mortgage company that illegally gathered a number of "investors" in order to fund the loans made to the Debtor.  By the recording of three separate notes and deeds of trust, Blackhawk allegedly loaned a total of $43,000,000 to Sargent.  The loans were funded in four separate installments in the following general order:

| | | |
|---|---|---|
| 1. | First Deed of Trust (June, 2000) | $15,000,000.00 |
| 2. | Second Deed of Trust (Nov. 2000) | $15,000,000.00[2] |
| 3. | First Deed of Trust Modification (Nov., 2000) | $10,000,000.00 |
| 4. | Third Deed of Trust (Oct. 2003) | $ 3,000,000.00[3] |

In addition to the $43,000,000 in original loans, Blackhawk arranged additional protective advances which raised the total loans to as much as $47,846,532.00 based on copies of bank

---

[2] In fact, this distribution to Sargent occurred over time, with Blackhawk first issuing the note and then selling portions of the note to its "investors" over a protracted period of time.

[3] See Declaration of Wayne F. Pierce ¶ 3.

1  statements previously held, controlled and managed by Blackhawk. These protective advances were

2  used for project expenses and costs as per the direction of Blackhawk, without the direction of the

3  Debtor or authority of the Debtor.   (See Declaration of Wayne F. Pierce, ¶ 3).

4        The particular methodology by which the loans were created, funded and recorded have led

5  to the filing of an adversarial action against Blackhawk and the secured creditors, identified as

6  *Sargent Ranch, LLC v. First Blackhawk Financial Corporation, et al*, Case No. 10-90467-PB in the

7  Southern District of California United States Bankruptcy Court (the "Complaint"). The complaint,

8  a true and correct copy of which is attached to the declaration of Wayne F. Pierce sets forth the

9  various improper and illegal methods by which Blackhawk funded the loans. The Complaint further

10  sets forth causes of action for intentional interference with economic advantage and other related

11  actions stemming from the secured creditors' subsequent efforts to prevent the Debtor from

12  developing the Debtor's Properties and/or from finding a way to pay off the secured creditors'

13  claims.(See Declaration of Wayne F. Pierce, ¶ 4 and Exhibit A thereto).

14        The Debtor's Properties were initially obtained by Sargent with the goal of developing

15  residential homes and ranches for sale with a golf course and several other commercial opportunities.

16  However, as the market for residential construction and certain limitations to construction in Santa

17  Clara became evident to Sargent, Sargent sought to expand the scope of potential projects on the

18  Debtor's Properties and began efforts to expand the use of the Debtor's Properties for other purposes.

19  Among these opportunities, was Sargent's efforts to have a tribe of native Americans obtain federal

20  recognition of its tribe and to have a portion of the Debtor's Properties identified as sovereign

21  property. Other opportunities were later identified and have been identified in this case various time.

22  Sargent spent significant amounts of money to develop other opportunities and established potential

23  projects that have exponentially multiplied the potential value, if not the actual value, of the Debtor's

24  Properties from a purchase price of approximately $18,000,000 to as much as $700,000,000. (See

25  Declaration of Wayne F. Pierce, ¶ 5).

26        It was this shift in Sargent's scope of operations that required the changes in the Operating

27  Agreement that ERG claims is further evidence of Mr. Pierce's wrongdoing. Again, nothing could

28  be further from the truth.  When the original Operating Agreement was created and recorded for

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC.,
RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE
ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS
TO SAME

1    Sargent, it was for a single member entity with a development plan in place. Subsequently, the

2    addition of other members and economic issues outside of Sargent's control, made it clear to the

3    Debtor and Blackhawk that the original Operating Agreement would not work. A fully functioning,

4    full-time managing member was required. The Operating Agreement was therefore modified to

5    reflect the needed changes. It was Mr. Pierce's reactive and needed proactive vision and foresight

6    that allowed the Debtor to continue discovering new source of value in the Debtor's Properties. If

7    not for those efforts, the Debtor's Properties would simply have been sitting there with the original

8    development plan that was not economically viable due to changes outside of the Debtor's control.

9    Because the Debtor had effective management, the Debtor's Properties have increased in realizable

10   value, a value that no one can deny now exists. The efforts put forth by the Debtor, and Mr. Pierce,

11   was to the benefit of all parties involved, without the new Operating Agreement, many of the

12   opportunities that currently exist would not even be known to the Debtor or its creditors. Yet, ERG

13   argues that the management of the Debtor is inept. Given the facts of this case, such an accusation

14   is completely untrue (See Declaration of Wayne F. Pierce, ¶ 6).

15        Because the Operating Agreement increased the managing member's responsibilities and

16   day-to-day duties, the Operating Agreement called for increased compensation to Mr. Pierce. The

17   law allows for such compensation for services rendered, the loan documents did not prohibit such

18   compensation and Blackhawk, as the servicer of each loan, was well aware of the increased

19   compensation for Mr. Pierce. (See Declaration of Wayne F. Pierce, ¶ 7).

20        Although misleading allegations have been made by ERG and other certain creditors, Sargent

21   never controlled the funds loaned to it by Blackhawk and its "investors". It was Blackhawk's

22   investors that insisted upon having Blackhawk control all loan funds, required that all funds be

23   maintained by Blackhawk in their bank accounts and all releases to Debtor were made subject to the

24   approval of Blackhawk. Debtor did not control the funds and could not direct those funds at its own

25   discretion. (See Declaration of Wayne F. Pierce, ¶ 8).

26        All funds paid to any and all parties, including Wayne F. Pierce, were approved by

27   Blackhawk. Any indication that Sargent misappropriated funds without Blackhawk's approval is

28

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC.,
RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE
ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS
TO SAME
4

1  completely unfounded.[4]  At all times Blackhawk held in trust all funds generated from any and all

2  loan funds for the benefit of the Debtor and had a valid loan servicing agreement with all

3  beneficiaries of said loans.  At all times, Blackhawk was in charge of the disbursement of all loan

4  proceeds.  Therefore, at all times, Blackhawk was fully aware of the use of and, in certain

5  circumstances, insisted upon the distribution of funds.  ERG's motion alleges that Mr. Pierce

6  improperly withdrew money for his personal use from the loaned funds and that Mr. Pierce received

7  moneys from an oil lease on the Debtor's Properties.  ERG further argues that Mr. Pierce's receipt

8  of these funds were somehow in contravention of Blackhawk's loan agreement with Debtor.

9  However, ERG is unable to point to any instance in the applicable loan documents wherein Sargent

10  Ranch was not allowed to compensate Mr. Pierce or where Mr. Pierce was not allowed to use the

11  funds lent to Sargent Ranch how he saw fit or where Mr. Pierce was prevented from receiving lease

12  payments as a member of the Sargent Ranch LLC.  Simply put, Mr. Pierce, as the managing member

13  of Sargent Ranch, LLC had a right to use the LLC's funds and assets as he saw fit and Blackhawk

14  controlled the use of these funds by holding all of the moneys lent to Debtor in Blackhawk's bank

15  accounts. (See Declaration of Wayne F. Pierce, ¶ 9).

16       ERG further alleges that ERG, and the other secured creditors, were not informed by Sargent

17  Ranch, LLC of the use of funds and how lease receipts were distributed.  ERG ignores two

18  paramount facts.  First, as before, the loan documents do not provide any requirement for Sargent

19  Ranch, LLC to report its use of funds to ERG or any other creditor.  Second, and perhaps more

20  importantly, the loan agreement for the alleged loans were all entered into between Sargent Ranch,

21  LLC and Blackhawk.  As such, Sargent Ranch's only responsibility was to Blackhawk and, as

22  provided above and admitted by ERG, Blackhawk had sole control of the loaned funds and was

23  aware of each penny that the Debtor spent.  As Blackhawk controlled all of the funds and was the

24  sole distributor of the funds, it seems more than reasonable to believe that all distributions were

25  made by Blackhawk with the full knowledge and consent of Blackhawk and its "investors",

26

27

28

---

[4] It is important to note that Sargent had a contractual relationship with Blackhawk and had no relationship with Blackhawk's individual "investors" other than those contracts with Blackhawk.

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC.,
RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE
ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS
TO SAME

1  including ERG; especially since ERG continues to work with and ally itself with Blackhawk's

2  former owner Greg Griffin.  If there is any claim that ERG possesses in relation to Sargent Ranch's

3  use of funds, it would best be brought against Blackhawk.  Of course, ERG cannot make such claims

4  as ERG continues to have a relationship with Greg Griffin, Blackhawk's disgraced, former owner

5  and with Dave Wallace, an individual that, despite admittedly having a non-disclosure and non-

6  circumvent agreement with the Debtor, continues to work against the Debtor and with ERG in an

7  attempt to obtain the Debtor's Properties. (See Declaration of Wayne F. Pierce, ¶ 10 and Exhibit B

8  thereto, a true and correct copy of Confidentiality and Non-Circumvention Agreement).

9       ERG has also made the ridiculous claim that the Debtor has squandered the $47,846,532.00

10  that Blackhawk "lent" to Sargent.  Sargent has reviewed bank records for Blackhawk's various

11  "Sargent Ranch" bank accounts.  This review has revealed that Blackhawk paid both pre-paid and

12  other interest payments to these same "investors" in the amount of $14,678,076.14. Blackhawk itself

13  received fees on these loans in the amount of $2,375,709.00.  These amounts alone indicate that

14  Sargent never even received almost seventeen million of the original forty-three million dollar loan.

15  Further, the acquisition of the Debtor's Properties cost a total of $17,756,132.28, further payments

16  for unpaid property taxes in the amount of $1,682,519.26 all went directly into the Debtor's

17  Properties.  After that, Blackhawk also "loaned" as much as $500,000.00 to its insiders, Griffin and

18  Appleton. (See Declaration of Wayne F. Pierce, ¶ 11).

19       Finally, Blackhawk made protective advances, at its own direction, not at Debtor's request,

20  to other entities known as Mare Island and Roddy Ranch in order to protect Blackhawk's interests

21  in those projects in the total amount of $1,537,440.27.  Most importantly, all but 3 of the creditors

22  in the Mare Island Loans are also creditors in the Sargent Ranch loans and all of the creditors that

23  were in the Roddy Ranch loans, including ERG, are also creditors in the Sargent Ranch loans and

24  all of these Blackhawk clients directly benefitted from the protective advances Blackhawk made to

25  both those projects.  ERG claims that Mr. Pierce induced these two other companies into bankruptcy

26  and damaged the creditors in those projects.  ERG does not offer any actual evidence to these

27  allegations and fails, in any way, to present a full and accurate picture of what occurred in those

28  projects and Debtor will not waste the Court's valuable time delving into such irrelevant issues.

1   Suffice it to say, ERG is once again either wrongly informed or is intentionally attempting to mislead

2   this Court.  Mr. Pierce was involved in the Mare Island Golf Course project which did go into

3   foreclosure due to circumstances out of Mr. Pierce's control.  In fact, it was Blackhawk that

4   demanded that Mr. Pierce allow the project to go to foreclosure to which Mr. Pierce agreed.  ERG

5   also refers to the Roddy Ranch Project. Roddy Ranch was another project in which Blackhawk was

6   the original lender and most, if not all of the individual lenders in the Roddy Ranch project are also

7   in the Sargent loans.  Further, lenders in Roddy Ranch received a 100% repayment of all original

8   principal loans and an approximate 15% return on their investment, partially from these protective

9   advances. As such, it was the lenders, including ERG, that benefitted from those protective advances

10  made by the secured creditors, not the Debtor and not Mr. Pierce. (See Declaration of Wayne F.

11  Pierce, ¶ 12).

12          Amazingly, Sargent never saw $37,829,876.94 of the initial "loans" made by the secured

13  creditors.  Again, it was Blackhawk that controlled these funds and used them at its will and,

14  presumably, at the will of its "investors".  With the remaining $10,016,655.06, Debtor worked

15  continuously towards the identification and development of the various raw material assets and

16  potential projects that have left the Debtor's Properties with a potential value of over seven hundred

17  million dollars. (See Declaration of Wayne F. Pierce, ¶ 13).

18          Unfortunately, ERG and certain other creditors systematically prevented the Debtor from

19  developing, advancing and/or selling any of the valuable assets on the Debtor's Properties.  From

20  July of 2004 to December of 2008, the Debtor, through Mr. Pierce's efforts, brought no less than

21  fourteen potential transactions that would have allowed the Debtor to partially or fully pay off the

22  secured creditors.  At every turn, Blackhawk and the minority group of "investors" apparently led

23  by ERG, refused in some form or fashion to allow for the payoff of their debt, including refusing to

24  grant the Debtor per acre releases which would have allowed the Debtor to sell portions of the

25  Debtor's Properties at a substantial gain.  Attached as Exhibit C to the declaration of Wayne Pierce

26  is a list of the fourteen opportunities that arose during the above referenced period of time.

27  Beginning with Cherokee Investment Partners, LLC in July of 2004, Wayne Pierce made every

28  possible effort to satisfy the growing claims of the secured creditors.  Mr. Pierce dealt with

1   investment firms such as Houlihan, Lokey, Howard & Zukin, local construction companies looking

2   to develop portions of the Debtor's Properties such as Giacalone Construction, mineral extraction

3   companies looking to partner with the Debtor and/or purchase portions of the Debtor's Properties

4   such as Granite Construction Company and Syar Industries.  Again, as every opportunity came and

5   went and, clearly, as certain secured creditors grew more and more interested in getting sole

6   ownership of the Debtor's Properties, it became clear to the Debtor that it would be impossible for

7   the Debtor to reach a mutually agreeable resolution with the secured creditors.  It was this inability

8   to get any cooperation from ERG, and its limited number of secured creditor co-conspirators, that

9   led to the filing of this bankruptcy.  (See Declaration of Wayne F. Pierce, ¶ 14).

10        Since the filing of the bankruptcy, Debtor has worked diligently to develop this case.  ERG

11   makes no allegations regarding Debtor's post-petition activities; in fact, there can be no allegation

12   of wrongdoing during the pendency of this bankruptcy.   Mr. Pierce has worked without

13   compensation since the inception of this case and continues to put in well over forty hours a week

14   in trying to get the Debtor back on the right track.  Initially, Debtor brought various motions to move

15   the case forward, all of which were opposed by ERG.  This included the Debtor's motion to employ

16   Freeman Associates for the development of a sand quarry operation on a small portion of the

17   Debtor's Properties (Docket No. 52 ), a motion to sell another portion of the Debtor's Properties for

18   the development of a solar facility (Docket No. 64), and an application to employ Cassidy Turley as

19   a broker in the listing for sale of the Debtor's Properties (Docket No. 96).   Each of these

20   opportunities was created by the Debtor without any capital and without any funds to market and

21   develop these potential avenues of income.  Again, each of these motions was met with ardent

22   challenges by ERG and its limited group of supporters.  It must be further noted that not one of these

23   motions was denied by this Court, instead, the Debtor negotiated an agreement with the Watley

24   Group and decided to withdraw these other motions when it brought its motion to employ the Watley

25   Group. (See Declaration of Wayne F. Pierce, ¶ 15).

26        Debtor sought (Docket No. 104) and received (Docket No. 130) court approval to employ

27   the Watley Group.  The Watley Group's employment was intended to create a new and revitalized

28   management group for the Debtor that would seek post-petition financing, would develop a business

plan for the development of the Debtor's Properties and would assist the Debtor in the development of a viable plan of reorganization. The simple fact is, **the Watley Group has done everything it was employed to do** and the Debtor has a pending motion with this Court to approve post-petition financing (Docket No. 147) and has filed a disclosure statement and plan that is pending disclosure statement approval (Docket No. 164).    A review of the Debtor's First Amended Disclosure Statement (Docket No. 164) reveals just how much the Debtor and the Watley Group have achieved:

    *A.*    *Financing:* Subject to the Court's approval, the Debtor has selected the provider of the Priming Financing from several competitive offers.    The Priming Financing will come from Equity Investment Properties, Inc.  The terms and conditions of the Note and Security Agreement are attached to the Declaration of John Bryan. Equity Investment Properties, Inc. shall obtain a 30% equity interest in the Reorganized Debtor as a result of this financing. Equity Investment Properties, Inc.'s ownership interest shall increase by one percent (1%) for every additional $750,000.00 Equity Investment Properties, Inc. provides in Priming Financing up to a total of 40% ownership for $15,000,000.00 in Priming Financing.   (See Declaration of John Bryan, ¶ 2).

    *B.*    *Business Plan and Development:* With the use of this financing, Debtor and the Watley Group plan to implement a phased "step-by-step" approach to the development of the Debtor's Properties. The short-term highest and best use and value of Debtor is the development of the sand, aggregate and liquid asphalt businesses and sales of environmental mitigation credits. Longer-term, the Debtor's management team will continue to evaluate other opportunities such as solar and wind power. (See Declaration of John Bryan, ¶ 3).

    There are currently seven separate business opportunities on the Debtor's Properties that the Debtor and the Watley Group plan to evaluate and implement when and as they are economically attractive.  All seven are allowed under the current County of Santa Clara General Plan and Zoning Ordinances. Following are the necessary actions that Debtor has begun performing for each of these business opportunities under the Debtor's Plan. (See Declaration of John Bryan, ¶ 4).

    *1. Sand Extraction/Quarry:* Retain Freeman Associates ("Freeman") to advise and assist in securing a use permit at a cost of $15,000 per month and a performance based success fee of up to $500,000 when the permit is obtained. Freeman Associates ("Freeman"), is an entitlement and

---

1   project management firm based in Palo Alto widely recognized as one of the best in the industry and

2   especially in Northern California. http://www.vfreeman-associates.com.  The Watley Group has

3   already negotiated a tentative agreement with Freeman on behalf of the Debtor and Debtor intends

4   to seek approval of said agreement if the Court approves the Debtor's motion for priming financing.

5   (See Declaration of John Bryan, ¶ 5).

6          Debtor further intends to engage an engineering/project manager specialized in this type of

7   development at total cost of approximately $400,000 over the two year permitting and pre-

8   production period. The Watley Group has been in discussions with Tetra Tech, Inc. a large publicly

9   held geotechnical engineering firm to provide confirmation of this Resource and engineering work

10  to support gaining operating permits. www.tetratech.com.  (See Declaration of John Bryan, ¶ 6).

11         Debtor also anticipates that it will have to conduct biological, traffic, civil engineering, and

12  environmental studies in support of the permit application.  Debtor will also have to build required

13  roads and infrastructure..  Debtor will have an environmental impact report performed under the

14  auspices of the County of Santa Clara Planning Department and a reclamation plan developed by a

15  sub-contractor of Freeman(See Declaration of John Bryan, ¶ 7).

16         *2. Riparian and Habitat Mitigation Credit Sales:* The Watley Group has worked to retain a

17  specialized consulting firm immediately upon funding (Live Oak Associates) to further evaluate this

18  opportunity and establish and execute a marketing plan for these credits.  This evaluation would

19  determine what credits can be sold and which credits should be retained so that Sargent Ranch can

20  execute its long term plan.  Upon confirmation of these assets, the Watley Group will sell

21  approximately 377 credits during 2011 through 2017 and yield total revenue of $23,646,000 during

22  this time period. (See Declaration of John Bryan, ¶ 8).

23         *3. Objectives/Action Steps:* The Debtor will be prepared to retain qualified expert consulting

24  and  potential  joint  venture  firms  (including  Ellis  Energy  Investments,  Inc.

25  www.ellisenergyinvestments.com) to determine quality and extent of deposits, costs of extraction,

26  and potential economic benefits to the Debtor for solar energy and other potential energy sources.

27  The Evaluation period to be completed in six months from funding and the Watley Group has

28  worked diligently to be prepared to move forward with this upon funding.  If the evaluation is

---

1  positive, the Debtor, with the Watley Group's assistance, shall execute joint venture or other funding

2  approaches to obtain permits and commence operations.    It is the Watley Group and the Debtor's

3  intent to achieve cash flow from this resource by 1st quarter of 2012.    (See Declaration of John

4  Bryan, ¶ 9 ). A more specific and detailed business plan was attached to the Disclosure Statement.

5         By comparison, ERG and those aiding and abetting it, seem inclined to shortly file a plan of

6  reorganization of their own. The plan, outlined by Dave Wallace during his recent deposition, would

7  call for the delivery of the Debtor's Properties to the secured creditors and would pay only three to

8  five cents on the dollar to unsecured creditors and eliminates all equity interests. Attached as Exhibit

9  A to the declaration of Chris Grivakes is a true and correct copy of a rough draft of Mr. Wallace's

10  deposition transcript.    In his deposition, Mr. Wallace indicates that he is drafting a plan in

11  conjunction with ERG and that he has willfully ignored the non-circumvent agreement he has with

12  Sargent due to his own conclusions regarding the enforceability of that agreement.

13         Mr. Wallace's involvement and alliance with ERG, ERG's counsel apparently now represents

14  Mr. Wallace, is in direct violation of his previous agreement with the Debtor, the Confidentiality and

15  Non-Circumvention Agreement previously identified and produced by Mr. Pierce hereto. Further,

16  the fact that ERG and Mr. Wallace are working on such a lopsided plan in conjunction with this

17  motion only serves to illustrate the bad faith that both ERG and Mr. Wallace have operated with

18  throughout the life of the "loans" made to the Debtor.  As discussed in more detail below, it is clear

19  that cause does not exist for the appointment of a trustee or for the conversion of this case.  ERG's

20  motion is merely a last ditch effort, made in continuing bad faith, to wrestle the Debtor's Properties

21  away from the Debtor.  ERG's desired result if such a motion were granted is clear.  ERG has not

22  provided any evidence suggesting that a trustee could offer anything to this case. There is no money

23  with which a trustee could begin to operate the Debtor.  The involvement of both the Watley Group

24  and Equity Investment Properties, Inc. would likely be terminated upon appointment and/or

25  conversion.[5]  In such a situation, a trustee would likely have no choice but to grant ERG and its

26

27         [5] In fact, Mr. Bryan has reviewed the employment agreement for the Watley Group and the tentative
   note and agreement with Equity Investment Properties, Inc. and can confirm that both parties have the ability
28  and the intent to withdraw from this case if there is a trustee appointed or a conversion order entered. (See
   Declaration of John Bryan, ¶ 11).

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC.,
RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE
ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS
TO SAME
11

1    fellow first deed of trust holders the right to foreclose upon the Debtor's Properties.  The end result

2    would be that no payments would be made to unsecured creditors, priority creditors or those

3    "secured" creditors that are in second and third positions unless they came forward and took the

4    unlikely step of paying off the first deed of trust holders in full.

5         The Declaration of Jeffrey J. Goodrich filed in support of ERG's motion and the

6    supplemental brief filed by ERG allege that the Debtor has exhibited some form of wrongdoing by

7    contacting the secured creditors by and through the Watley Group.  As part of Mr. Goodrich's

8    declaration, he attached a letter from John Bryan sent to Sargent Ranch creditors.  Mr. Goodrich and

9    Mr. Wallace suggest that this letter and a subsequent telephone conference, which they both

10   attended, were improper solicitations and somehow continue the alleged wrongdoings of the Debtor

11   from pre-petition dates.  The fact that ERG and Mr. Goodrich have to rely on such a weak allegation

12   of post-petition wrongdoing clearly illustrates the fact that the Debtor has done nothing wrong since

13   the filing of the bankruptcy.  Mr. Smaha, of the Smaha Law Group, reviewed the letter before it was

14   sent and made sure that it was clear that the letter and the meeting would not be used for solicitation

15   purposes.  In fact, Mr. Smaha made sure the letter included the following language, in bold: **"You**

16   **should be aware that under the Bankruptcy Code, no one is allowed to solicit your support**

17   **until they have a court approved disclosure statement that provides you with adequate**

18   **information to make an intelligent decision on whether or not to support their plan."** Mr.

19   Bryan's letter goes on to make clear that the disclosure statement and plan have yet to be approved

20   in any way by the Court and that solicitations for votes will not be made until the disclosure

21   statement has been approved: **"We filed a disclosure statement and plan of reorganization last**

22   **Friday and we are working hard to get it approved by the court so that you have all the**

23   **information necessary to support our plan.  After the court has approved the disclosure**

24   **statement you will receive an official ballot in order to vote for or against the plan."** As such,

25   any allegation claiming that this letter was a misguided effort to solicit votes is, simply incorrect.

26   (See Declaration of John L. Smaha, ¶ 2).

27         It must also be noted that the drafting of Mr. Bryan's letter and the service of the disclosure

28   statement, the proposed plan and the notice of hearing for the approval of the disclosure statement

---

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC.,
RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE
ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS
TO SAME

1  was done with the same purpose in mind. The Debtor was aware that the proposed plan and the

2  disclosure statement were being discussed by and amongst the secured creditors. More importantly,

3  ERG and its co-conspirators were busy criticizing the disclosure statement and plan that had

4  previously been sent out to ERG and a limited number of creditors and, by Mr. Wallace's own

5  admission, ERG was busy soliciting support for a competing plan that is being put together (See

6  Exhibit A to Mr. Grivakes's declaration, the deposition transcript of Mr. Wallace). In light of this,

7  the Debtor served the notice and the disclosure statement on all creditors to provide these secured

8  creditors with an accurate representation of where the case has progressed and to provide a true and

9  correct draft of the disclosure statement for their review.[6] (See Declaration of John L. Smaha, ¶ 3).

10      Finally, ERG makes factual allegations that the Watley Group's involvement has not helped

11  the Debtor in any way, that there continues to be some sort of mistrust towards Debtor's management

12  and that the proposed plan is patently unconfirmable. The progress that the Watley Group has made

13  in such a short time, and described in detail above, shows that ERG's allegations are completely

14  unfounded. In fact, ERG claims that it is the Watley Group that admits that issues regarding the

15  trustworthiness of Mr. Pierce made obtaining credit difficult. What ERG fails to realize is that the

16  only reason the Debtor has any difficulties with it's image and/or its "trustworthiness", such

17  difficulties arose solely due to the Debtor's relationship with Blackhawk and Griffin and due to those

18  allegations that ERG itself has created. Despite these short lived difficulties, the Debtor and the

19  Watley Group have obtained financing and have proceeded to strengthen the Debtor's position. (See

20  Declaration of John Bryan, ¶ 10). ERG's claim that the plan is patently unconfirmable is based

21  mostly on their allegation that the non-settling secured creditors stand to lose their secured position

22  and may not be paid in full. This view oversimplifies the situation. It is true that non-settling

23  secured creditors could be subordinated if the litigation against them is successful, in which case they

24  _____

25      [6] ERG claims that providing the disclosure statement to all creditors, in addition to the notice of the hearing, is a violation of Federal Rules of Bankruptcy Procedure Rule 3017. In fact, Rule 3017 requires

26  service of notice to all creditors and further requires serving the disclosure statement on the debtor, the united states trustee and those creditors that have requested a copy, but it is not an indication that the Debtor may

27  not, at its option, serve the disclosure statement on all creditors and parties in interest. Debtor did not solicit any votes by providing a copy of the disclosure statement and the notice, and Mr. Bryan's subsequent letter,

28  clearly indicated that the Debtor is only currently seeking approval of the disclosure statement and is not soliciting votes.

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC.,
RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE
ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS
TO SAME

13

1    fully deserve to be subordinated.  If the litigation is not successful, then the non-settling secured

2    creditors would retain their status and would be entitled to payment on the basis of their secured

3    claim.  Even if the non-settling secured creditors are subordinated, the plan still would anticipate that

4    they would receive payment in full of whatever claim was approved by the Court.  That is of course,

5    if the results of the  litigation allows them to retain any claim.

6                                                    **II.**

7                   **LEGAL GROUNDS FOR RELIEF ON ERG'S MOTION**

8            The Bankruptcy Code sets forth two avenues for appointment of a chapter 11 trustee, one

9    mandatory and one discretionary.  Under 11 USC § 1104 the grounds for appoint a trustee are:

10           "(a) At any time after the commencement of the case but before confirmation of a
             plan, on request of a party in interest or the United States trustee, and after notice and
11           a hearing, the court shall order the appointment of a trustee- (1) for cause, including
             fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor
12           by current management, either before or after the commencement of the case, or
             similar cause, but not including the number of holders of securities of the debtor or
13           the amount of assets or liabilities of the debtor; (2) if such appointment is in the
             interest of creditors, any equity security holders, and other interests of the estate,
14           without regard to the number of holders of securities of the debtor or the amount of
             assets or liabilities of the debtor."

15

16           The is a strong presumption in chapter 11 cases that a debtor in possession should remain in

17   possession absent a showing **of the need for a trustee.** (_In re SunCruz Casinos, LLC_,

18   (Bankr.S.D.Fla. 2003) 298 B.R. 821, 828; _In re Intercat, Inc._, (Bankr.S.D.Ga. 2000) 247 B.R. 811,

19   920).  This presumption is based on the belief that the debtor in possession is most knowledgeable

20   about, and best able to run, the debtor's business (_In re SunCruz Casinos, LLC_, at 828).  As the

21   Fourth Circuit noted in _Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc._, 828 F.2d

22   239, 240 (4th Cir.1987), "the overriding philosophy of Chapter 11 ... is to give the debtor a second

23   chance.  Consistent with such a philosophy is this court's finding that current management should

24   be permitted to identify and correct its past mistakes".

25           Because the appointment of a trustee is such an extraordinary remedy, the moving party must

26   show that cause for appointment of a trustee exists by clear and convincing evidence (See _In re_

27   _Sundale Ltd._ (Bankr.S.D.Fla. 2009) 400 B.R. 890; see also _Official Comm. Of Asbestos Claimants_

28   _v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)_, (3rd Cir. 2004); _In re Sharon Steel Corp._, (3d Cir.

---

1  1989) 871 F.2d 1217; *In re Royster Co.*, (Bankr.M.D.Fla. 1992) 145 B.R. 88, 90).

2       ERG attempts to argue that the Supreme Court in *Grogan v. Garner*, held that a

3  preponderance of the evidence standard should be applied.  However the Supreme Court did not

4  make such a finding and, as can be seen by the dates of the holdings above, the Supreme Court's

5  opinion from 1991 (*Grorgan v. Gamer*, (1991) 498 U.S. 279) has not led district courts or circuit

6  courts to hold that such a standard should be applied to a motion to appoint a trustee, with the lone

7  exception of one district court in Massachusetts.  As indicated by the Florida Southern District

8  bankruptcy court, "the vast majority of courts, including the only circuit court to address this issue

9  has held that the standard of proof to appoint a trustee is clear and convincing evidence..." (*In re*

10  *Sundale*, at 900).[7]  As such, any creditor moving for the appointment of a trustee has a substantial

11  burden and needs to have clear and convincing evidence of cause.  As expressed in detail below,

12  ERG simply cannot show cause in this case.

13       Under § 1141(a)(1), the court is required to appoint a trustee upon finding cause, including

14  fraud, dishonesty, incompetence or gross mismanagement by the debtor (See *In re Suncruz*, 298 B.R.

15  at 828).  However, the level of the acts constituting cause, the conduct, failure to act, or gross

16  mismanagement or the like, must "[rise] to a level sufficient to warrant the appointment of a trustee."

17  (*Comm. Of Dalkon Shield Claimants v. A.H. Robins Co.*, (4th Cir. 1987) 828 F.2d 239, 242).  While

18  appointment is mandatory once cause is found, it is within the court's discretion, on a case-by-case

19  basis, "to determine whether conduct rises to the level of 'cause'" (*Id* at 242; see also, *In re Ford*,

20  (Bankr.W.D.Ky. 1983) 36 B.R. 501, 504).  In making a determination of whether cause exists under

21  this section, courts have looked at a variety of factors including: (1) Materiality of the misconduct;

22  (2) evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other

23  creditors or customers; (3) the existence of pre-petition voidable preferences or fraudulent transfers;

24  (4) unwillingness or inability of management to pursue estate causes of action; (5) conflicts of

25  interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;

---

27  [7] While a court is not bound by the precedent of another circuit, a court should follow a holding from
another circuit court of appeals unless it is convinced that court's decision is erroneous. (*U.S. Tr. v. Pettibone*

28  *Corp.*, (N.D.Ill. 2000) 251 B.R. 335, 341).  "A sister circuit's reasoned decision deserves great weight and
precedential value" (*Owens v. Miller (In re Miller)*, (8th Cir. 2002) 276 F3d 424, 429).

1    (6) self-dealings by management or waste or squandering of corporate assets. (*In re Intercat, Inc.*,

2    247 B.R. at 921).   In weighing these factors, Courts have often considered both the pre-petition

3    conduct of a debtor and the post-petition conduct to determine whether a trustee is warranted, giving

4    more weight to the post-petition behavior of a debtor and the likelihood of a reorganization than the

5    "smoke" caused by pre-petition behavior that may have been alarming at the time but may not be a

6    fire burning at the time of the bankruptcy (See *Schuster v. Dragone*, (D.Conn 2001) 266 B.R. 268;

7    *In re Clinton Centrifuge*, (Bankr.E.D.Pa. 1988) 85 B.R. 980; *In re Anchorage Boat Sales,*

8    *Inc.*,(Bankr.E.D.N.Y.1980) 4 B.R. 635).

9           When determining the appointment of a trustee under § 1141(a)(2), the court's exercise of

10   its discretion is much broader and can take into consideration a variety of different factors.   "§

11   1141(a)(2) may well entail the exercise of a spectrum of discretionary powers and equitable

12   considerations, including a cost-benefit analysis, to determine whether the appointment of a

13   reorganization trustee would be in the interests of creditors, equity security holders and other

14   interests of the Estate." (*In re V. Savino Oil & Heating, Co.*, (Bankr.E.D.N.Y. 1989) 99 B.R. 518,

15   525).

16          In essence, under § 1141(a)(2) a court need not find fault or cause, instead, § 1141(a)(2)

17   reflects the practical reality that a trustee may be needed in a case. (*In re Sharon Steel Corp.*, (3d

18   Cir. 1989) 871 F.2d 1217).  Factors that courts have used to determine whether a trustee should be

19   appointed under this subsection include: (1) the trustworthiness of the debtor; (2) the debtor in

20   possession's past and present performance and the prospects for the debtor's rehabilitation; (3) the

21   confidence-or lack thereof- of the business community and of creditors in present management; and

22   (4) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment.

23   (*In re Euro-Am. Lodging Corp.*, (Bankr.S.D.N.Y. 2007) 365 B.R. 421).  A court must keep in mind

24   the dislocation caused by the appointment of a trustee, and the Court must also consider the cost of

25   the trustee and balance the harm of such an appointment against the benefits of a trustee's

26   appointment. (See *In re General Oil Distribs., Inc.*,  (Bankr.E.D.N.Y.1984) 42 B.R. 402, 409. The

27   Court must weigh all of the factors and interests carefully because the appointment of a trustee is an

28   **extraordinary remedy which will cause additional expense to the estate.** *(In re North Star*

*Contracting Corp.*, (Bankr.S.D.N.Y.1991) 128 B.R. 66, 70, *emphasis added*).

ERG's motion alternatively seeks to have the case converted to that of a chapter 7 bankruptcy. Under 11 U.S.C. § 1112(b)(1), the moving party bears a similar burden of establishing cause for such relief:

> "Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and 1104(3), on request of a party in interest, and after notice of a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court convert a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors if the movant establishes cause."

ERG's motion indicates that cause exists because there has been a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." Although the Bankruptcy Court provides moving parties with other grounds to seek such relief, ERG has not raised any other potential "cause" here. Again, ERG, as the movant, bears the burden of proving that such cause exists. As shown herein, no such proof exists, especially in light of the Debtor's pending motion for priming financing.

### III.

### CAUSE DOES NOT EXIST FOR APPOINTMENT OF A TRUSTEE

In the instant case, ERG claims that "cause" exists under § 1141(a)(1), because "the Debtor has taken the Loan, and after purchasing the Property, fully depleted the remainder of the Loan proceeds on interest, expenses, consultations, legal fees, studies, and petitions; yet nothing on the Property has changed in that time. Despite the Debtor's dreams for the future, the Debtor has not built a single home or golf course or a casino on the Property, and has failed to extract an ounce of liquid asphalt, sell a unit of its mitigation credits, break ground on any solar energy facility or procure a permit to sell sand from the property." It is clear then, that ERG believes that cause can be established by their unproven allegations that the Debtor misused the Loan proceeds and that Debtor failed to develop the property to ERG's satisfaction.

*A.     Debtor's Alleged Misuse of Funds*

ERG alleges that Debtor has failed to service and comply with terms of loans made by ERG and other creditors to the Debtor in the principal amount of approximately $40,000,000. ERG

---

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC., RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS TO SAME

1 | further alleges that these failures by Debtor rose to the level or fraud, self dealing, dishonesty, gross

2 | mismanagement and incompetence by Mr. Pierce because Mr. Pierce allegedly admitted that he used

3 | funds from the loans to make loans to himself and other members of Debtor without disclosing those

4 | transactions to Debtor's lenders, that Mr. Pierce admitted to paying himself over $1,000,000 from

5 | leases owned by the Debtor without disclosing those transaction to Debtor's lenders, that he made

6 | protective advances to other real estate projects in which Mr. Pierce had an interest through the use

7 | of funds loaned to Debtor and that Debtor had two versions of its operating agreement and that one

8 | version included a $750,000 management fee payable to Mr. Pierce from the Debtor, all allegedly

9 | without disclosure to Debtor's lenders.  A review of these allegations and the general lack of

10 | evidence provided in support of the "wrongness" of these allegations shows that ERG can show no

11 | "cause" for the appointment of a trustee.

12 |       *1.*     *Loans to Mr. Pierce and Other Members.*

13 |      There are a number of problems with ERG's allegation that the loans to Mr. Pierce and other

14 | members of the Debtor are proof of fraud.  First, ERG fails to identify one document, one loan

15 | agreement, or any other agreement between the Debtor and the secured creditors or between Mr.

16 | Pierce and the secured creditors that placed any restriction on the Debtor from lending funds to its

17 | members.  Of course, ERG does not provide any such evidence because no such language exists.

18 | The loan agreements between the Debtor and Blackhawk certainly placed no such restrictions on the

19 | use of the loaned funds and, perhaps most importantly, there are no loan agreements between ERG,

20 | and any of the other individual creditors or Blackhawk "investors", and the Debtor.  As such, ERG

21 | cannot make any allegation that these loans from the Debtor to its insiders were in violation of any

22 | contractual or legal responsibility between the Debtor and ERG and no such allegation is made in

23 | ERG's moving papers.

24 |      Further, it is well established and openly admitted by ERG, that the Debtor **had no control**

25 | **over the loaned funds**.  That duty and responsibility fell upon Blackhawk and Greg Griffin as

26 | Blackhawk's owner.  Any and all advances to Mr. Pierce, Mr. Griffin and Mr. Appleton were made,

27 | not at Mr. Pierce's direction or by Mr. Pierce's actions.  They were all made at the direction and by

28 | the actions of Blackhawk and Mr. Griffin.  As Blackhawk was the agent for all the secured creditors,

1  was the loan servicer for all of the loans and controlled the funds in its own bank accounts, ERG's

2  claim that those loans were made without the lenders' knowledge does not give rise to any

3  wrongdoing by the Debtor, any such wrongdoing or alleged fraud would fall squarely on Blackhawk.

4  Amazingly, Mr. Griffin, Blackhawk's owner, is now working hand in hand with ERG's main owner

5  and representative Burton Benson and David Wallace, a man who has admittedly and intentionally

6  breached its contractual agreements with the Debtor.    For ERG to claim that Debtor was not

7  informing the creditors of the transfer of these funds is disingenuous, as Debtor had no duty to

8  communicate directly with the lenders, and blatantly false as Blackhawk, as the lender's agent, was

9  the entity making these loans. Further, most of the loans alleged by ERG were actually paid to Mr.

10  Griffin and Mr. Appleton and are part of the reason that the Debtor has brought an action against

11  Blackhawk and the secured creditors.

12          Finally, one must note the treatment that Wayne F. Pierce is receiving under the current plan

13  of reorganization. Although Mr. Pierce does receive a release of all claims that the Debtor may have

14  against him, Mr. Pierce is also releasing the Debtor from a potential $7,000,000 claim that he holds

15  against the Debtor. Further, his old ownership interest is being eliminated by the terms of the Plan.

16  Finally, Mr. Pierce's new equity interest will be subordinated to all creditors (not just secured

17  creditors) and Mr. Pierce will not be entitled to any distribution due to his new ownership interest

18  until and only if all other claims of all other creditors have been paid in full.  In light of the harsh

19  treatment that Mr. Pierce is agreeing to in the Debtor's own plan, it seems ridiculous that ERG could

20  in any way claim that Mr. Pierce is receiving some form of preferential treatment under the Plan.

21  The plan does provide for Mr. Pierce to receive a salary of $250,000 a year. However, the Court

22  must appreciate the fact that Mr. Pierce has managed the Debtor without a penny of compensation

23  during the entire life of this bankruptcy and that he will be expected to continue to spend well over

24  full time on the Debtor and its various projects.    In light of these facts, Mr. Pierce's salary as  the

25  managing member is only reasonable and is certainly not a violation of the creditors' rights.  In any

26  event, this is really a non-issue as the salary can be reviewed for appropriateness as part of a hearing

27  on Confirmation of the Debtor's Plan of Reorganization.

28  ///

---

2. *Payment of Over $1,000,000 in Leases Owned by the Debtor.*

The Debtor did assign the rights to Mr. Pierce of the lease payments for an oil lease in 2007! ERG attempts to characterize this, and Debtor's alleged failure to notify each and every creditor, as a breach of the loan agreement with Blackhawk and as evidence of self-dealing. Again, ERG fails to point out any actual terms of any real agreement that required the Debtor to turn over all proceeds of the Debtor's operations to the secured creditors. In fact, ERG offers no evidence to suggest that ERG or any of the other creditors had any interest, secured or otherwise, in the proceeds from any lease. As such, Debtor was free to assign the proceeds of these funds to anyone, including Mr. Pierce.

A point that must be kept in mind while considering ERG's motion is that the alleged actions by the Debtor and the default on the loans occurred from 2004 to 2007. During this entire time, the secured creditors and Blackhawk, as their representative, was well aware of all of the actions that were taken by the Debtor, including these payments. Despite the note default and the alleged "ineptitude" of the Debtor's management, the creditors, including ERG, took absolutely no action for over six years. They never sued the Debtor, never brought a motion to appoint a trustee or a keeper for the Debtor and never insisted upon the replacement of Mr. Pierce as the manager. This is just another reason behind the litigation brought against the creditors, in that they behaved, acted and operated more as equity holders of the Debtor than as lenders.

It is also important to note that the approximately $1,000,000 in lease payments (of which a significant amount of these proceeds were used for expenses related to the Debtor's Properties) pales in comparison to the moneys that Blackhawk and the secured creditors received from the Debtor on a pre-petition basis. Blackhawk paid both pre-paid and other interest payments to these same "investors" in the amount of $14,678,076.14. Blackhawk itself received fees on these loans in the amount of $2,375,709.00. By comparison, Debtor only received approximately $10,000,000 of the principal from these same loans. Those $10,000,000 were almost exclusively used for the development of the Debtor's Properties opportunities. Again, the assignment of approximately $1,000,000 from the Debtor to Mr. Pierce does not rise to the level of "cause" that requires the appointment of a trustee.

1    The fact of the matter is, Mr. Pierce was entitled under the controlling operating agreement

2  for compensation of $750,000 a year.  Over ten years, the Debtor owed Mr. Pierce approximately

3  $7,500,000.00.  The payment of approximately $1,000,000.00 to Mr. Pierce did not come close to

4  eliminating this amount.   The payment of these funds is certainly not "cause" warranting the

5  extraordinary relief requested by ERG, especially since the loan agreements between the Debtor and

6  Blackhawk in no way prohibited the payment of such funds to Mr. Pierce.  The Debtor's plan

7  provides for payment of 100% of all claims to all creditors.   The pre-petition payment of

8  approximately $1,000,000 to Mr. Pierce will not prevent Debtor from completing its plan of

9  reorganization and an action seeking the potential recovery of these funds from Mr. Pierce is not

10  necessary for the effective reorganization of the Debtor, especially in light of Mr. Pierce's treatment

11  under the plan of reorganization proposed by the Debtor..

12        3.    *Protective Advances.*

13        ERG alleges that Mr. Pierce directed the payment of "protective advances" to other real estate

14  development projects.  Blackhawk made protective advances, at its own direction, not at Debtor's

15  request, to other entities known as Mare Island and Roddy Ranch in order to protect Blackhawk's

16  interests in those projects in the total amount of $1,537,440.27 **back in 2002.** Most importantly, all

17  but 3 of the creditors in the Mare Island Loans are also creditors in the Sargent Ranch loans and all

18  of the creditors that were in the Roddy Ranch loans, including ERG, are also creditors in the Sargent

19  Ranch loans and all of these Blackhawk clients directly benefitted from the protective advances

20  Blackhawk made to both those projects.   ERG claims that Mr. Pierce induced these two other

21  companies into bankruptcy and damaged the creditors in those projects.  ERG does not offer any

22  actual evidence to these allegations and fails, in any way, to present a full and accurate picture of

23  what occurred in those projects and Debtor will not waste the Court's valuable time delving into

24  such irrelevant issues.   Suffice it to say, ERG is once again either wrongly informed or is

25  intentionally attempting to mislead this Court.

26        4.    *Operating Agreement*

27        Finally, ERG claims that "cause" arises due to the two versions that exist of the Debtor's

28  operating agreement and that the later version added compensation for Mr. Pierce and changed the

---

1    assets of the Debtor.  The reason for the existence is explained herein above, the shift from real

2    estate development on the Debtor's Properties to the need to develop new projects required the

3    changes in the agreement.  Further, once again, nothing in the loan documents prevented the Debtor

4    from making such changes and certainly, notice was not required to the lenders.  Regardless, both

5    Griffin and Appleton, as owners of both the Debtor and Blackhawk, were perfectly aware of these

6    changes, thus giving constructive notice to all secured creditors and, if anyone had a duty to reveal

7    these changes to the secured creditors, it would have been Blackhawk.  Again, Griffin and Appleton

8    have no involvement with the current management of the Debtor and Mr. Griffin continues to work

9    closely with a number of the secured creditors, including ERG.  It is clear, from the above, that the

10   alleged wrongdoings of the Debtor involving the assets and funds of the Debtor do not give rise to

11   the necessary "cause" for the appointment of a trustee.

12   B.    *Debtor's Alleged Failure to Develop the Debtor's Properties*

13       ERG also attempts to claim that Debtor's mismanagement and incompetence has led to the

14   failure of development.  It was ERG and certain other creditors that systematically prevented the

15   Debtor from developing, advancing and/or selling any of the valuable assets on the Debtor's

16   Properties.  From July of 2004 to December of 2008, the Debtor, through Mr. Pierce's efforts,

17   brought no less than fourteen potential transactions that would have allowed the Debtor to partially

18   or fully pay off the secured creditors.  At every turn, Blackhawk and the minority group of

19   "investors" apparently led by ERG, refused in some form or fashion to allow for the payoff of their

20   debt, including refusing to grant the Debtor per acre releases which would have allowed the Debtor

21   to sell portions of the Debtor's Properties at a substantial gain.

22       This is not surprising in that since the filing of the bankruptcy, the Debtor has found no less

23   than four opportunities to move this case forward, the employment of Freeman Associates, the

24   employment of Cassidy Turley, the motion to sell a portion of the Debtor's Properties for a solar

25   facility and the employment of the Watley Group.  Of course, ERG objected to every single one of

26   these opportunities and is now objecting to Debtor's motion to bring in priming financing.  The fact

27   that the Debtor has found so many avenues exemplifies that the Debtor was not the cause of the

28   delays and inability to develop the Debtor's Properties.  Further, ERG's continued obstructionism

1  is also exemplary of what was the true cause of those delays and Debtor's inability to produce

2  results.

3      It should also be noted that the Debtor's current management team is not the same as the

4  management team that existed prior to the filing of the bankruptcy. The Watley Group has gathered

5  a skilled and talented group of experienced managers and leaders that have given the Debtor a

6  structured organization and have provided a goal oriented plan that is well on its way to fruition.

7  Further, the Debtor and the Watley Group have not done anything without first seeking the Court's

8  approval and are operating within the confines of the Bankruptcy Code.   Again, ERG makes no

9  substantiated allegation that the Debtor, or the Watley Group, have committed any wrongdoing since

10 the filing of this case. As indicated above, the alleged improper solicitation for plan approval, is

11 simply not true.

12                                      **IV.**

13 ## <u>APPOINTMENT OF A TRUSTEE IS NOT IN THE BEST INTERESTS OF ALL CREDITORS</u>

14

15     As cause does not exist under § 1141(a)(1), ERG is therefore left with seeking relief under

16 § 1141(a)(2).  The question here, is whether a trustee is needed in this case or not.  As indicated

17 above, there are certain factors that a court must consider: (1) the trustworthiness of the debtor; (2)

18 the debtor in possession's past and present performance and **the prospects for the debtor's**

19 **rehabilitation**; (3) the confidence-or lack thereof- of the business community and of creditors in

20 present management; and (4) the benefits derived by the appointment of a trustee, balanced against

21 the cost of the appointment.

22     The simple fact is, a trustee is not needed and is practically impossible in this case.  The

23 Debtor has pending motions for primary financing and has filed a viable disclosure statement and

24 plan. Subject to the Court's approval, the Debtor has selected the provider of the Priming Financing

25 from several competitive offers.    The Priming Financing of up to $20,000,000 will come from

26 Equity Investment Properties, Inc.  The terms and conditions of the Note and Security Agreement

27 are attached to the Declaration of John Bryan as Exhibit A. Equity Investment Properties, Inc. shall

28 obtain a 30% equity interest in the Reorganized Debtor as a result of the first $7,500,000 financing.

---

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC.,
RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE
ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS
TO SAME

1   Equity Investment Properties, Inc.'s ownership interest shall increase by one percent (1%) for every

2   additional $750,000.00 Equity Investment Properties, Inc. provides in Priming Financing up to a

3   total of 40% ownership for $15,000,000.00 in Priming Financing.

4       With the use of this financing, Debtor and the Watley Group plan to implement a phased

5   "step-by-step" approach to the development of the Debtor's Properties. The short-term highest and

6   best use and value of Debtor is the development of the sand, aggregate and liquid asphalt businesses

7   and sales of environmental mitigation credits. Longer-term, the Debtor's management team will

8   continue to evaluate other opportunities such as solar and wind power, as well as various real estate

9   development opportunities.  The opportunities are set out in detail in the proposed disclosure

10  statement already on file.

11      At the very least, the Debtor should be allowed the opportunity to seek approval of the

12  priming financing and push for the approval of a plan that the Debtor strongly believes shall pay all

13  creditors in full. ERG argues that Debtor's plan of reorganization does not provide for full payment

14  to those secured creditors that do not enter into the settling class. This is simply not true. If those

15  creditors succeed in defeating the lawsuit, they will be paid in full. If, on the other hand, they lose

16  the lawsuit, they will be treated in accordance with the results of that lawsuit and will be fairly

17  treated.  Considering the alternative of having a trustee put in place, ERG's motion has no merit.

18      The appointment of a trustee would result in the withdrawal of the Watley Group from the

19  Debtor's employment, as it is authorized to do. Further, Equity Investment Properties, Inc. would

20  withdraw its offer of priming financing to the Debtor. Without these options, a trustee would be in

21  a situation of leading a Debtor that has no money, would have no employees (as even Mr. Pierce

22  would withdraw from his managing member position and Mr. Pierce cannot be made to work for the

23  Debtor), would have no prospects for reorganization and would soon have no chapter 11 trustee as

24  even such a trustee would be expecting to be compensated in some form or another.  Further, the

25  Debtor would find itself unable to continue the litigation against the creditors due to a lack of support

26  from any interested party towards that litigation.  This assumes that the Debtor would even be able

27  to obtain a trustee to begin with.  Again, the Debtor has no funds and any chapter 11 trustee would

28  need to be compensated. Interestingly, ERG has not suggested any trustee or any way to compensate

1   such a trustee. Of course, this is exactly the result that ERG hopes to achieve. From the inception

2   of the loans, it is Debtor's belief, that ERG has sought to obtain ownership of the Debtor's Properties

3   and ERG believes that the appointment of a trustee, or obviously the conversion of this case to a

4   chapter 7 bankruptcy, would lead to ERG's ability to foreclose on its position on the first deed of

5   trust.

6       ERG may make two arguments in response to Debtor' undeniable progress. First, that the

7   secured creditors do not trust the Debtor and has lost all confidence in the Debtor. However, loss

8   of confidence or acrimony, however bitter, does not result in the appointment of a trustee. "There

9   is no per se rule by which mere conflicts or acrimony between the debtor and creditors mandates the

10  appointment of a trustee." (*In re Marvel Entm't Group*, (3d Cir. 1998) 140 F.3d 463, 473). In fact,

11  acrimony is always to be expected in a bankruptcy and, as here, where litigation exists between the

12  parties, it is assumed to put those parties at odds. However, the litigation will presumably resolve

13  the most serious of those disputes and the approval of a plan of reorganization is not impossible.

14  (See *In re G-I Holdings, Inc.*, 385 F.3d at 321).

15      ERG may also argue that it is prepared to bring a competing plan forward, with the assistance

16  of Dave Wallace. Of course, ERG has not brought such a plan forward and the filing of such a plan

17  would likely increase the contentions and potential liability for various parties in the ongoing

18  litigation. A litigation that could be eliminated only by appointing a trustee in this case or converting

19  this case to a chapter 7. As such, ERG has no reason to file such a plan at this time and will not have

20  any reason to bring such a plan upon the appointment of a trustee or the conversion of this case.

21  ERG's offer to file such a plan would therefore be nothing more than a red herring. Further, any

22  such plan would, based on Mr. Wallace's testimony and e-mail communications with ERG, only

23  provide a two or three percent return to unsecured creditors. Compared to the 100% return of

24  Debtor's plan, ERG's argument holds no water.

25      Alternatively, Mr. Goodrich's clients request that an examiner be appointed. Again, such a

26  request is premature at this time for much the same reasons that ERG's request for a trustee is

27  premature. There is no money currently in the estate to pay for such an examiner. The Debtor is

28  moving forward with a plan of reorganization that will pay creditors 100% of their claims, to obtain

1  an examiner to look into alleged misdeeds is wasteful, especially since such alleged misdeeds are

2  of less import in a case where all creditors will be paid in full.

3        Considering the overall picture presented by this case, the appointment of a trustee or an

4  examiner is not in the best interest of anybody, except perhaps for ERG. There is no cause for such

5  an appointment and the facts of this case show that a trustee is simply not needed, indeed it may be

6  impossible for a trustee to be appointed. The only other option available for ERG to argue is that

7  a conversion of this case should be entered.

8  **V.**

9  <u>**LIKEWISE, CONVERSION IS NOT IN THE BEST INTERESTS OF ALL CREDITORS**</u>

10        ERG alternatively requests that the court convert this case to a chapter 7 liquidation. Under

11  ERG's motion, "a basis for the granting of the instant Motion under Section 1112(b)(4)(A) of the

12  Bankruptcy Code exists because, since the Petition Date, there has been a diminution of the value

13  and assets of the Debtor's estate and there appears to be no reasonable likelihood of rehabilitation."

14  ERG offers no actual evidence to support these conclusions. There is no evidence provided to

15  suggest that the Debtor's Properties are losing any of its value. Further, ERG has no evidence to

16  suggest that a rehabilitation is not reasonably likely. ERG claims that "the Debtor has no apparent

17  funding over the short term." This, of course, is completely wrong. Debtor has a pending motion

18  for priming financing and the only reason those funds haven't been provided to the Debtor is that

19  ERG has objected to the Debtor's financing motion.

20        As indicated above, the Debtor has a pending motion for approval of its disclosure statement

21  and has filed a plan of reorganization with this court. Arguably, if the Debtor cannot confirm this

22  plan and fails in its efforts to get a plan approved despite ERG's adamant objections, then perhaps

23  at that time, the conversion of this case may be a viable option. At this time, where the Debtor is a

24  hair's breadth away from obtaining priming financing and from getting a plan of reorganization

25  before all creditors for voting, ERG's motion for both the appointment of a chapter 11 trustee or for

26  conversion is simply premature. As such, the Debtor respectfully requests that ERG's motion be

27  denied in its entirety.

28  ///

# VI.

## CONCLUSION

ERG has failed to produce clear and convincing evidence that cause exists for the appointment of a trustee or for the conversion of this case to a chapter 7. Further, ERG cannot show that a trustee is required in this case, especially at this time, where the Debtor has a viable opportunity to obtain priming financing and get a plan approved. As such, ERG's motion should be denied for its failure to request relief which can be granted and/or should be held to be premature at this time.

Dated: December 3, 2010

                               _/s/ John L. Smaha_____
John L. Smaha
SMAHA LAW GROUP, APC
*Attorneys for*
Sargent Ranch, LLC
Debtor and Debtor-In-Possession

W:\Sargent Ranch\Opposition.Motion.Trustee\100.Opposition.wpd

JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC., RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS TO SAME

27

John L. Smaha, Esq.  Bar No. 95855
Gustavo E. Bravo, Esq. Bar No. 218752
**SMAHA LAW GROUP APC**
7860 Mission Center Ct., Ste. 100
San Diego, California 92108
(619) 688-1557  Telephone
(619) 688-1558  Facsimile

Attorneys for Debtor, Sargent Ranch, LLC

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

**PROOF OF SERVICE**                    CASE NO.  10-00046-PB11

*In re Sargent Ranch, LLC*

    I am employed in the City of San Diego, California.  I am over the age of 18 and not a party to the within action.  My business address is 7860 Mission Center Court, Suite 100, San Diego, California 92108.

    On December 3, 2010, I caused to be served the following document(s) described as:

    **1.**    **JOINT OPPOSITION TO MOTION OF ENERGY RESEARCH & GENERATION, INC. (ERG) AND ERG, INC., RETIREMENT TRUST FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, AN ORDER CONVERTING THE DEBTOR'S CASE TO CHAPTER 7 AND TO JOINDERS TO SAME;**
    **2.**    **DECLARATION OF WAYNE F. PIERCE;**
    **3.**    **DECLARATION OF JOHN L. SMAHA;**
    **4.**    **DECLARATION OF ANTHONY J.A. BRYAN, JR.; AND**
    **5.**    **DECLARATION OF CHRISTOPHER GRIVAKES**

in this action by placing the true copies thereof enclosed in a sealed envelope addressed as follows:

UNITED STATES TRUSTEE                    **SEE ATTACHED SERVICE LIST**
Department of Justice
402 West Broadway, Ste. 600
San Diego, CA 92101

[X]    **(BY MAIL)** I served the individual named by placing the documents in a sealed envelope.  I then placed it for collection and mailing with the United States Postal Service this same day, at my address shown above, following ordinary business practice.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on **December 3, 2010**, San Diego, California.

                        */s/Amelda M. Johnson*
                        Amelda M. Johnson

1

### SPECIAL NOTICE SERVICE LIST

Robert N. Phillips, Esq.
Jayne Laiprasert, Esq.
Howrey LLP
525 Market Street, Ste. 3600
San Francisco, CA 94105-2708
(415) 848-4950
(415) 848-4999 (Fax)
**Attorneys for Frederic Sylvester, Sherie Sylvester, and Jocelyn Sylvester**

Lisa Holder
Klein DeNatale Goldner, et al.
P.O. Box 11172
Bakersfield, CA 93389-1172
(661) 395-1000
(661) 326-0418 (Fax)
**Attorneys for Bonanza Creek Energy Co., Bonanza Creek Energy Operating Co. & Patriot Resources, LLC**

Peter C. Califano
Cooper White & Cooper, LLP
201 California St., 17th Flr.
San Francisco, CA 94111
(415) 433-1900
(415) 433-5530
**Attorneys for Creditors Linda H. Kralik, Albert Kralik, Paul Pagnini and Thomas Marckwardt**

Paul E. Manasian
Manasian & Rougeau, LLP
400 Montgomery Street, Ste. 1000
San Francisco, CA 94104
(415) 291-8425
(415) 291-8426 (Fax)
manasian@mrlawsf.com
**In Pro Per**

Cecily A. Dumas
Friedman Dumas & Springwater
33 New Montgomery Street, Ste. 290
San Francisco, CA 94105-4520
(415) 834-3800
(415) 834-1044 (Fax)
**Attorneys for Frederic Sylvester, Sherie Sylvester, and Jocelyn Sylvester**

Dan E. Chambers
Troutman Sanders, LLP
5 Park Plaza, Ste. 1400
Irvine, CA 92614
(949) 622-2700
(949) 622-2739 (Fax)
dan.chambers@troutmansanders.com
**Attorneys for Energy Research & Generation, Inc. and ERG, Inc., Retirement Trust**

County of Santa Cruz
Office of the Treasurer-Tax Collector
701 Ocean Street, Room 150
Santa Cruz, CA 95061
(831) 454-2281
**Attorneys for Creditor County of Santa Cruz, Office of the Treasurer/Tax Collector**

Jeffrey J. Goodrich
Goodrich & Associates
336 Bon Air Center, #335
Greenbrae, CA 94904
(415) 925-8630
(415) 925-9242 (Fax)
**Attorneys for First Priority Sargent Ranch Lenders**

Victor A. Vilaplana
Matthew J. Riopelle
Foley & Lardner, LLP
402 W. Broadway, Ste. 2100
San Diego, CA 92101
(619) 234-6655
(619) 234-3510 (Fax)
vavilaplana@foley.com
mriopelle@foley.com
***Attorneys for Secured Creditors Enderley
Limited, NewCombe Management, Ltd.,
Michael Thompson and Anita Thompson***

James L. Holman
Duane Morris LLP
30 South 17th Street
Philadelphia, PA 19103-4196
(215) 689-2562
JJHolman@duanemorris.com
***Attorneys for Ms. Tena Collins and Nailder
Investments Limited***

Stephen T. O'Neil
Rachel Ragni Larrenaga
Murray & Murray
19400 Stevens Creek Blvd., Ste. 200
Cupertino, CA 95014-2548