1  GARY E. KLAUSNER (STATE BAR NO. 69077)
   GREGORY K. JONES (STATE BAR NO. 181072)
2  STUTMAN, TREISTER & GLATT
   PROFESSIONAL CORPORATION
3  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA 90067
4  Telephone:  (310) 228-5600
   Telecopy:  (310) 228-5788
5
6  Reorganization Counsel for
   Debtor and Debtor in Possession
7
   Debtor's Mailing Address:
8  888 Prospect Street, Suite 300
   La Jolla, California 92037
9

10            UNITED STATES BANKRUPTCY COURT

11            SOUTHERN DISTRICT OF CALIFORNIA

12

13  In re                              ) Case No. 09-19431-LA11
                                       )
14  IMPERIAL CAPITAL BANCORP, INC., a  ) Chapter 11
    Delaware corporation,              )
15                                     )
                                       ) **FIRST INTERIM FEE APPLICATION
16                 Debtor.             ) OF STUTMAN, TREISTER & GLATT
                                       ) PROFESSIONAL CORPORATION
17  Tax Identification Number: 95-4596322 ) (REORGANIZATION COUNSEL FOR
                                       ) DEBTOR AND DEBTOR IN
18                                     ) POSSESSION) FOR COMPENSATION
                                       ) OF SERVICES RENDERED AND
19                                     ) REIMBURSEMENT OF EXPENSES
                                       ) INCURRED (DECEMBER 18, 2009 TO
20                                     ) JUNE 30, 2010); DECLARATION OF
                                       ) GARY E. KLAUSNER IN SUPPORT
21                                     ) THEREOF; EXHIBITS**
                                       )
22                                     )
                                       )          Hearing
23                                     )
                                       ) [To Be Set By Court]
24                                     )
                                       )
25  ───────────────────────────────────

26  ///

27  ///

28  ///

542741v1

# **TABLE OF CONTENTS**

**Page(s)**

I.    BACKGROUND INFORMATION ................................................................. 1

II.   HISTORY OF THE DEBTOR'S CASE ......................................................... 2

    A.    The Petition Date .......................................................................... 2

    B.    The Debtor's Prepetition Capital Structure and Business Operations.................... 2

    C.    The Debtor's Chapter 11 Case and ST&G's Active Involvement .......................... 2

        1.    The Debtor's Tax Refunds ........................................................ 3

        2.    Preservation Of The Debtor's NOLs ......................................... 4

        3.    The Rabbi Trust Complaint ...................................................... 5

        4.    Other Administrative Matters ................................................... 5

III.  SUMMARY OF SERVICES RENDERED AND FEES INCURRED ............................. 6

        1.    Case Administration — Matter No. 010. ................................... 8

        2.    Meetings Of And Communications With Creditors — Matter No. 020... 10

        3.    General Business Operations — Matter No. 030...................................... 11

            a.    Coordination With Debtor .............................................. 11

            b.    Analysis Of Debtor's NOLs ........................................... 12

            c.    Other Matters ............................................................. 13

        4.    Fee/Employment Applications — Matter No. 040. .................................. 14

        5.    Fee/Employment Objections – Matter No. 050. ...................................... 15

        6.    Financing – Matter No. 060. ........................................................... 15

        7.    Claims Administration And Objections — Matter No. 070. ..................... 15

        8.    Asset Analysis and Recovery – Matter No. 080. ................................... 16

        9.    Asset Disposition – Matter No. 90. .................................................. 18

        10.    Plan/Disclosure Statement  - Matter No.  100 ......................................... 18

        11.    Employee Benefits/Plans – Matter No.  110........................................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

12.    Litigation — Matter No. 120. ................................................... 21

IV.    SUMMARY OF ACTUAL, NECESSARY EXPENSES ................................................ 22

V.    APPLICABLE AUTHORITY ................................................................. 23

    A.    Reasonableness of Compensation Requested ........................................ 24

    B.    Novelty And Difficulty of Legal Questions/Skill Requisite to Performing Legal Services.................................................................... 25

    C.    Experience, Reputation And Ability Of The Attorneys............................. 25

III.    CONCLUSION.............................................................................. 25

## TABLE OF AUTHORITIES

**CASES**

*In re Auto Parts Club, Inc.,*
211 B.R. 29 (B.A.P. 9th Cir. 1997)..................................................................24

*In re Auto Parts Club, Inc.,*
224 B.R. 445 (Bankr. S.D. Cal. 1998) ............................................................24

*In re Montgomery Drilling Co.,*
121 B.R. 32 (Bankr. E.D. Cal. 1990) ..............................................................24

*In re Powerine Oil Co.,*
71 B.R. 767 (B.A.P. 9th Cir. 1986)..................................................................24

*In re Yermakov,*
718 F.2d 1465 (9th Cir. 1983) .........................................................................24

**STATUTES**

11 U.S.C. § 330.........................................................................................................25

11 U.S.C. § 330(a)....................................................................................................23

11 U.S.C. § 331.........................................................................................................25

11 U.S.C. § 365(o).......................................................................................................1

11 U.S.C. § 327(a)......................................................................................................1

11 U.S.C. § 329...........................................................................................................1

11 U.S.C. § 504(b).....................................................................................................26

11 U.S.C. § 1107(a)....................................................................................................2

11 U.S.C. § 1108.........................................................................................................2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

542530v2

Stutman, Treister & Glatt Professional Corporation ("ST&G"), reorganization counsel for Imperial Capital Bancorp, Inc. (the "Debtor"), hereby submits its "First Interim Fee Application of Stutman, Treister & Glatt Professional Corporation (Reorganization Counsel for Debtor and Debtor in Possession) for Compensation of Services Rendered and Reimbursement of Expenses Incurred (December 18, 2009 to June 30, 2010)" (the "Application").  During the period of December 18, 2009 through June 30, 2010 (the "First Period"), ST&G incurred $561,816.00 in compensation for services rendered, and $29,528.60 in costs incurred for a total amount of $591,344.60.[1]  This Application is supported by the Declaration of Gary E. Klausner (the "Klausner Declaration"), which is being filed contemporaneously with the filing of this Application.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### BACKGROUND INFORMATION

On December 18, 2009 (the "Petition Date"), the Debtor filed its chapter 11 case.  On January 11, 2010, the Debtor submitted its "Application for Order Pursuant to 11 U.S.C. §§ 327(a) and 329 Authorizing the Employment and Retention of Stutman, Treister & Glatt, P.C. as Reorganization Counsel for the Debtor and Debtor in Possession" (the "Employment Application") [Docket No. 33].  This Court entered an order approving the Employment Application on January 20, 2010 [Docket No. 41] (the "Employment Order").  A true and correct copy of the Employment Order is attached as Exhibit "A" to the Klausner Declaration.

Members of ST&G have extensive experience in the area of insolvency and corporate reorganization and limit their practice primarily to that area.  Attached hereto as Exhibit "B" is a summary of the background and qualifications of the members of ST&G who rendered services to the Debtor during the Application Period.  ST&G has served exclusively as the reorganization counsel for the Debtor during the Debtor's case, and has not previously filed any fee applications in this case.

---

[1]    In reaching this total, ST&G has agreed to write-off approximately $34,000 in fees during the First Period.

1

## II.

## HISTORY OF THE DEBTOR'S CASE

**A.     The Petition Date**

The Debtor commenced this chapter 11 case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on the Petition Date.  As permitted by Bankruptcy Code sections 1107(a) and 1108, the Debtor is continuing to operate its business as a debtor in possession.  On March 9, 2010, the Office of the United States Trustee (the "UST") appointed a three member official committee of creditors holding unsecured claims against the Debtor (the "Committee").

**B.     The Debtor's Prepetition Capital Structure and Business Operations**

The Debtor is a diversified bank holding company headquartered in La Jolla, California.  As of the Petition Date the Debtor owned 100% of the common stock of Imperial Capital Bank (the "Bank"), a California state chartered commercial bank that had approximately $4.4 billion in assets and six retail branches located in California, two retail branches located in Nevada, and one retail branch located in Baltimore, Maryland.  On the Petition Date, the California Department of Financial Institutions (the "DFI") closed the Bank and placed it into a receivership with the FDIC.  Subsequently, the FDIC sold certain of the Bank's assets and liabilities to City National Bank.  The Bank had been in business for thirty-five years.  After the seizure of the Bank, the Debtor commenced this chapter 11 case to protect its assets and develop a confirmable reorganization plan by utilizing those assets and potential business opportunities.

**C.     The Debtor's Chapter 11 Case and ST&G's Active Involvement**

Upon first glance, the Debtor's case might appear to be relatively simple.  The Debtor is no longer operating the Bank.  However, the Debtor, which has prepetition liabilities of over $100 million, owns a handful of potentially valuable assets that could generate approximately $35 to $40 million in proceeds for distribution to unsecured creditors.  The Debtor's efforts in analyzing and maximizing the value of these assets has made this chapter 11 case challenging, and has required significant effort from the Debtor's professionals, most notably ST&G.  In addition, the Debtor has NOLs in the amount of approximately $280 million which have substantial potential value if they can be exploited.

### 1.    The Debtor's Tax Refunds

The largest assets of the Debtor's estate, other than the potential value of its NOLs, are its 2008 and 2009 tax refunds (the "Refunds"). Prior to the Petition Date, the Debtor filed its 2008 tax return and asserted a right to a significant refund. The Debtor has been unable to collect all of this refund, however, as the IRS has not completed its examination of the Debtor's request for the refund.[2] Further, during this chapter 11 case, the Debtor is preparing its 2009 tax return, which has not yet been filed with the IRS. The Debtor believes that the Refunds will total approximately $26 million.

The FDIC's claim that it is entitled to the Debtor's tax refunds has increased the complexity of this case in at least two ways. First, the FDIC's claim to the Refunds has required the Debtor and its professionals to engage in a substantial amount of legal research and analysis regarding whether the Refunds are property of the Debtor's estate. The Debtor and its professionals have engaged in a thorough analysis of other similar chapter 11 cases around the country that involve bank holding debtors (for more details, see Section III.8, infra). Virtually every court to have confronted this issue has concluded that the refunds belong to the parent company and that the rights of the FDIC, which are derivative of the subsidiary bank, are limited to those of a general unsecured creditor. Second, the FDIC's aggressive and litigious posture towards the Debtor has forced the Debtor and its professionals to devote significant time and resources towards protecting the Debtor's rights and assets.

While resolution of the legal question as to ownership of the Refunds is necessary and appropriate, the FDIC's behavior has unfortunately increased the amount of time that the Debtor's professionals have devoted to this case. Most notably, the FDIC has resisted efforts to simplify the adjudication of ownership of the Refunds. Recognizing at the Petition Date that there was a dispute between the Debtor and the FDIC as to ownership of the Refunds, the Debtor

---

[2]    The IRS' review of the 2008 request for refund has been delayed by the FDIC's actions in filing a Form 56-F with the IRS. The IRS has notified the Debtor that, as a result of the FDIC's filing of the Form 56-F, it has stopped processing the request for refund. Notwithstanding the Debtor's notification to the FDIC that is was violating the automatic stay and the Debtor's request that the FDIC withdraw its Form 56-F, the FDIC has refused to do so.

1     and its counsel proposed entry into a simple stipulation that would preserve the status quo

2     pending resolution of the disputed Refund ownership claims. However, the FDIC responded to

3     the Debtor by proposing a more complex stipulation that did not simply preserve the status quo.

4     The Debtor negotiated the terms of this more complicated stipulation in good faith; however, on

5     numerous occasions, when the stipulation appeared to be complete, the FDIC imposed new

6     substantive provisions that went far beyond the original purpose of the stipulation. As of the

7     date of the filing of this Application, the FDIC was continuing to introduce new concepts to the

8     stipulation, thereby prolonging the negotiation process.[3] As a result, the Debtor has prepared a

9     declaratory judgment complaint against the FDIC, and is prepared to file the complaint to obtain

10     a judgment stating that the Refunds are property of the Debtor's estate.

11           In sum, the battle with the FDIC over ownership of the Refunds consumed a

12     significant amount of ST&G's time during the First Period, and will likely continue to do so in

13     the future.

14           **2.**       **Preservation Of The Debtor's NOLs**

15           The Debtor's second most significant asset is its approximately $280 million of

16     net operating losses ("NOLs"). At the beginning of its case, the Debtor recognized that it might

17     be able to exploit the NOLs and develop a plan of reorganization that provided greater value to

18     creditors than would be the case under a liquidating plan. Theoretically, the Debtor could enter

19     into a transaction whereby a third party would provide consideration to the Debtor for its

20     corporate shell and NOLs.

21           The Internal Revenue Code ("IRC") and regulations promulgated thereunder

22     allow a reorganized debtor to use its NOLs post-confirmation. However, in order to utilize such

23

---

[3] The FDIC has also engaged in other activity that has distracted the Debtor and ST&G from focusing on maximizing the value of the Debtor's estates. For example, as this Court is well aware, at the inception of this case, the FDIC improperly seized many of the Debtor's books, records, computers, and financial documents. Through the persistent efforts of the Debtor and its counsel, the FDIC and Debtor negotiated the terms of a stipulation that provided for the return of the Debtor's property. However, for an approximately sixty day period, the Debtor and ST&G were focused on restoring order and recovering the Debtor's personal property.

24

25

26

27

28

           4

NOLs, several restrictions must be met, including "continuity of ownership" and "continuity of business". The analysis of such restrictions is complex and fact intensive, and, as discussed below (see Section III.3, infra), the Debtor and its professionals have devoted a substantial amount of time towards determining the optimal structure for utilization of the NOLs. The Debtor and ST&G are hopeful that such analysis and research will provide the groundwork for a successful transaction between the Debtor and a third party.

### 3. The Rabbi Trust Complaint

The Debtor's third most valuable asset is its cause of action (the "Complaint") against Union Bank of California, N.A. ("Union Bank"), Brian Benson, Timothy Doyle, George Haligowski, Thom Hobbs, David Hunt, Charles Kohl, Rosemary Lennon, Lyle Lodwick, Phillip Lombardi, and Scott Wallace (collectively, the "Defendants") for the turnover of assets.

In the Complaint, the Debtor sought entry of an order requiring Union Bank to turn over to the Debtor the assets of the trust (the "Rabbi Trust") created by the "Imperial Capital Bancorp Rabbi Trust Agreement Amended and Restated Effective January 1, 2005" (the "Rabbi Trust Agreement"). As of the Petition Date, the value of the stock and cash in the Rabbi Trust was approximately $2 million, and the Rabbi Trust is the owner of a variable life insurance policy with an estimated cash surrender value of $4.75 million. In July 2010, Union Bank agreed to the terms of a stipulated judgment that provided the Debtor with the relief requested in the Complaint. Additionally, as of the filing of this Application, the Debtor had obtained default judgments against seven of the ten individual defendants.

The Debtor and ST&G have diligently prosecuted this matter, which will result in the turnover of property having a value of approximately $6.75 million to the Debtor's estate.

### 4. Other Administrative Matters

Along with focusing on the critical issues raised in the prior three subsections, the Debtor and ST&G have also performed the customary tasks relating to the administration of a debtor's chapter 11 bankruptcy case. Details regarding such activities are included in section III

below.[4]

      In summary, as demonstrated in more detail below and in Exhibit "E" to the Klausner Declaration, ST&G has performed a number of essential tasks for the Debtor. ST&G has exercised considerable skill and expertise in dealing with the numerous critical issues facing the Debtor, and this Court should enter an order approving this Application on an interim basis.

### III.

### SUMMARY OF SERVICES RENDERED AND FEES INCURRED

      During the First Period, ST&G personnel billed 940.3 hours at a blended hourly rate of approximately $597 per hour. In accordance with the Region XV United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (the "UST Guidelines"), ST&G has classified its time entries for all of its services to the Debtor as follows:

| Matter Number | Description | Fees Incurred |
|---|---|---|
| 6044-010 | Case Administration | $113,844.50 |
| 6044-020 | Meetings and Communications with Creditors | $22,670.50 |
| 6044-030 | General Business Operations | $195,989.50 |
| 6044-040 | Fee/Employment Applications | $47,091.00 |
| 6044-050 | Fee/Employment Objections | $1,998.00 |
| 6044-060 | Financing | 0.00 |
| 6044-070 | Claims Administration and Objections | $24,882.00 |
| 6044-080 | Asset Analysis and Recovery | $56,954.50 |
| 6044-090 | Asset Disposition | $6,871.50 |
| 6044-100 | Plan and Disclosure Statement | $50,197.00 |

---

[4]  The following disclosures are made pursuant to the UST Guidelines: All quarterly fees have been paid to the UST, and all monthly operating reports have been filed. As of June 30, 2010, the Debtor was in possession of $5,720,577.15 in unencumbered cash. The nature of accrued unpaid administrative expenses is professional fees that will be the subject of the first interim fee applications.

| Matter Number | Description | Fees Incurred |
|---|---|---|
| 6044-110 | Employee Benefits/Plans | $16,008.00 |
| 6044-120 | Litigation | $25,309.50 |
| | **FEES DURING FIRST PERIOD** | **$561,816.00** |

On June 11, 2010, this Court entered its "Order on Motion to Establish Procedures for Interim Compensation" (the "Interim Compensation Order"). The Interim Compensation Order allows professionals such as ST&G to seek payment of (i) interim compensation in the amount of eighty percent (80%) of the total fees incurred during a period and (ii) interim reimbursement of expenses in the total amount of one hundred percent (100%) of the expenses incurred during a period.

In accordance with the provisions of the Interim Compensation Order, on June 22, 2010, ST&G filed and served its "First Statement of Stutman, Treister & Glatt, P.C. for Interim Compensation and Reimbursement of Expenses (December 19, 2009 to May 31, 2010)" (the "First Monthly Statement"), which sought payment of $332,061.60 in fees (which was 80% of the fees billed for the period of December 19, 2009 to May 31, 2010) and $25,911.13 in expenses. No parties objected to ST&G's First Monthly Statement, and ST&G obtained the amounts requested therein through application of amounts left in its client trust account ($211,462.53) and direct payment from the Debtor.

On July 20, 2010, ST&G filed and served its "Second Statement of Stutman, Treister & Glatt, P.C. for Interim Compensation and Reimbursement of Expenses (June 1, 2010 to June 30, 2010)" (the "Second Monthly Statement"), which sought payment of $117,391.20 in fees (80% of the fees billed in June 2010) and $3,617.47 in expenses. As of the filing of this Application, the time to object to the Second Monthly Statement was still pending.

In connection with this Application, ST&G has prepared the following exhibits in accordance with the UST Guidelines, each of which is attached to the separately filed Klausner Declaration:

| Exhibit "B" | Summary of the experience and qualifications of the ST&G attorneys who billed the greatest number of hours in connection with the Debtor's case during the First Period. |
|---|---|
| Exhibit "C" | Summary of hours by professional during the First Period. |
| Exhibit "D" | Summary of hours by category during the First Period. |
| Exhibit "E" | Detailed time records by matter category during the First Period. |
| Exhibit "F" | Summary of expenses incurred by category during the First Period. |

As counsel to the Debtor, ST&G has performed literally hundreds of discrete services and tasks. Descriptions of each of these services and tasks are contained in ST&G's detailed time records, which are attached as Exhibit "E" to the Klausner Declaration ("Exhibit E"). As demonstrated by these records, it would be an extremely time-consuming task to describe in detail all of the services provided to the Debtor by ST&G during the First Period. What follows, therefore, is a brief summary of the more significant services rendered by ST&G in each of the respective matter categories.

1.    **Case Administration — Matter No. 010.**

Generally, the Case Administration category includes services rendered in connection with organization, coordination, and compliance activities. These activities include the planning and coordination between the Debtor and its professionals, communications between ST&G and the Debtor regarding the status of numerous matters encountered in these cases, and communications between ST&G and professionals representing other parties in interest regarding the status of the bankruptcy cases.

Members of the ST&G team periodically conducted internal strategy or status conferences, as needed, to coordinate their efforts, update others on the status of pending matters, and allocate responsibilities. The frequency of such internal conferences varied depending on the fluctuating demands of the Debtor's case. Status and strategy conferences enabled junior attorneys and paraprofessionals (with low billing rates) to coordinate with senior attorneys (with higher billing rates) to ensure that all ST&G professionals were performing services appropriate to their respective billing rates.

1    Prior to the Petition Date, ST&G prepared three motions that were filed

2    contemporaneously with the Debtor's voluntary petition (the "First Day Pleadings"). The First

3    Day Pleadings included the following: (1) the Motion for an Order Limiting the Scope of Notice

4    (the "Limit Notice Motion"), (2) the Motion for Continuance of Utility Service and Approval of

5    Adequate Assurance of Payment to Utility Companies (the "Utility Motion"), and (3) the Motion

6    for Order Extending Time to File Schedules and Statements (the "Schedule Extension Motion").

7    After the Petition Date, ST&G prepared orders approving the First Day Pleadings, which were

8    granted by this Court with slight modifications (the "First Day Orders").

9    Additionally, shortly after the Petition Date, ST&G attorneys contacted the UST

10    to discuss the First Day Pleadings and applicable UST Guidelines. The UST Guidelines mandate

11    that the Debtor submit certain information to the UST's office, including a "7-Day Package" and

12    monthly operating reports. In order to comply with the UST Guidelines, ST&G compiled the

13    information necessary to complete the 7-Day Package (which included (i) copies of insurance

14    policies, (ii) projected operating statements, (iii) recent income tax returns, (iv) a real property

15    questionnaire, and (v) evidence of the closure of bank accounts and the opening of new debtor-

16    in-possession accounts). When necessary, ST&G assisted the Debtor in completing certain tasks

17    such as the opening and closing of new bank accounts. Further, after the submission of the 7-

18    Day Package, ST&G advised the Debtor with respect to the preparation of monthly operating

19    reports.

20    Additionally, after entry of the First Day Orders, ST&G conferred with the client

21    and reviewed documents containing information relevant to the Debtors' Schedules and

22    Statements of Financial Affairs. Preparation of the Schedules and Statement of Financial

23    Affairs was difficult, as the Debtor did not have access to all of its books and records by the

24    January 21, 2010 filing deadline. Nonetheless, ST&G and the Debtor utilized all of the

25    information in their possession, and prepared and filed the Schedules and Statement of Financial

26    Affairs by the deadline. After the FDIC returned certain of the Debtor's books and records,

27    ST&G and the Debtor proceeded to review and revise the Schedules and Statement of Financial

28    Affairs. On February 23, 2010, ST&G filed amendments to certain of the Debtor's Schedules,

1   and on March 1, 2010, ST&G filed amendments to the Debtor's Statement of Financial Affairs.

2          ST&G also devoted time in this category to the preparation of status reports and

3   attendance at status conferences on March 11, 2010, May 13, 2010, and June 17, 2010. This

4   Court requested that the Debtor submit reports prior to the status conferences. ST&G conferred

5   with the Debtor and prepared and filed detailed reports that provided the Court with information

6   about the Debtor's activities and the general direction of the Debtor's case. Additionally, in

7   connection with the status conference hearings, ST&G prepared and filed responses to

8   statements of position filed by the FDIC. ST&G attorney Gary E. Klausner prepared for and

9   attended each of the three status conferences.

10          ST&G spent a total of 249.1 hours rendering services in this category, for which

11  ST&G seeks compensation of $113,844.50. See Exhibit E.

12      **2.     Meetings Of And Communications With Creditors — Matter No. 020.**

13          During the First Period, ST&G received numerous inquiries from creditors and

14  equity holders wanting to know generally about the status of the Debtor's case or specific

15  information about their claims. ST&G responded as appropriate.

16          In March 2010, the UST formed the Committee, and the Committee selected Akin

17  Gump Strauss Hauer & Feld LLP as its counsel ("Akin Gump"). ST&G analyzed the formation

18  of the Committee and conferred with the Debtors' management about the Committee's

19  constituents. Further, shortly after the Committee's retention of Akin Gump, ST&G met with

20  Akin Gump attorneys Peter Gurfein and David Simonds about the Debtor's assets and liabilities

21  and possible reorganization strategies. Indeed, throughout the First Period, ST&G and the

22  Debtor frequently advised the Committee and Akin Gump about proposed actions and the

23  Debtor's progress in liquidating its assets and composing a reorganization plan. ST&G regularly

24  prepared written memoranda and correspondence to the Committee's professionals about a vast

25  range of issues. Engaging in such communication facilitated the cost-effective administration of

26  this case by keeping the Committee fully informed of material developments and allowing the

27  Committee and its professionals to disseminate such information to their constituents.

28

In a meeting between the Debtor's and Committee's attorneys, the Committee requested that the Debtor and Committee enter into a stipulation that would allow the indenture trustees under certain of the Debtor's debentures to file master proofs of claim on behalf of all affected debenture holders.  Accordingly, ST&G assisted in the preparation of the "Stipulation Between Imperial Capital Bancorp, Inc. and the Official Committee of Unsecured Creditors to Amend the Bar Date Order" (the "Bar Date Stipulation") [Docket No. 179] and, with the Committee, jointly filed an ex parte motion for approval of the Stipulation [Docket No. 180]. This Court entered an order approving the Bar Date Stipulation [Docket No. 203].

Additionally, during the First Period, the Committee informally requested the production of certain documents.  ST&G assisted the Debtor in the review and production of the documents, and responded to the Committee's inquiries on the content of the produced documents.

ST&G spent a total of 33.8 hours rendering services in this category, for which ST&G seeks compensation in the amount of $22,670.00.  See Exhibit E.

3.      **General Business Operations — Matter No. 030.**

a.      **Coordination With Debtor**

ST&G devoted a significant amount of time in the General Business Operations category towards communications with the Debtor's officers and Board of Directors on the management of the Debtor's chapter 11 case.  During the first weeks of this case, ST&G communicated with the Debtor both telephonically and in-person on a nearly daily basis to resolve issues raised by the FDIC seizure of the Bank.  Additionally, ST&G advised the Debtor's officers about (i) the Debtor's limited operations, staffing and budget; (ii) the Debtor's lease with 888 Prospect, L.J.; (iii) outstanding payroll taxes; (iv) the wind-down of the Debtor's 401(k) plan; (v) the Debtor's bank account at City National Bank ("CNB") and CNB's refusal to provide the Debtor with access to the account; and (vi) compliance with the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of California (the "Local Rules") and UST Guidelines.

In addition to regularly conferring with the Debtor's officers, Mr. Gary E.

Klausner (lead attorney for ST&G) prepared for and attended approximately eight Board of Director meetings. The meetings were often extensive and intensive. In-person meetings frequently lasted for four hours or longer, while telephone conferences ranged from one to three hours. The deliberations and decisions of the Debtor and Board of Directors at these meetings are confidential. On occasion, Mr. Klausner also conferred with select members of the Board of Directors to discuss potential transactions that would take advantage of the Debtor's NOLs (for more details, see Section II.C.2).

Mr. Klausner's meetings with creditors and other interested parties have also been included in the General Business Operations category. At the beginning of this case, Mr. Klausner devoted time in this category towards communicating with inside and outside FDIC counsel about the Bank seizure. Additionally, in January, Mr. Klausner prepared for and attended (i) the January 11, 2010 initial debtor interview with the UST and (ii) the January 26, 2010 Section 341(a) meeting of creditors. Further, after the appointment of the Committee, Mr. Klausner devoted time in this category towards in-person and telephonic meetings with the Committee's attorneys and proposed financial advisor. Finally, Mr. Klausner attended interviews with potential investment bankers and assisted the Debtor in its negotiations with KPMG Corporate Finance LLC ("KPMG").

b. **Analysis Of Debtor's NOLs**

Additionally, during the First Period, ST&G's tax specialist, Mr. Mark S. Wallace, devoted a significant amount of time towards analyzing whether Debtor could preserve its NOLs. As stated above, preservation of the NOLs could attract an investor that would provide consideration to the Debtor's estate in exchange for a majority ownership in the Debtor.

In order to utilize such NOLs, several restrictions must be met, including "continuity of business" and "continuity of ownership". The "continuity of business" restriction is detailed in IRC section 269. Generally speaking, IRC section 269 provides that if an investor acquires control of a corporation for the principal purpose of avoidance of federal income tax by gaining the benefit of a corporate NOL, the IRS may deny the use of the NOL. Unfortunately, there is very little guidance on what constitutes avoidance of federal income tax by gaining the

benefit of a corporate NOL.  The Treasury Regulations provide that the test is based on all the facts and circumstances.

The "continuity of ownership" restriction is discussed in IRC section 382, and occurs if an "ownership change" occurs with respect to the corporation's stock.  An ownership change occurs if so-called "5 percent shareholders" and persons or entities deemed to be "5 percent shareholders" increase their stock ownership in the debtor corporation by more than 50 percentage points over any three year period.  Analysis of the continuity of ownership restriction involves an examination of the historical trading of the Debtor's stock.

In order to apply these restrictions to the facts in the Debtor's case, Mr. Wallace frequently met and conferred with the Debtor and its accountant, Ernst & Young, LLP.  Given the complexities of IRC sections 269 and 382, Mr. Wallace spent a significant amount of time in performing his analysis, which culminated in the preparation of a detailed and confidential memorandum to the Debtor and its Board of Directors regarding the potential preservation of the NOLs.  Mr. Wallace's memorandum will guide the Debtor in its efforts to preserve and utilize its NOLs for the benefit of its estate.

**c.    Other Matters**

In the General Business Operations category during the First Period, ST&G also prepared and filed an ex parte motion for authority to pay certain prepetition payroll taxes.   Prior to the Petition Date, the Debtor was in the process of transferring money and opening new bank accounts, and, as a result, there were insufficient funds in the account electronically linked to ADP to fund the prepetition payroll taxes due to the IRS and California taxing authorities.  This Court entered an order approving the payroll tax motion on January 28, 2010 [Docket No. 71], without the need for a hearing.

ST&G spent a total of 258.7 hours rendering services in the Business Operations category, for which ST&G seeks compensation of $195,989.50.  See Exhibit E.

**4.    Fee/Employment Applications — Matter No. 040.**

This category includes services rendered in connection with preparing and/or reviewing employment applications, fee applications and monthly professional statements.

1    During the First Period, ST&G prepared and filed its employment application, which was

2    approved by this Court.  Additionally, ST&G prepared the employment applications and

3    supporting pleadings for three additional professional firms – (1) Squar, Milner, Peterson,

4    Miranda & Williamson, LLP ("Squar") as accountants for the Debtor; (2) Silver, Freedman &

5    Taff LLP ("Silver") as special regulatory counsel for the Debtor; and (3) Ernst & Young LLP, as

6    tax services provider for the Debtor.  In order to properly complete these three employment

7    applications, ST&G conferred with both the Debtor and the aforementioned professional firms to

8    obtain conflict check information and details about the scope of their proposed services.  After

9    finalizing the fee applications, ST&G submitted them to the UST in accordance with this Court's

10   Local Rules and responded to inquiries from UST attorneys.  After receiving the UST's

11   statements of position, ST&G drafted employment orders and filed the Squar, Silver, and E&Y

12   applications, all of which were approved by this Court.

13        ST&G also devoted time in this category to reviewing the employment

14   applications submitted by Akin Gump and FTI Consulting, Inc. ("FTI") (proposed financial

15   advisor to the Committee).  ST&G conferred with the Debtor about the contents of the

16   Committee's two employment applications and contacted Akin Gump and FTI with specific

17   questions about said employment applications.

18        Finally, ST&G prepared and filed its "Motion for Order Pursuant to 11 U.S.C.

19   §§ 105 and 331 Establishing Procedures For Interim Compensation and Reimbursement of

20   Expenses of Professionals" [Docket No. 154] (the "Interim Compensation Motion").  This Court

21   approved the Interim Compensation Motion and entered the Interim Compensation Order

22   without the need for a hearing.  After entry of the Interim Compensation Order, ST&G prepared

23   and served its first fee statement, which was not the subject of any objections.

24        ST&G spent a total of 82.2 hours rendering services in this category, for which

25   ST&G seeks compensation of $47,091.00.  See Exhibit E.

26        **5.**   **Fee/Employment Objections – Matter No. 050.**

27        This category includes services rendered by ST&G in connection with objections

28   to employment and fee applications.  During the First Period, ST&G devoted time in this

1  category to reviewing the Court's initial denial of FTI's employment application and the FDIC's

2  objection to the amended FTI employment application.  ST&G also prepared a pleading

3  responding to issues raised in the FDIC's objection to the FTI Application that related

4  specifically to the Debtor.

5        ST&G spent a total of 2.7 hours rendering services in this category, for which

6  ST&G seeks compensation of $1,998.00.  See Exhibit E.

7      **6.**    **Financing – Matter No. 060.**

8        ST&G did not render any services to the Debtor in the Financing category during

9  the First Period.

10     **7.**    **Claims Administration And Objections — Matter No. 070.**

11       The "Claims Administrations and Objections" category contains services rendered

12 by ST&G in connection with the review of claims asserted in the Debtor's cases.

13       ST&G devoted time in this category towards analysis of all claims filed in the

14 Debtor's case.  In particular, ST&G reviewed the claims asserted by the indenture trustees

15 pursuant to five prepetition indentures.  The focus of ST&G's review was determining whether

16 there was any basis to subordinate the indenture trustees' claims to claims asserted by general

17 unsecured creditors.  After engaging in detailed research, ST&G concluded that there was no

18 basis for subordination, and prepared a memorandum to the Debtor's Board of Directors

19 regarding the results of its research.

20       Additionally, during the First Period, ST&G prepared and filed its "Ex Parte

21 Motion for Order Establishing a Bar Date for Filing Proofs of Claim or Interest Pursuant to 11

22 U.S.C. § 501" (the "Bar Date Motion") [Docket No. 136].  This Court entered an order approving

23 the Bar Date Motion [Docket No. 139] and established a bar date of June 14, 2010.  After entry

24 of this order, ST&G researched lists of the Debtor's creditors and equity interest holders and

25 ensured that all such parties received notice of the bar date.

26       During the end of the First Period, ST&G reviewed the detailed proof of claim

27 filed by the FDIC (the "FDIC Claim") and conferred with the Debtor about the filing of a

28 potential objection to the FDIC Claim.  In connection therewith, ST&G also researched

542741v1

15

1   Bankruptcy Code section 365(o), which is one of the bases for the FDIC's assertion that it is

2   entitled to an administrative claim.  As a result of this research, ST&G prepared an objection to

3   the portion of the FDIC Claim based on Bankruptcy Code section 365(o); however, the drafting

4   of this objection took place after the expiration of the First Period.

5           ST&G spent a total of 48.8 hours rendering services in this category, for which

6   ST&G seeks compensation of $24,882.00.  See Exhibit E.

7       **8.     Asset Analysis and Recovery – Matter No. 080.**

8           This category includes services rendered in connection with reviewing and

9   analyzing the Debtor's assets and potential causes of action that the Debtor's estate may have

10  against other parties.   During the First Period, ST&G engaged in a number of activities in its

11  representation of the Debtor.

12          As discussed above, the Debtor's most significant assets are the Refunds.  Since

13  the FDIC has asserted that it is entitled to ownership of the Refunds, ST&G undertook to

14  research and prepare a comprehensive memorandum regarding the legal principles that apply in

15  tax-related disputes between the FDIC, as receiver of a failed bank or thrift, and its parent

16  company in bankruptcy.  This memorandum was prepared by Mr. Whitman L. Holt, who has

17  prior experience in bank-holding chapter 11 cases such as the Fremont General Corporation case

18  pending in the United States Bankruptcy Court for the Central District of California.  Among

19  other things, Mr. Holt reviewed the regulations concerning the filing of consolidated federal

20  income tax returns and the default "unjust enrichment" rule regarding the allocation of tax

21  refunds between a parent company and its subsidiaries.  Additionally, Mr. Holt researched the

22  impact of a tax sharing agreement on refund allocation and surveyed currently pending cases

23  involving tax refund disputes between the FDIC and bank-holding debtors that are similar to the

24  Debtor.

25          Ultimately, the memorandum detailed the reasons why the debtor-parent's estate

26  has far better title in and to any resulting refund.  As a result of Mr. Holt's memoranda, the

27  Debtor has concluded that the Refunds are property of its estate, and that it is appropriate for the

28

1    Debtor to take all necessary actions to ensure that the Refunds are collected by the Debtor and
2    made available for distribution to the Debtor's unsecured creditors.
3          Additionally, in February and March 2010, ST&G conferred with the Debtor's
4    officers and Board of Directors about potential claims that the Debtor might have against the
5    Bank and the FDIC in the Bank's receivership estate. As a result, ST&G prepared and filed the
6    Debtor's proof of claim against the FDIC (the "Debtor's Claim") in the receivership estate. The
7    Debtor's Claim is premised on numerous grounds and asserts eight separate legal theories.
8          ST&G also devoted time in this category to negotiating stipulations with the
9    FDIC. During the First Period, ST&G conferred with counsel to the FDIC and advised the
10   Debtor to enter into a stipulation with the FDIC that provided the FDIC with additional access to
11   certain laptop computers that were used by the Debtor's general counsel and certain of the
12   Debtor's Board members (the "Access Stipulation"). This Court approved the Access Stipulation
13   by entering an order on May 18, 2010. Additionally, ST&G and counsel to the FDIC engaged in
14   negotiations over the terms of a stipulation that would preserve the parties' respective rights and
15   claims to certain tax refunds (the "Escrow Stipulation").
16         Further, ST&G conferred with the Debtor's landlord about (i) rejection of the
17   Debtor's existing lease at 888 Prospect Avenue and (ii) entry into a new lease that would cover
18   significantly less square footage at the same building. Through ST&G's efforts, the Debtor and
19   its landlord negotiated the "Stipulation Between Imperial Capital Bancorp, Inc. and 888
20   Prospect, LLC Regarding Rejection of Lease and Entry into New Lease" (the "Lease
21   Stipulation") [Docket No. 81]. As a result of the Lease Stipulation, the Debtor decreased its
22   monthly rent by approximately $75,000. ST&G drafted the Lease Stipulation and a motion to
23   approve the Lease Stipulation, which was approved by this Court without the need for a hearing.
24         Finally, during the First Period, ST&G (i) analyzed the Debtor's life insurance
25   policies and conferred with the Debtor about obtaining the surrender value of such policies, (ii)
26   obtained Court approval for a procedure to sell automobiles; (iii) reviewed the Rabbi Trust
27   Agreement and researched the appropriate procedure for obtaining the assets in the Rabbi Trust,
28

1 (iv) prepared a motion to sell furniture, fixtures, and equipment; and (v) prepared the NOL

2 Motion (see Section II.C.2, supra).

3       ST&G spent a total of 99.5 hours rendering services in this category, for which

4 ST&G seeks compensation of $56,954.50. See Exhibit E.

5     **9.**    **Asset Disposition – Matter No. 90.**

6       This category includes services rendered in connection with the sale or other

7 disposition of the Debtors' assets. During the First Period, ST&G: (i) conferred with the Debtor

8 about the disposition of its automobiles and personal property; (ii) prepared the notice to sell the

9 Debtor's Bentley in accordance with the procedures previously approved by the Court; (iii)

10 prepared a notice of intent to sell 1,900 shares of Prudential Financial, Incorporated stock; (iv)

11 conferred with the FDIC's attorneys about the ownership of certain property that remained at 888

12 Prospect after the seizure of the Bank; and (v) presided over a conference call with the Debtor's

13 Board of Directors regarding the Rabbi Trust Agreement and a general business plan.

14       ST&G spent a total of 9.5 hours rendering services in this category, for which

15 ST&G seeks compensation of $6,871.50. See Exhibit E.

16     **10.**    **Plan/Disclosure Statement  - Matter No.  100**

17       During the First Period, in the Plan/Disclosure Statement category, ST&G

18 considered and analyzed various plan alternatives and structures for the Debtor and conferred

19 with the Debtor's officers and Board of Directors about such options. As noted above, the

20 Debtor is seeking to implement a business restructuring, rather than a chapter 11 liquidation plan.

21 However, the Debtor and ST&G reached the conclusion that a reorganization plan could not be

22 confirmed until the Debtor resolved numerous issues, including, but not limited to, the following:

23 (i) a determination of whether the Debtor can exploit its NOLs and implement a transaction with

24 a third party, (ii) resolution of whether the Debtor or FDIC is entitled to the Tax Refunds, (iii)

25 litigation regarding claims that the Debtor possesses against the Bank and the FDIC, and (iv)

26 litigation over the Rabbi Trust Agreement.

27       The exclusivity period for the Debtor to file a plan was initially set to expire on

28 April 17, 2010. Recognizing that it would be impossible to propose a detailed reorganization

1    plan prior the expiration of the exclusivity period, ST&G prepared a motion to extend the plan

2    filing exclusivity period for 60 days (the "First Exclusivity Motion") [Docket No. 121]. In order

3    to ensure that the First Exclusivity Motion was heard and decided prior to the exclusivity

4    deadline (which may or may not be necessary), ST&G prepared and filed a motion for an order

5    shortening the notice period on the First Exclusivity Motion, which was granted by this Court.

6    After obtaining a hearing date, ST&G conferred with counsel to the Committee, which filed a

7    pleading in support of the First Exclusivity Motion. Additionally, ST&G prepared and filed a

8    response to the FDIC's statement concerning the First Exclusivity Motion. On May 15, 2010,

9    this Court indicated that it would approve the First Exclusivity Motion without a hearing. ST&G

10   prepared an order granting the First Exclusivity Motion, which was signed by this Court. See

11   Docket No. 138. As a result, the Debtor's plan exclusivity period was extended to June 18, 2010.

12          During the next month, the Debtor made progress resolving the numerous issues

13   mentioned above. However, in order to protect its exclusivity rights, the Debtor decided to file a

14   second motion to extend the exclusivity period (the "Second Exclusivity Motion"). ST&G

15   prepared the Second Exclusivity Motion [Docket No. 174] and additional pleadings in support

16   thereof. As was the case with the First Exclusivity Motion, ST&G conferred with the Committee

17   about the Second Exclusivity Motion, and the Committee filed a statement supporting the

18   Debtor's second request for an exclusivity extension. The FDIC filed an opposition to the

19   Second Exclusivity Motion, and ST&G prepared a reply thereto [Docket No. 191].

20          ST&G prepared for and attended the June 17, 2010 hearing on the Second

21   Exclusivity Hearing. This Court approved the Second Exclusivity Motion, and continued the

22   Debtor's plan filing exclusivity period to September 3, 2010. ST&G prepared an order

23   approving the Second Exclusivity Motion, which was entered by this Court [Docket No. 211].

24          ST&G spent a total of 80.9 hours rendering services in this category, for which

25   ST&G seeks compensation of $50,197.00. See Exhibit E.

26   **11.    Employee Benefits/Plans – Matter No. 110**

27          During the First Period, ST&G devoted time in this category towards compensation

28   requests for the Debtor's insiders. Pursuant to Local Bankruptcy Rule 4002-2, on January 7, 2010,

1    ST&G filed a notice of intended action to compensate Anthony Rusnak, the Debtor's General

2    Counsel and Chief Operating Officer. See Docket No. 28. Additionally, on February 10, 2010,

3    ST&G prepared and filed a notice of intended action to compensate Joseph W. Kiley, III, the

4    Debtor's Chief Executive Officer. See Docket No. 79. This Court set a March 11, 2010 hearing to

5    consider both insider compensation requests.

6           In order to minimize the hardship on Mr. Rusnak in waiting over 60 days to obtain

7    payment for his services, ST&G prepared and filed its "Ex Parte Motion for Order (1) Authorizing

8    Compensation to Anthony Rusnak on an Interim Basis [Local Bankruptcy Rule 4002-2(b)] or (2)

9    Rescheduling Hearing Date on Request for Insider Compensation" (the "Ex Parte Motion") [Docket

10   No. 91]. After filing the Ex Parte Motion, ST&G conferred with the UST about interim payment to

11   Mr. Rusnak and prepared a stipulation authorizing payment to Mr. Rusnak pending the March 11

12   hearing, which was approved by this Court. ST&G attended the March 11 hearing, where the Court

13   authorized Messrs. Kiley and Rusnak to be paid through May 13, 2010.

14          On May 6, 2010, ST&G prepared and filed the Debtor's second insider

15   compensation request, which contained a significant amount of detail regarding Mr. Kiley's and Mr.

16   Rusnak's duties and responsibilities. See Docket No. 158. Two days before the hearing to consider

17   the second request, the FDIC filed an objection that discussed various issues in the case unrelated to

18   Mr. Rusnak's employment. Given the breadth and content of the FDIC's statement, ST&G was

19   forced to prepare and file a reply to the FDIC's objection. See Docket No. 165. ST&G prepared for

20   and attended the hearing on the Debtor's second insider compensation request. At the hearing, the

21   Court authorized the Debtor to compensate Mr. Kiley for the foreseeable future and Mr. Rusnak

22   until June 17, 2010.

23          Finally, on June 10, 2010, ST&G prepared and filed the Debtor's third insider

24   compensation request for Mr. Rusnak. See Docket No. 194. On June 17, 2010, this Court

25   authorized the Debtor to compensate Mr. Rusnak for an additional sixty days.

26          ST&G spent a total of 31.5 hours rendering services in this category, for which

27   ST&G seeks compensation of $16,008.00. See Exhibit E.

28

**12.    Litigation — Matter No. 120.**

This category primarily includes services rendered by ST&G in connection with the Rabbi Trust litigation. As detailed above in Section II.C.3, supra, during the First Period, ST&G prepared the Complaint against the Defendants and conferred with the Debtor about the contents of the Complaint. ST&G filed the Complaint on May 19, 2010, which commenced adversary proceeding number 10-90250-LA. In connection with the filing of the Complaint, ST&G prepared and filed related pleadings, including a summons for each Defendant and notices of compliance with Local Rule 7016-2.

After the filing of the Complaint, ST&G conferred with counsel for three of the individual Defendants to discuss extensions of time to file responses to the Complaint. Based on ST&G's advice, the Debtor entered into a stipulation with Defendant George Haligowski that provided Mr. Haligowski with a thirty day extension to respond to the Complaint.

Additionally, after commencement of the Rabbi Trust adversary proceeding, ST&G contacted Union Bank's counsel to discuss Union Bank's response to the Complaint. Over time, ST&G and counsel to Union Bank negotiated the terms of a stipulated judgment against Union Bank that provided for Union Bank to turn over the Rabbi Trust assets to the Debtor. ST&G prepared the stipulated judgment, a motion to approve the stipulated judgment, and an order regarding the stipulated judgment. This Court entered an order approving the stipulated judgment in July 2010.

Further, during the First Period, ST&G prepared requests for the entry of default against several of the individual Defendants. ST&G submitted declarations in support of such requests that contained the evidence necessary to obtain entries of default under Bankruptcy Rule 7055. The Clerk of Court entered default against several of the individual Defendants in July 2010.

ST&G spent a total of 43.6 hours rendering services in this category, for which ST&G seeks compensation of $25,309.50. See Exhibit E.

# IV.

## SUMMARY OF ACTUAL, NECESSARY EXPENSES

ST&G seeks reimbursement of a total of $29,528.60 in actual, necessary expenses incurred during the First Period. The UST Guidelines require that an application seeking reimbursement of expenses include a summary listing of all expenses incurred, which is attached as Exhibit "F" to the Klausner Declaration. The following description of ST&G's accounting procedures for expenses is provided to assist the Court in reviewing ST&G's expense reimbursement request:

A.    **Computer Research Services**. In the course of its representation of the Debtor, ST&G found it necessary and cost efficient to use computer research services to research certain issues that arose during this case. ST&G bills the actual cost of using PACER, LEXIS and WESTLAW directly to its clients without any surcharge. The total expenses incurred by ST&G in this category during the First Period were $2,739.84.

B.    **Copy Production**. ST&G's internal photocopy projects are electronically logged and billed directly to the client at the cost of twenty-five cents (25¢) per page. This rate is uniformly set by ST&G as its best estimate of the actual costs of furnishing photocopying services, and is comparable to the rate charged by a substantial number of other law firms in the community in both bankruptcy and nonbankruptcy engagements. The total photocopy expenses incurred by ST&G during the First Period were $16,979.23.

C.    **Deposition or Transcript Fee.** ST&G obtained copies of hearing transcripts, which are being charged at the cost billed to ST&G, without any surcharge. The total expenses incurred in this category during the First Period were $832.40.

D.    **Long Distance Telephone/Teleconference**. Long distance telephone charges reflect direct costs for telephone charges (including conference calls) incurred by ST&G in the course of its representation of the Debtor. These telephone charges are billed by ST&G to all of its clients as direct charges, without adding any surcharge. The total expenses incurred by ST&G in the long distance telephone expense category during the First Period were $1,696.70.

E.   **Messenger.**   Urgent time deadlines involved in this case occasionally necessitated the use of independent messengers to deliver documents to parties locally, as well as court messengers.   In such instances, ST&G used outside messenger services, and charged its clients the rates set by such messenger services, without adding any surcharges.   The total expenses incurred by ST&G in this category during the First Period were $986.09.

F.   **Postage.**   The cost of transmitting mail by ST&G is billed directly to its clients.   Postage is logged and billed directly to ST&G's clients through use of a computer system.   ST&G calculates postage costs at the rates set by the Postal Service for the weight and class of a given mailing.   The total expenses incurred in the postage expense category during the First Period were $1,983.89.[5]

## V.

## APPLICABLE AUTHORITY

Section 330(a) of the Bankruptcy Code provides that a Bankruptcy Court may award to a professional person employed under sections 327 or 1103 "reasonable compensation for actual, necessary services rendered by [such] . . . attorney. . . and reimbursement of actual, necessary expenses." 11 U.S.C. § 330(a).  Section 330 also provides the following guidelines for the Court to consider with respect to the amount of compensation to be awarded:

> In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, extent, and the value of such services, taking into account all relevant factors, including-
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed; and

---

[5]   Additional expenses include the following:   (1) $861.02 for air freight, (2) $273.00 for business meals, (3) $276.00 for court filing fees, (4) $330.31 for hotel stay, (5) $266.25 for parking validation, (6) $28.50 for UCC searches, and (7) $1,102 in miscellaneous expenses. All expenses were billed directly to the Debtor without any surcharge.

1

2

       (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

3

11 U.S.C. § 330(a)(3)(A).

4

5

6

      In addition, section 330 prohibits the Court from allowing compensation for "unnecessary duplication of services" or "services that were not . . . reasonably likely to benefit the debtor's estate or . . . necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A).

7

8

9

10

11

12

13

14

15

16

      In determining the award of compensation, courts generally consider "the nature, the extent, and the value of the professional's services". In re Auto Parts Club, Inc., 211 B.R. 29, 33 (B.A.P. 9th Cir. 1997). However, "the primary method used to determine a reasonable attorney fee in a bankruptcy case is to multiply the number of hours expended by an hourly rate." In re Yermakov, 718 F.2d 1465, 1471 (9th Cir. 1983); In re Powerine Oil Co., 71 B.R. 767, 772 (B.A.P. 9th Cir. 1986) (holding that the fees calculated by multiplying the number of hours by the hourly rate creates a presumption of reasonableness); In re Montgomery Drilling Co., 121 B.R. 32, 39 (Bankr. E.D. Cal. 1990). Professional services rendered by ST&G during these cases have been itemized by professional, noting each professional's rate, number of hours and total compensation requested. See Exhibit "E" to the Klausner Declaration.

17

**A.    Reasonableness of Compensation Requested**

18

19

20

21

22

23

24

25

26

27

28

      ST&G requests compensation for attorneys and paralegals at their respective customary hourly rates. The hourly rate of each professional who rendered services in connection with the Debtor's case during the First Application Period is set forth in Exhibit "C" to the Klausner Declaration. Courts have held that the prevailing market rate in the community is indicative of a reasonable hourly rate. See In re Auto Parts Club, Inc., 224 B.R. 445, 449 (Bankr. S.D. Cal. 1998). ST&G regularly conducts a survey of hourly rates charged by law firms that routinely perform work before bankruptcy courts in this district and other districts. Based on the results of its most recent survey, ST&G believes that the hourly rates charged for its members, paralegals, and law clerks are reasonable and competitive with the hourly rates charged by law firms of comparable size and quality that have similar expertise and level of experience as ST&G. ST&G submits that, based upon the factors to be considered pursuant to

section 330 and section 331 of the Bankruptcy Code, the quality of the services provided and the results that have been achieved to date more than justify allowance of the amounts requested.

**B.     Novelty And Difficulty of Legal Questions/Skill Requisite to Performing Legal Services**

Due to the complex nature of the Debtor's case, it has been necessary that ST&G evaluate difficult factual and legal issues. Because of the complex questions of law and fact involved in these proceedings, ST&G has had to exercise considerable skill and expertise in dealing with the particular legal issues that arose.

**C.     Experience, Reputation And Ability Of The Attorneys**

ST&G has an excellent nationwide reputation based upon its experienced and capable group of professionals. ST&G was selected as Debtor's counsel due to the experience and expertise of its attorneys in the areas of bankruptcy and other insolvency-related areas of law. ST&G has represented creditors, debtors, creditors' committees and trustees in insolvency cases and adversary proceedings throughout the United States, and maintains an active insolvency practice. The professional services rendered have been performed by attorneys with a high level of skill in the areas for which they have been employed.

### III.

### CONCLUSION

Based upon all of the foregoing, ST&G respectfully requests that this Court enter an order: (i) allowing, on an interim basis, reasonable compensation in the amount of $561,816.00 for actual, necessary services rendered by ST&G during these cases, and reimbursement in the amount of $29,528.60 for actual, necessary expenses incurred by ST&G during these cases; and (ii) granting such other and further relief as the Court deems to be just and proper.

Dated: July 30, 2010

     /s/ *Gregory K. Jones*
GARY E. KLAUSNER and
GREGORY K. JONES
STUTMAN, TREISTER & GLATT P.C.
Reorganization Counsel for Debtor

## DECLARATION OF GARY E. KLAUSNER[6]

I, Gary E. Klausner, declare as follows:

1.     I am over 18 years of age and have personal knowledge of the matters set forth herein. If called upon, I would testify competently with respect to these matters. I submit this declaration ("Declaration") in support of the First Interim Fee Application of Stutman, Treister & Glatt Professional Corporation (Reorganization Counsel for Debtor and Debtor in Possession) for Compensation of Services Rendered and Reimbursement of Expenses Incurred (December 18, 2009 to June 30, 2010) (the "Application").

2.     I am a member of Stutman, Treister & Glatt Professional Corporation ("ST&G"), reorganization counsel to the Debtor. I either rendered or had supervisory responsibility for ST&G's legal services rendered to the Debtors during the First Period.

3.     Attached hereto are true and correct copies of the following documents:

    a.     Exhibit "A" — a copy of the "Order on Application to Employ Stutman, Treister & Glatt Professional Corporation" entered by the Court on January 20, 2010;

    b.     Exhibit "B" — summary of the experience and qualifications of those members of ST&G who rendered services to the Debtors during the First Period;

    c.     Exhibit "C" - summary, by attorney, paralegal, and law clerk, of the number of hours expended by each attorney, paralegal, and law clerk in rendering services to the Debtors during the First Period, and their respective hourly rates;

    d.     Exhibit "D" - summary of fees incurred for each of the activity categories;

    e.     Exhibit "E" - schedules of ST&G's computer billing records for fees incurred in these cases, by billing category, during the First Period; and

    f.     Exhibit "F" -- breakdown of costs incurred by ST&G during the First Period.

---

[6]   Capitalized terms not otherwise defined herein have the same meaning as in the Application.

1    4.    The Application has been prepared in compliance with the UST

2  Guidelines.  Neither ST&G nor any member of ST&G has any agreement or understanding of

3  any kind or nature to divide, pay over, or share any portion of the fees to be awarded to ST&G in

4  these cases with any other person or attorney, except as among members of ST&G.

5    5.    There are no claims against or stock or other interests in the Debtor or any

6  affiliates of the Debtor in which a beneficial interest has been acquired or transferred to ST&G or

7  any of its members for its or their account before or after the filing of these cases.

8    6.    ST&G recently conducted a survey of hourly rates charged by law firms

9  that routinely perform work before bankruptcy courts in this district and other districts.  Based on

10  the results of this survey, ST&G believes that the hourly rates charged by ST&G for its

11  members, paralegals, and law clerks are reasonable and competitive with the hourly rates

12  charged by law firms of comparable size and quality that have similar expertise and experience

13  level as ST&G.  The survey also indicated that ST&G's hourly rates are lower than the rates used

14  by most of the New York based law firms surveyed and the rates of some of the large law firms.

15    7.    ST&G has not entered into any arrangement or agreement with any person

16  or entity with respect to the sharing of fees and expenses for which ST&G is seeking

17  compensation and reimbursement as set forth herein, except as permitted by section 504(b)(1) of

18  the Bankruptcy Code.  ST&G has not entered into any agreement, express or implied with any

19  other party in interest, or any attorney or other party in interest for the purpose of fixing fees or

20  compensation and reimbursement of expenses incurred.

21    I declare under penalty of perjury that the foregoing is true and correct.

22    Executed this 30th day of July, 2010, at Los Angeles, California.

23

24    /s/ Gary E. Klausner
      Gary E. Klausner

25

26

27

28

**Exhibit "A"**

**ORDER APPROVING EMPLOYMENT OF STUTMAN, TREISTER & GLATT**

542722v1

CSD 1001A [11/15/04]
Name, Address, Telephone No. & I.D. No.
Gary E. Klausner (SBN 69077)
Gregory K. Jones (SBN 181072)
Stutman, Treister & Glatt Professional Corporation
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600/Fax: (310)228-5788

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

Imperial Capital Bancorp., Inc.

Debtor.

BANKRUPTCY NO. 09-19431-LA11

Date of Hearing:
Time of Hearing:
Name of Judge: Adler

## ORDER ON

### Application to Employ Stutman, Treister & Glatt Professional Corporation

IT IS ORDERED THAT the relief sought as set forth on the continuation pages attached and numbered two (2)

through __2__ with exhibits, if any, for a total of __2__ pages, is granted. Motion/Application Docket Entry No. __33__

//
//
//
//
//
//

DATED:
January 20, 2010

Signature by the attorney constitutes a certification under
Fed. R. of Bankr. P. 9011 that the relief in the order is the
relief granted by the court.

Submitted by:

Stutman, Treister & Glatt, P.C.
(Firm name)

By: /s/ Gregory K. Jones
Attorney for ☑ Movant ☐ Respondent

Judge, United States Bankruptcy Court

CSD 1001A

CSD 1001A [11/15/04] (Page 2)
ORDER ON Application to Employ Stutman, Treister & Glatt Professional Corporation
DEBTOR: Imperial Capital Bancorp., Inc.                                                   CASE NO: 09-19431-LA11

Upon review and consideration of the "Application for an Order Pursuant to 11 U.S.C. Sections 327(A) and 329 Authorizing the
Employment and Retention of Stutman, Treister & Glatt Professional Corporation as Reorganization Counsel for the Debtor
and Debtor in Possession" (the "Application") filed by Imperial Capital Bancorp, Inc., debtor and debtor in possession in the
above-captioned case (the "Debtor") and the "Declaration and Federal Rule of Bankruptcy Procedure 2016(B) Statement of
Gary E. Klausner in Support of Application for an Order Pursuant to 11 U.S.C. Sections 327(A) and 329 Authorizing the
Employment and Retention of Stutman, Treister & Glatt Professional Corporation as Reorganization Counsel for the Debtor
and Debtor in Possession" (the "Klausner Declaration"); and it appearing that the attorneys at Stutman, Treister & Glatt
Professional Corporation are disinterested persons who do not hold or represent an interest adverse to the Debtor's estate in
the matters upon which they are to be engaged, and that their employment for the purposes set forth in the Application is in the
best interest of the Debtor and its estate; notice of which was sufficient and proper, and it appearing that good cause exists for
the relief sought in the Application,
NOW, THEREFORE, IT IS HEREBY ORDERED THAT:
1. The Application is granted as set forth herein.
2. The Debtor is authorized to employ Gary E. Klausner, Gregory K. Jones, and other members, associates, and attorneys of
counsel to Stutman, Treister & Glatt Professional Corporation as of the commencement of the above-captioned chapter 11
case, for the purposes and on the terms set forth in the Application, with compensation at the expense of the Debtor's estate.

CSD 1001A

*Signed by Judge Louise DeCarl Adler January 20, 2010*

**Exhibit "B"**

**BIOGRAPHIES OF MEMBERS OF
STUTMAN, TREISTER & GLATT
RENDERING SUBSTANTIAL SERVICES TO THE DEBTOR**

**Gary E. Klausner:** Mr. Klausner is a senior shareholder at Stutman, Treister & Glatt. He received a B.A. in 1971 from the University of Maryland and a J.D. with honors in 1974 from the University of Maryland School of Law. He served on the editorial staff of the University of Maryland Law Review from 1972 to 1973. He was admitted to practice law in the State of Maryland in 1974 and California in 1976. He is also admitted to practice before the United States District Court for the Central District of California, the United States Circuit Court of Appeals for the Ninth Circuit and the United States Supreme Court.

Since 1976 Mr. Klausner has devoted his practice exclusively to bankruptcy, corporate reorganization and debtor/creditor matters and has represented chapter 11 debtors, secured and unsecured creditors, creditors' committees, trustees and receivers, licensors and franchisors, purchasers of assets out of bankruptcy cases and parties involved in litigation and appeals in connection with bankruptcy cases. He has handled cases involving a broad range of businesses and industries, including real estate development, hotels and restaurants, manufacturing, aerospace, retail, entertainment, transportation and health care.

In addition to client matters, Mr. Klausner has been actively involved and has held prominent positions in local and national professional organizations and bar associations. Mr. Klausner is a member of the Board of Governors of the Financial Lawyers Conference and served as its President from 1993 through 1994. He is a Board member of the Los Angeles Bankruptcy Forum (serving as its President in 2003-2004), a member of the American Bar Association, Section on Business Law, where he chaired a task force on The Economics of Chapter 11 Practice, and is Chair of the Subcommittee on Bankruptcy Fraud, Crimes and Abuse of the Bankruptcy Process. He is a member of the Los Angeles County Bar Association, where he has served as a member of the Executive Committee of the Commercial Law and Bankruptcy Section as well as being Vice-Chair of the Section's Bankruptcy Committee.

Mr. Klausner lectures frequently on subjects involving bankruptcy and commercial law and has published numerous articles on bankruptcy-related topics. Mr. Klausner authored "Section 1111(b) Look Before You Leap," 2 Bankruptcy Study Group Journal 15 (1986). He also co-authored "Chapter 11: The Bank of Last Resort," The Business Lawyer, November, 1989; Vol. 45, No. 1, and "The New Bankruptcy Rules," 4 Bankruptcy Study Group Journal 64 (1987). Mr. Klausner was an adjunct Professor of Law at Southwestern University School of Law from 1982 through 1986.

The numerous chapter 11 debtors whom Mr. Klausner has represented include Mr. Gasket Co. and Prism Entertainment Corporation, both of which are public companies, Packaging Corporation of America; Super Shops, Inc.; Cannon Pictures; Maguire Thomas Partners; Fifth & Grand, Ltd.; ABC International Traders, Inc.; Maxicare; Watts Health Foundation, Inc., dba UHP Healthcare; and Valley Health System. Mr. Klausner has represented creditors committees in cases such as Consolidated Freightways, Westward Ho Markets, Naki Electronics, Prime Matrix, The Movie Group, American Restaurant Group and Solidus Networks, Inc.

542722v1

**Eve H. Karasik:** Ms. Karasik is a senior shareholder of ST&G. She attended the University of California, Berkeley, where she received her B.A. in History in 1984 with High Honors, and then attended the University of Southern California, receiving her J.D. in 1991. At USC she was admitted to the Order of the Coif.

She served as the Managing Editor of the University of Southern California Computer Law and Major Tax Planning Journals. Ms. Karasik is the author of "A Normative Analysis Of Disclosure, Privacy, and Computers: The State Cases," 10 Computer/L.J. 603, 1990.

Ms. Karasik's practice is focused primarily on the representation of operating debtors in chapter 11 cases, as well as creditor and equity committees, in venues throughout the country. Her more recent debtor engagements include Utah 7000, LLC., *et al* ( Salt Lake City, UT); Falcon Products, Inc., *et al* ( St. Louis, MO); Clark Retail Group *et al* ( Chicago, IL); MJ Research, Inc. ( Reno, NV); and U.S. Aggregates, Inc.*et al* ( Reno, NV). Creditor and equity committee representations include Eurofresh, Inc. *e tal* ( Phoenix, AZ), USA Capital First Trust Deed Fund ( Las Vegas, NV), Aladdin Gaming, Inc. ( Las Vegas, NV) and Amerco ( Reno, NV). She also served as counsel to the Trustee in the Securities Investor Protection liquidation proceeding of W.S. Clearing, Inc. She is currently serving as counsel to the Examiner in the Fontainebleau Las Vegas Holdings, LLC, *et al* ( Miami, FL).

**Mark S. Wallace:** Mr. Wallace is of counsel to ST&G. He received his A.B., summa cum laude, from Princeton University in 1976, and received his J.D. from Columbia University School of Law in 1977. He was a member of Phi Beta Kappa. He was admitted to the Arizona bar in 1977 and the California bar in 1991.

Mr. Wallace was the Notes and Comments Editor of the Columbia Law Review from 1976 to 1977. He served as a Law Clerk to Judge William B. Enright in the U.S. District Court, Southern District of California from 1977 to 1979.

He is the author of "Practical Aspects of Representing the Failing Business" 44 Major Tax Planning 400 (1992), "Reorganizing The Financially-Troubled Taxpayer", 46 Major Tax Planning 800 (1994), and "Distressed Technology Companies Face Challenging Tax Issues", 24 Los Angeles Lawyer 13 (October 2001) and "Dealing With Individual and Corporate Tax Claims and Litigating with Tax Authorities in Bankruptcy Court", 57 Major Tax Planning 1100.

Mr. Wallace is currently serving as an Adjunct Professor of Law at Loyola Law School, where he teaches bankruptcy and taxation. He served as Adjunct Professor of Law at Arizona State University for the years 1984 through 1986 and 1988.

He is a part Chair of the Bankruptcy and Workouts Committee of the American Bar Association Section of Taxation.

He is a member of the following bar associations: Beverly Hills, Los Angeles County (Member, Commercial Law and Bankruptcy Section; Taxation) and American (Member, Sections of Taxation, Corporate Tax Committee). He is a member of the State Bar of California.

542722v1

**Gregory K. Jones:** Mr. Jones is of counsel to ST&G. He was born in Torrance, California in 1970 and attended the University of California, Los Angeles, where he received a B.A. in Political Science, magna cum laude, in 1992 and a J.D. in 1995.

Mr. Jones was admitted to the state bar of California in 1995 and is authorized to practice in the U.S. District Court, Southern, Central and Northern Districts of California and the U.S. Court of Appeals, Ninth Circuit. At the UCLA School of Law, Mr. Jones was Managing Editor for the UCLA Law Review and author of the article "The Classification and Cram Down Controversy in Single Asset Bankruptcy Cases: A Need for the Repeal of Bankruptcy Code Section 1129(a)(10)," 42 UCLA Law Review 623, 1994. Mr. Jones was the recipient of the 1994 Los Angeles Bankruptcy Forum Writing Award for this article.

Mr. Jones has been involved in numerous bankruptcy cases where he represented debtors, including the County of Orange, L.A. Gear, Liberty House, Inc., StorMedia, Inc., SmarTalk Communications, Boston Markets, U.S. Aggregates, Inc., The Resort as Summerlin, Inc., Watts Health Foundation, Inc., d/b/a UHP Healthcare, and The Kushner-Locke Company. Mr. Jones also represented the Official Committee of Unsecured Creditors in the bankruptcy case of Consolidated Freightways, Inc.

Mr. Jones is a Member of the State Bar of California (Business Law Section); the American Bar Association (Business Law Section); the Los Angeles County Bar Association (Commercial Law and Bankruptcy Section); the Los Angeles Bankruptcy Forum; and the Financial Lawyers Conference.

Reported Cases: In re Colortran, Inc., 210 B.R. 823 (Bankr. 9th Cir. 1997); Expeditors International of Washington, Inc. vs. Citicorp North America, 218 B.R. 507 (Bankr. 9th Cir. 1997); White vs. County of Orange, 88 Cal.App.4ᵗʰ. 298 (Cal. Ct. App. 2001).

**Whitman L. Holt:** Mr. Holt has been a member of ST&G and the California bar since 2005. He is admitted to practice before the U.S. District Courts for the Northern, Central, and Southern Districts of California, as well as before the U.S. Courts of Appeals for the Second and Third Circuits.

Mr. Holt attended Bates College, where he received his B.A.,*magna cum laude,* in 2002 and was elected a member of Phi Beta Kappa. He then attended Harvard Law School, where he received his J.D., *cum laude,* in 2005 and served as an Editor of the Harvard Journal of Law & Public Policy.

Mr. Holt has represented clients across the bankruptcy spectrum. His work on the side of the bankruptcy estate includes representing Fremont General Corporation as a chapter 11 debtor in possession and representing the liquidation trust formed in the *Oakwood Homes* bankruptcy. His work on the side of individual creditors includes representing significant debtholders in the *Lehman Brothers, Washington Mutual, Enron, Calpine,* and *Owens Corning* bankruptcies. Mr. Holt has also represented borrowers in and out of court, secured creditors in and out of bankruptcy, hedge and distressed debt funds, plaintiffs and defendants in bankruptcy-related litigation and appeals, and prospective purchasers of debtors' assets. Mr. Holt also has experience regarding various alternative insolvency regimes, including bank and thrift receiverships under title 12 of the U.S. Code and proceedings for troubled insurers under state law.

Mr. Holt is a regular participant in educational seminars and panels regarding bankruptcy and commercial law. He has also guest-lectured about bankruptcy and tax law at the USC and Loyola Law Schools. Mr. Holt's professional interests include the interface between credit derivatives and bankruptcy, the outer limits of federal bankruptcy jurisdiction and power, and methods of improving the economic efficiency of chapter 11.

542722v1

**Exhibit "C"**

**Summary of Hours By Professional**

542722v1